IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| DENVER FOOTE,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN DOE 1[1], BRANDON HOLTON, ADAM HERMAN, CLARK ALLEN, ERNESTO ESCOBAR HERNANDEZ; JEFFREY GEORGE, KIRK BAGBY, DANA WINGERT; and the CITY OF DES MOINES, IOWA,<br><br>Defendants. | Case No.  4:21-cv-00043<br><br><br>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ....................................................................................3
STATEMENT OF UNDIPSPUTED FACTS ...............................................................3
SUMMARY JUDGMENT STANDARDS ................................................................12
ARGUMENT ............................................................................................................13

I.     Summary Judgment Must Be Granted to Officers Holtan, Herman, Bagby, Allen, Escobar Hernandez, and George on Count I, the 4th Amendment to the United States Constitution Claim for the Arrest of Denver Foote .........................................13
II.    The Officers are Entitled to Summary Judgment for the Arrest of Denver Foote Under the Iowa Constitution and for the Tort of False Arrest....................................21
III.   Officers Holton and Herman are Entitled to Summary Judgment on Counts III, IV and XV Related to the Force Used in Arresting Denver Foote .............................25
IV.    Officers Holton, Herman, Bagby, Allen, Escobar-Hernandez, and George Are Entitled to Qualified Immunity Under Counts V and VI Because Their Actions Were Not Retaliatory Against First Amendment Activity .......................................33
V.     Officers Holton, Herman, Bagby, Allen, Escobar-Hernandez, and George Are Entitled To Qualified Immunity For Counts VII and VIII and Because They Did Not Conspire to Violate Foote's Constitutional Rights ........................................36
VI.    The City and Wingert are Not Liable For Deliberately Indifferent Policies, Practices, Customs, Training and Supervision; Summary Judgement Should be Granted to Them on Counts IX and X ............................................................................39

---

[1] The Plaintiff has never identified John Doe 1, and based on information and belief after a robust discovery process, John Doe 1 is not a City of Des Moines Police Officer. The instant Motion for Summary Judgment is not filed on his or her behalf.

VII.    Because the Force Used Against Her was not Outrageous nor is Her Distress Severe, Ms. Foote's Intentional Infliction of Emotional Distress Claim Fails ............. 42
VIII.   Ms. Foote cannot prevail on her malicious prosecution claim when there was probable cause for her arrest and her prosecution was not motivated by malice .......................................................................................................... 46
IX.     Ms. Foote's libel claims fail as a matter of law ................................................ 48

CONCLUSION .......................................................................................................... 52

## SUMMARY OF ARGUMENT

There are no disputed factual issues in this case. Much of the events are captured on video, and the Defendants accept Ms. Foote's deposition testimony of events for purposes of summary judgment. Based on this undisputed record, the officers had probable cause to arrest Ms. Foote. The presence of probable cause thwarts nearly all of Foote's arguments, including the First Amendment retaliation claims, the conspiracy allegations, and the common law torts. Further, there is no clearly established law to be free from seizure when one deliberately places oneself in the middle of a riot and then flees only when police become present. It is also uncontroverted that the force used was within acceptable police practices, especially in the context of a riot. Finally, the record is devoid of any evidence that the City of Des Moines or Chief Wingert were deliberately indifferent, or in any way, failed in hiring, training, and supervising these officers.

## STATEMENT OF UNDISPUTED FACTS

**Foote's Actions on May 29, 2020**

Denver Foote attended a planned protest on May 29, 2020, and after the event concluded, she continued with a group who marched to where the police keep their personal vehicles. (App. at 12-13) On May 29, 2020, the Des Moines Police Department worked with protest organizers to assist with creating space for the protests regarding George Floyd's killing to occur in the immediate vicinity of the Des Moines Police Department. (App. at 500-508) The support the Department provided included blocking traffic at the intersections of E. 2nd Street and Court Avenue and River Drive and Court Avenue to allow safe movements of protesters in the road without threat of car traffic. (App. at 500)

Several individuals made speeches and the sizable crowd was peaceful. (App. at 500) The planned protest was scheduled to last for a set period of time. (App. at 500) At the close of the planned protest, organizers advised the attending crowd that the event was completed. (App. at 500)

Many people left at that time but a crowd of more than one hundred remained. (App. at 500) Those that remained were becoming increasingly agitated and confrontational. (App. at 500)

Command staff was monitoring the activity as there was concern about a potential attack on the Police Department building, as had just occurred in Minneapolis the day before. (App. at 500) As command staff was monitoring, they learned that the crowd had targeted Des Moines Police Officer Sidik Becirovic, who was alone in his marked vehicle blocking traffic at East 2nd and Court Avenue. (App. at 501, 503) Eventually, Officer Becirovic was forced to deploy OC spray, commonly referred to as mace or pepper spray, in order to escape the threat of the people attacking him and his vehicle. This was, of course, in the immediate vicinity of the crowd that remained after the planned protest ended. (App. at 501)

It was the actions of the crowd toward Becirovic that caused command staff to direct that a protective line be put in place to ensure the security of the Police Department building. (App. at 501) This protection was absolutely imperative for public safety because there were employees working inside, and also because there are firearms, seized narcotics, and money inside the building. (App. at 501) The protective line was made up of uniformed officers. (App. at 501) Those officers began to be assaulted by the crowd, which was by this time growing rather than diminishing. (App. at 501)

Social media and mainstream media were providing live information about the events, which prompted additional people to join in the disturbance. (App. at 501) The assaults on law enforcement included being hit with water bottles—some frozen for greater impact, rocks, broken concrete, and landscaping blocks. (App. at 501, 503) Once the crowd became this violent, it was clear that the tactical squad, STAR Team, was needed. (App. at 501)

Once STAR Team, a multi-agency tactical squad, was in place, the uniformed officers were able to drop back and protect other portions of the Police Department campus. (App. at 501). The assault on officers continued and the crowd continued to grow. (App. at 501) As such, Assistant Chief Allan Tunks made the decision to make dispersal orders. (App. at 501, 805) Tunks did so through the Public Address "PA" system in a patrol car parked immediately at the line between the STAR Team and the crowd. (App. at 501, 805) Tunks made at least three dispersal orders, with ample time to allow for compliance, to no effect. (App. at 501, 805)

There were also community leaders out talking to members of the crowd trying to get them to stop the violence and disperse, also to no effect. (App. at 501) Based on the escalating threat and violence, and after consulting with the commander for STAR Team, Tunks made the decision to deploy a riot control agent, CS gas, commonly referred to as teargas. (App. at 501) This was done in stages to allow for people to exit the area. (App. at 501)

Officers had to deploy CS gas several times in order to get dispersal compliance. (App. at 501) Only when tear gas was deployed, Foote left the area. (App. at 13) Tunks can say with a high level of certainty, if a person was in the crowd outside the Police Department on May 29, 2020, leaving only when teargas was deployed, that person witnessed criminal violence against police officers and criminal violence against public and private property. (App. at 501, 503-508, 509-511)

**Foote's Actions on May 30-31, 2020**

Then again, on May 30, 2020, Foote attended an in-progress march in downtown Des Moines that spanned along the streets between the Polk County Courthouses to the Capitol. (App at. 14-16, 177) She was wearing black jeans, Puma sneakers, a red bandana, and a black rain jacket. (App. at 27-28) Foote was equipped with goggles. (App. at 27)

Foote was present at the area of the county courthouses at approximately 9:45 p.m. (App. at 239) At the courthouses, Foote observed people confronting officers, and she remained in the area. (App. at 16) At the courthouses, Foote heard breaking glass and chose to remain in the area, despite her concerns about the crowd escalating. (App. at 16-18) This was during the same gathering when an individual attempted to light the historic Polk County courthouse on fire. (App. at 512, 507-508, 806)

After some period of time, Foote proceeded with others to the Capitol. (App. at 17) She remained at the Capitol for approximately two hours. (App. at 17, 19) The first dispersal order was given over a loudspeaker at the Capitol at 11:08 p.m. (App. at 805) After there was no compliance with the first dispersal orders, second and third dispersal orders were given by 11:11 p.m. and the crowd still failed to disperse. (App. at 805) A final dispersal order was given over loudspeaker 11:12 p.m. (App. at 805)

Foote was primarily "loitering down by the front street in between the garden and where the stairs start" within approximately 25 feet of the police line around the Capitol. (App. at 24) Again, not until teargas was deployed by an unknown source did Foote leave the Capitol area. (App. at 19) She acknowledged that the point of deploying teargas was to get the crowd to disperse. (App. at 20) Up to that point, no officer had engaged in any way with Foote despite hours of alleged First Amendment activity.[2] The teargas deployed by unknown law enforcement members caused irritation to Foote's eyes; she was not wearing her goggles at the time. (App. at 27)

When she left, she traveled with a crowd that was leaving the Capitol toward Court Avenue. (App. at 30) She witnessed individuals breaking windows at a parking garage where she was located. (App. at 32-33) It was at this point that Foote decided to disperse from the area. (App. at

---

[2] It should be noted that Foote's petition does not indicate what First Amendment activity in which she was supposedly engaged, whether it be redress of government, expression or association.

33) She was concerned about the behavior of the rioters at this point. (App. at 33) Foote returned

home with her partner, Jacob Grobe. (App. at 37) They stayed home for approximately two hours,

from approximately midnight to 2:00 a.m. (App. at 37)

Then, Foote and Grobe returned to the Court Avenue area to look for a friend, Miranda

Nicolai. (App. at 38) When they parked, they walked toward Court Avenue and saw people

loitering in the area with no police presence. (App. at 39) Foote and Grobe found their friend at a

corner of Court Avenue and 3rd Street, where people were placing trash cans in the street to block

traffic. (App. at 39-40, 42, 244) Even though Foote recognized they should leave the area, she

didn't. (App. at 40)

Despite seeing this, she walked westward, away from her vehicle, with others to watch the

events on Court Avenue. (App. at 40-41) While she was in the immediate vicinity, Foote saw

people break the windows at Spaghetti Works restaurant. (App. at 41) She traveled west on Court,

past Tonic, Johnny's Hall of Fame and Spaghetti Works, all of which had broken windows that

happened in her immediate contemporaneous vicinity. (App. at 90-91)

Foote and Grobe, who were standing at Court Avenue and 3rd Street at 2:35 a.m. amongst

broken glass and detritus from the ongoing riot, noticed that people began to run from the area.

(App. at 91, 250) In response, at approximately 2:36 a.m., Foote and Grobe ran also, but Foote had

no idea why people, or they themselves, were running. (App. at 91, 252) She acknowledged that the

people who were running were likely the people who had been smashing businesses. (App. at 91)

Foote ran north through an alley between third and fourth streets on Court, then east back out to 3rd

Street. (App. at 94-95) Foote, Grobe and Nicolai stood in front of Outlaws bar for a period of time.

(App. at 821 and 807 at 2:41:08 a.m.)

Again, rather than leaving the area, Foote and her companions went back into the scene of rioting and looting, of which Foote was directly aware. (App. at 95 and 807 at 2:41:53 a.m. Foote and her companions reached the northwest corner of 3rd Street and Court Avenue and stayed there observing for around 40 seconds. (App. at 807 at 2:42:55 a.m. to 2:43:08 a.m.) Shortly after, Foote and her companions saw law enforcement moving toward them, southbound on 3rd Street toward Court Avenue. 9 (App. at 96-97) In response, Foote's two companions ran. (App. at 96-97)

**Officers Holton and Herman's Actions on May 30-31, 2020**

Holton and Herman serve on STAR Unit 1. (App. at 518, 599) STAR Team stands for Special Tactics And Response Unit. (App. at 668) STAR Team includes individuals from surrounding law enforcement agencies, not just the City of Des Moines Police Department. (App. at 670) The mission of the Metro Special Tactics and Response Unit is to provide the public with a prepared and professional emergency response and defensive capability to manmade and naturally occurring critical incidents. This is achieved through the combination of management, professional training, and the use of specialty equipment and techniques. (App. at 671)

Holton had been on-call May 30, 2020 in his capacity as a STAR Unit member. (App. at 654) Holton worked approximately 19 hours that day. (App. at 652) During this shift, several officers were injured. (App. at 652) Herman knew that the crowd was throwing fireworks at the police line, as well as gasoline and glass bottles. (App. at 529-530) Herman saw an officer get hit in the head around 11:00 p.m. (App. at 529-530) Herman had never experienced a shift of policing that was as "chaotic" and "stressful" as May 30-31. (App. at 581)

The officers, after being released from their shift, were told they had to go back on shift to respond to the Court Avenue area, specifically because the HyVee on Court Avenue was being broken into. (App. at 530, 581, 811) They traveled to that area in a cube van. (App. at 525) They

parked by the federal building on Walnut Street. (App. at 630) The goal at that time was to secure

the parking ramp at 3rd and Court because there was violent activity occurring there. (App. at 578,

621) As such, Holton and Herman progressed from the intersection of Walnut and 3rd Street. (App.

at 807)

**The Arrest of Denver Foote**

When Officer Holton first saw Foote, she was running on 3rd Street. (App. at 823). STAR

Unit 1 initially arrived at the building belonging to Annie's Irish Pub at 2:43:09 a.m. (App. at 807)

Officers began running within a second or two of arriving at Annie's Pub. (App. at 807 at 2:43:10

a.m.) Foote was standing close to a nook at Annie's Pub. (App. at 64) She expected to get arrested.

(App. at 56)

An unknown officer sprayed Foote in the eyes with pepper spray. (App. at 54) Holton gave

verbal commands to get on the ground and when Foote did not, Holton deployed a "very short"

spray to Foote that mostly hit her mask. (App. at 55, 618) Holton then pushed Foote into the nook at

Annie's by using his shield. (App. at 57) After she was already against the wall, Herman also

pressed his shield against Foote, in effect boxing her in. (App. at 58)

While Foote was still standing, she believes Herman gave three strikes with his baton—

though she could not see the object, which Foote reports struck her arm, ribs and thigh. (App. at 59,

62) Once hit with the baton, Foote stated she wasn't resisting. (App. at 60) At this point, Foote fell

to the ground. (App. at 63) While on the ground, an officer held her to the ground with a knee to her

back until they could get her handcuffed with zip-ties. (App. at 64, 824)

All of these uses of force are "minimally intrusive" and consistent with training and best

practices. (App. at 817) Foote's glasses came off during her arrest. (App. at 65) Foote believes she

saw an officer step on her glasses, even though she couldn't discern between officers without her

glasses. (App. at 65, 66) Foote does not know if that was an accident. (App. at 66) The officers did

not deliberately step on Foote's glasses. (App. at 577) The officers did not arrest Foote for

exercising her First Amendment rights; Foote was no longer protesting in any event. (App. at 155,

653, 580)

Foote was escorted by two officers toward a wagon. (App. at 808 at 2:46:04) Allowing time

to walk to the spot where this escort is seen on video, the entire arrest took under 3 minutes. (App. at

740 at 2:46:04) Foote was then escorted to a transport vehicle at approximately 2:46:45 a.m. (App.

at 741 at 4:34) Foote was placed in the transport vehicle and taken to jail by Officers Clark Allen

and Ernesto Escobar. (App. at 684-685)

## Charging Decisions

There were ongoing communications with the County Attorney on what the charges on

individuals should be. (App. at 686-687) While the arrests were being processed, there was direction

to charge everyone with criminal mischief and rioting. (App. at 810 at 1:05) That information was

given to Officers Allen and Escobar by Lieutenant Kirk Bagby. (App at 810 at 1:05) Neither officer

knows if Bagby actually made the charging decision or just passed the information on. (App. at 752,

789) Bagby did not make charging decisions; rather he was relaying information from command

staff to individuals transporting arrestees to jail. (App. at 828)

In the afternoon of May 31, 2020, the County Attorney provided updated charging

information to (then) Sergeant Chad Nicolino and directed that all charges be refiled as Rioting

(723.1), Unlawful Assembly (723.2) and Failure to Disperse (723.3). (App. at 686-687, 799-804)

Officer Jeff George was called in to assist Nicolino with filing the new charges. (App. at 691)

Officer George relied on the arrest report and previous criminal charges to file the affidavit on the

preliminary complaint. (App. at 705-706, 722)

**Emotional Distress**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**Written Documents**

Officer Allen completed a form titled Jail Booking Information about Ms. Foote's arrest. (App. at 827) Officer Allen also completed an Arrest Report regarding Ms. Foote's arrest. (App. at 826) On June 10, 2020, Officer Holtan completed a supplemental report regarding Ms. Foote's arrest describing the events leading up to and during her arrest. (App. at 823) On June 10, 2002, Officer Herman completed a supplemental report regarding Ms. Foote's arrest describing events leading up to Ms. Foote's arrest, the arrest, and events afterward. (App. at 824)

**Policies and Training**

The City of Des Moines has policies that specifically direct officers to observe the constitutional rights of individuals they encounter, including during protest activity. (App. at 833-834, 838-882, 898-1023, 1024-1036) All officers, including the named officers, have been trained to observe the constitutional rights of individuals. (App. at 1037-1148) All named officers have been trained on arrest protocols, use of force and various statutes. (App. at 883-897, 898-1023, 1024-1036, 1037-1148) In 2020 alone, prior to the riots, Adam Herman received more than 20 hours of training. (App. at 1139-1142) Holton, in that same time period received 26 hours. (App. at 1135-1138) Clark Allen received 21 hours in early 2020. (App. at 1148) Escobar-Hernandez received 19 hours of training in 2020, prior to the riots. (App. at 1147) Jeff George had 13 hours in that same time period. (App. at 1143-1146)

## SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56(c) provides that summary judgment is warranted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the Defendants are entitled to a judgment as a matter of law.  Summary judgment is appropriate if the record, viewed

in the light most favorable to the nonmoving party, reveals no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Woods v. Daimler Chrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). While the movant bears the initial responsibility of informing the district court of the basis for its motion and must identify the undisputed material facts of record, the non-moving party must do more than simply show there is some metaphysical doubt as to the material facts. *Baldwin,* 333 F.Supp. 3d at 833 (citing *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011)(*en banc*) internal citations omitted), "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *Peters*, 979 F. Supp. at 926 (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (*en banc*)). In describing how to approach a motion for summary judgment, the Eighth Circuit has observed that the "substantive law determines which facts are relevant and which are immaterial. Only disputes that might affect the outcome will properly preclude summary judgment. *Krueger v. Fuhr,* 991 F.2d 435, 438 (8th Cir. 1993) (all internal citations omitted).

<u>ARGUMENT</u>

**I. Summary Judgment Must Be Granted to Officers Holtan, Herman, Bagby, Allen, Escobar Hernandez, and George on Count I, the 4th Amendment to the United States Constitution Claim for the Arrest of Denver Foote.**

"Qualified immunity shields government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." *Yowell v. Combs*, 89 F.3d 542, 544 (8th Cir. 1996). "What this means in practice is that

'whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.'" *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). The applicable standard in such cases is viewed from the totality of the circumstances and judged from the viewpoint of a reasonable officer -- irrespective of the officer's underlying intent or motivation. *McCoy v. City of Monticello*, 342 F.3d 842, 848 (8th Cir. 2003).

Qualified immunity is an immunity from suit rather than a mere defense to liability… it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As the Eighth Circuit has noted, "[t]he Supreme Court has generously construed qualified immunity to shield 'all but the plainly incompetent or those who knowingly violate the law.'" *Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Littrell*, 388 F.3d at 582. To overcome qualified immunity inquiry, Foote must establish that the defendants were "intentional or reckless, thereby shocking the conscience." *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 672 (8th Cir. 2007) (citing *Wilson v. Lawrence County, Mo.*, 260 F.3d 946, 955-56 (8th Cir. 2001)). Mere negligence will not suffice. *Id.*

Courts use a two-part test when determining whether a lawsuit against an official may proceed under a qualified immunity assertion. First, the court must determine whether, "taken in the light most favorable to the party asserting the injury… the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the

court must determine whether the right in question was "clearly established." *Id*. For the right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." *Buckley v. Rogerson*, 133 F. 3d 1125, 1128 (8th Cir. 1998).

As a consequence, a plaintiff is required to point to closely analogous cases or show that the right is so clear that no one thought it worthwhile to litigate the issue. *Dunn v. City of Elgin*, 347 F.3d 641, 650 (8th Cir. 2003). "If either question is answered in the negative, the public official is entitled to qualified immunity." *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007) (quoting *Vaughn v. Ruoff*, 253 F.3d 1124, 1128 (8th Cir. 2001)). Both of these questions are answered in the negative for the reasons set forth below.

### I.A. THERE WAS PROBABLE CAUSE FOR THE ARREST OF DENVER FOOTE, SO THERE WAS NO CONSTITUTIONAL VIOLATION

The first part of the qualified immunity test answers the question of whether there has been a violation of the Fourth Amendment to the United States Constitution. If the answer is no, then, no further analysis is needed as to immunity. The question of false arrest is answered, as well. In sum, the arrest of Denver Foote was supported by probable cause. As such, summary judgment as to Count I must be granted in favor of all named officers.

The Constitution prohibits arrests that are not based on probable cause. *Clay v. Conlee*, 815 F.2d 1164, 1167–68 (8th Cir. 1987).

> Whether [an] arrest was constitutionally valid depends ... upon whether, at the moment the arrest was made, the officers had probable cause to make it-whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [person arrested] had committed ... an offense. *Beck v. Ohio,* 379 U.S. 89 (1964).

"Probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be …useful as evidence of a crime; it does not require a showing that a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983)[internal citations omitted].

> As stated in 5 Am.Jur.2d *Arrest* § 48, at 740–41 (1962):
>
> The existence of 'probable cause,' justifying an arrest without a warrant, is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. It is a pragmatic question to be determined in each case in the light of the particular circumstances and the particular offense involved.
>
> Probable cause does not depend on the actual state of the case in point of fact, as it may turn out upon legal investigation, but on knowledge of facts and circumstances that would be sufficient to induce a reasonable belief in the truth of the accusation. It depends on the facts known, at the time of the arrest, to the person by whom the arrest is made, from which it follows that an arrest cannot be justified by what a subsequent search discloses. On the other hand, if probable cause existed at the time of the arrest, the fact that investigation proves the person arrested to be innocent does not make the arrest unjustifiable.
>
> In determining probable cause, all the information in the officer's possession, fair inferences therefrom, and observations made by him, are generally pertinent; and facts may be taken into consideration that would not be admissible on the issue of guilt.

*Children v. Burton*, 331 N.W.2d 673, 680 (Iowa 1983).

The State of Iowa also uses a different standard of probable cause analysis depending on whether cases are criminal or civil. "In dealing with civil damage actions for false arrest, courts apply a probable cause standard less demanding than the constitutional probable cause standard in criminal cases. If the officer acts in good faith and with reasonable belief that a crime has been committed and the person arrested committed it, his actions are justified and liability does not attach." *O'Neill v. Keeling*, 227 Iowa 754, 758, 288 N.W. 887, 889 (1939); *Greer v. Turner*, 639 F.2d 229, 231–32 (5th Cir.1981); *Dellums v. Powell*, 566 F.2d 167, 175 (D.C.Cir.1977), *cert.*

*denied,* 438 U.S. 916 (1978); *Hill v. Rowland*, 474 F.2d 1374, 1377 (4th Cir.1973); *Wilcox v.*

*United States*, 509 F.Supp. 381, 384–85 (D.C.C.1981); *Gueory v. District of Columbia*, 408 A.2d

967, 969 (D.C.App.1979); *Mitchell v. Drake*, 360 N.E.2d 195, 198 (1977); *Terry v. Zions*

*Cooperative Mercantile Institution*, 605 P.2d 314, 320–21 (Utah 1979); *Town of Jackson v.*

*Shaw*, 569 P.2d 1246, 1250 (Wyo.1977).

The named officers had probable cause to arrest and charge Ms. Foote with unlawful

assembly, rioting, unlawful assembly, and failure to disperse.[3] The charges are defined below.

> Iowa Code §723.1 Participation in a Riot: A riot is three or more persons
> assembled together in a violent manner to the disturbance of others, and with any
> use of unlawful force or violence by them or any of them against another person,
> or causing property damage. A person who willingly joins or remains a part of a
> riot, knowing or having reasonable grounds to believe that it is such, commits an
> aggravated misdemeanor.[4]

> Iowa Code § 723.2 Unlawful Assembly: An unlawful assembly is three or more
> persons assembled together, with them or any of them acting in a violent manner,
> and with intent that they or any of will commit a public offense. A person who
> willingly joins in or remains a part of an unlawful assembly, knowing or having
> reasonable grounds to believe that it is such, commits a simple misdemeanor.[5]

> Iowa Code § 723.3 Failure to Disperse: A peace officer may order the participants
> in a riot or unlawful assembly or persons in the immediate vicinity of a riot or
> unlawful assembly to disperse. Any person within hearing distance of such
> command, who refuses to obey, commits a simple misdemeanor.

---

[3] Initially, all people arrested in the early morning of May 31, 2020, for general participation in the events on Court Avenue were charged with Rioting and Criminal Mischief 2nd, the latter defined as "any damage, defacing, alteration, or destruction of property is criminal mischief when done intentionally by one who has no right to so act." Iowa Code § 716.1. Second degree criminal mischief occurred when the damage rises to a certain cost or is targeted to monuments or statues. Later that same day, upon direction of the Polk County Attorney, those charges were dismissed and new charges of rioting, unlawful assembly, and failure to disperse were filed.

[4] This statute was changed by the state legislature in 2021 to read as follows: A riot is three or more persons assembled together in a violent and disturbing manner, and with any use of unlawful force or violence by them or any of them against another person, or causing property damage. A person who willingly joins in or remains a part of a riot, knowing or having reasonable grounds to believe that it is such, commits a class "D" felony.

[5] This code section was changed in 2021 to the following: An unlawful assembly is three or more persons assembled together, with them or any of them acting in a violent manner, and with intent that they or any of them will commit a public offense. A person who willingly joins in or remains a part of an unlawful assembly, or who joined a lawful assembly but willingly remains after the assembly becomes unlawful, knowing or having reasonable grounds to believe that it is such, commits an aggravated misdemeanor.

It is important next to analyze what each officer knew in relation to what actions each took. Officers have separate perspectives; they should be analyzed separately. *Wisham v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997); *Rouse v. Plantier*, 182 F.3d 192, 200 (3rd Cir. 1999). Under section 1983, an individual defendant can be liable only for his own actions. See, e.g., *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009); *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1249 (7th Cir. 1994).

Officers Holton and Herman had been working a very long shift, during which they had been dealing with violent rioters for hours. (App. at 654, 529-530) They knew dispersal orders had been given. They had personally yelled at people to leave the area. (App. at 653) They believed they were at the end of their shift when they were abruptly sent out to the Court Avenue area because rioting had recommenced in that area. They knew that the HyVee had been targeted, as well as other businesses on Court Avenue, for property damage. (App. at 530) When they arrived on scene, Holton saw Foote running northbound away from the area of the rioting. (App. at 823) This is consistent with other evidence in the record. The two other people with Foote were also fleeing the scene of criminal activity. (App. at 96-97) Foote eventually tried to hide in a nook but then stepped back out and stayed still, which is when Holton began his attempts to arrest her. (App. at 64) It is important to emphasize, this was not some mass arrest based only on physical proximity to an event. Though if it were, that has been determined to be acceptable in situations of a mobile riot, as this was. *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012). Rather, Foote was seen running from the immediate vicinity of a riot in-progress—she, *in fact*, was running from the immediate vicinity, according to her own testimony. Foote was with two other people who were also running, among a group of many others running from the riot area.

The act of fleeing the immediate area of a crime provides ample probable cause for arrest. *U.S. v. Reed*, 733 F.2d 492 (8th Cir. 1984); *Thompson v. Hubbard*, 257 F. 3d 896 (8th Cir. 2001); *U.S. v. Smith*, 990 F. 3d 607 (8th Cir. 2021); *U.S. v. Flores-Lagonas*, 993 F.3d 550 (8th Cir. 2021). Although we don't force officers to have the ability of hindsight when making an arrest, it is important to note in this case, the officers were correct. Foote and her two friends had placed themselves in the midst of rioting behavior because they wanted to see what was happening. Foote saw glass being broken out of businesses. She heard glass being broken. There are photographs of her in the midst of people blocking traffic using trashcans. She acknowledged that there was criminal activity occurring all around her. And even after fleeing the first time when she saw people running away from the scene, she didn't continue to her car to drive home. She walked right back toward Court Avenue into the fray. The Fourth Amendment analysis for her arrest should stop right there. There was no constitutional violation for her arrest, as to Holton and Herman, and thereafter the officers who assisted in getting Foote to jail (Clark and Escobar-Hernandez) and the officer who imparted command staff's direction on charging, Kirk Bagby. There was probable cause for her arrest; the officers should be granted summary judgment on all counts related to her arrest.

### I.B. THE RIGHT TO BE IN THE IMMEDIATE PROXIMITY OF A RIOT SO ONE CAN OBSERVE AND/OR PARTICIPATE IS NOT A CLEARLY ESTABLISHED RIGHT.

If this court finds that there was a federal constitutional right violated, the inquiry moves on the second prong of immunity analysis, regarding whether a right is clearly established. As summarized by the Supreme Court,

> The doctrine of qualified immunity shields officials from civil liability so long as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800 (1982)). A clearly

established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards,* 566 U.S. 658 (2012). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

*Mullenix v. Luna*, 577 U.S. 7, 11 (2015). All the reasons applied above related to probable cause set forth above, apply equally to the issue of whether the right to attend a riot is clearly established. It is axiomatic; no one has the right to engage in unlawful activity. A riot is "three or more persons assembled together in a violent manner to the disturbance of others, and with any use of unlawful force or violence by them or any of them against another person, or causing property damage." There were dozens of people captured on video breaking windows—some with bar stools taken from bars or restaurants-- throwing trashcans, smashing planters, blocking traffic, and ultimately, breaking into HyVee and looting it. A riot was happening and Denver Foote, along with her friends, were in the middle of it by choice.

Officials have a positive duty to suppress a riot. *In re Removal of Pickering*, 266 N.E.2d 248 (3d Dist. Logan County 1970). As such, they may take aggressive measures, using such force as is necessary and proper to suppress the riot. *State v. Boles*, 5 Conn. Cir. Ct. 22, 240 A.2d 920 (1967). The undersigned has been unable to find any cases that come close to this fact pattern, in which an arrest for rioting or similar charges has been determined to be in violation of a clearly established right, when a person is seen fleeing from the scene of a riot. To the contrary, the balance of caselaw indicates that, even in situations of mass arrest, it is permissible to make mass arrests if in proximity to—in time and place—a riot. *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012). *Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009). Again, this case is not about mass arrest. It is about one arrest of one individual fleeing the scene of a riot.

For all the above reasons, all named officers are entitled to federal qualified immunity on Count I as relates to the arrest of Denver Foote.

## II.  THE OFFICERS ARE ENTITLED TO SUMMARY JUDGMENT FOR THE ARREST OF DENVER FOOTE UNDER THE IOWA CONSTITUTION AND FOR THE TORT OF FALSE ARREST.

### II.A. THE ARREST OF DENVER FOOTE DID NOT VIOLATE ARTICLE I, SECTION 8 OF THE IOWA CONSTITUTION

First, it is important to note that there is no case that definitively states that there is a direct cause of action under this particular section of the Iowa Constitution, as is discussed in more detail in sections below. The Defendants assert, that the Iowa Supreme Court, has not answered this question, either directly or by way of certified question. It was assumed by the federal court in *Baldwin v. Estherville*, that there was a direct cause of action under this section. 915 N.W.2d 259, 277 (Iowa 2018). The Court does not typically answer questions that are not before it.

Without waiving the above issue, the Defendants offer the following, assuming arguendo, that there is a direct cause of action under this section of the Iowa Constitution. In *State v. Brown*, which is a criminal suppression case, the Iowa Supreme Court stated,

> Article I, section 8 of the Iowa Constitution is the "*nearly* identical [provision] to the Fourth Amendment to the United States Constitution." *State v. Short*, 851 N.W.2d 474, 500–01 (Iowa 2014) (discussing the differences in punctuation between the Iowa Constitution and the Federal Constitution and how members of this court have interpreted said differences). It provides,
>
> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized. Iowa Const. art. I, § 8.

*State v. Brown*, 890 N.W.2d 315, 322 (Iowa 2017). The Iowa Supreme Court "has traditionally considered the federal and state due process provisions to be equal in scope, import, and purpose." *In*

*re Det. of Garren,* 620 N.W.2d at 284 (citing *In re Interest of C.P.,* 569 N.W.2d 810, 812 (Iowa

1997); *Exira Cmty. Sch. Dist. v. State,* 512 N.W.2d 787, 792 (Iowa 1994)).

However, "[w]e have an interest in harmonizing our constitutional decisions with those of the

Supreme Court when reasonably possible... we recognize and will jealously guard our right and

duty to differ in appropriate cases." *State v. Olsen,* 293 N.W.2d 216, 219–20 (Iowa 1980).

Nevertheless, the Iowa Supreme Court recognizes a probable cause standard that is very similar

to the federal standard, in the criminal context. "The substance of all the definitions of probable

cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized

with respect to the person to be searched or seized." *State v. Klimstra*, 808 N.W.2d 755 (Iowa Ct.

App. 2011), citing *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)(internal quotation marks and

citation omitted). Probable cause is "defined as such cause which would lead a reasonably

prudent man to conclude a crime had been committed." *State v. Drake*, 224 N.W.2d 476, 478

(Iowa 1974). "The significant point is that courts look to the facts within the officers' knowledge at

the time the arrest is made." *State v. Vallier*, 159 N.W.2d 406, 408 (Iowa 1969); *State v. Raymond,*

142 N.W.2d 444, 447 (Iowa 1966).

A "false arrest is one way to commit the tort of false imprisonment." *Children v. Burton,* 331

N.W.2d 673, 678 (Iowa 1983), citing, *Law of Torts* 42 (4th ed. 1971) ("The action for the tort of

false imprisonment, sometimes called false arrest, is another lineal descendent of the old action

of trespass. It protects the personal interest in freedom from restraint of movement."); *Norton v.

Mathers,* 222 Iowa 1170, 1175, 271 N.W. 321, 323 (1937) ("This is a case of false arrest and

imprisonment"); *Fox v. McCurnin,* 205 Iowa 752, 757, 218 N.W. 499, 501 (1928) ("although

plaintiff has alleged false arrest in count 2 and false imprisonment in count 3, they are not

distinguishable, and therefore amount only to a charge of false imprisonment"). In dealing with

civil damage actions for false arrest, courts apply a probable cause standard less demanding than

the constitutional probable cause standard in criminal cases.

> If the officer acts in good faith and with reasonable belief that a crime has been
> committed and the person arrested committed it, his actions are justified and liability
> does not attach. *O'Neill v. Keeling*, 288 N.W. 887, 889 (Iowa 1939); *Greer v. Turner*,
> 639 F.2d 229, 231–32 (5th Cir. 1981); *Dellums v. Powell*, 566 F.2d 167, 175 (D.C.
> Cir. 1977), *cert. denied,* 438 U.S. 916 (1978); *Hill v. Rowland*, 474 F.2d 1374, 1377
> (4th Cir. 1973); *Wilcox v. United States,* 509 F. Supp. 381, 384–85 (D.C.C. 1981);
> *Gueory v. District of Columbia*, 408 A.2d 967, 969 (D.C.App.1979); *Mitchell v.
> Drake*, 360 N.E.2d 195, 198 (Ind. App. 1977); *Terry v. Zions Cooperative Mercantile
> Institution*, 605 P.2d 314, 320–21 (Utah 1979); *Town of Jackson v. Shaw*, 569 P.2d
> 1246, 1250 (Wyo. 1977).

*Children v. Burton,* 331 N.W.2d 673, 680 (Iowa 1983). This is a point reiterated more recently by the

Iowa Supreme Court, "It is certainly fair to exclude the evidence from any ensuing criminal

proceeding whenever the line is crossed, even slightly. But if the law enforcement officer also is

subject to a damage action, this could lead him or her to be reluctant to act at all in any gray area."

*Baldwin v. City of Esterville*, 915 N.W.2d 259, 277 (Iowa 2018). Thus, it follows, that Iowa does not

apply the same onus of probable cause in civil actions as it would in a suppression case. This would

be comparable to the standard in federal court, which is defined as, "Arguable probable cause exists

even where an officer mistakenly arrests a suspect believing it is based in probable cause if the

mistake is "objectively reasonable." *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011). So, even

if the officer is mistaken about probable cause, he will not be liable if the mistake is objectively

reasonable.

However, again, these officers were not mistaken. Foote was present for the riot. Foote was

present because of the riot. Then, Foote fled because other rioters fled but then she returned to the

scene of the riot. For all the reasons set forth in subsection I.A. and herein, there was no state

constitutional violation, nor tort violation for false imprisonment. Thus, all the named officers should

be granted summary judgment on Counts II and XIII as relates to the arrest of Denver Foote.

II.B.    All of the Named Officers Are Entitled to State Immunity Because They Acted With All Due Care in Arresting Foote.[6]

Even if this Court finds that Foote's arrest was not supported by probable cause, it does not immediately follow that the officers are liable. If the officers acted with all due care, they are entitled to immunity under Iowa law. The Iowa Supreme Court stated that:

> The right to recover damages for a constitutional violation does not need to be congruent with the constitutional violation itself." *Baldwin*, 915 N.W.2d at 278. More specifically,

> Such an approach is not consistent with Iowa precedent or Restatement section 874A, and would result in too little play in the joints. Logically, the threshold of proof to *stop* an unconstitutional course of conduct ought to be less than the proof required to *recover damages* for it. Indeed, if a right of recovery for a constitutional tort existed whenever a constitutional violation occurred, it stands to reason that such recovery could not be subject to other limits, such as a statute of limitations. *Baldwin*, 915 N.W.2d at 278-79.

> Thus, the determination, above, that Baldwin's rights under article I, §§ 1 and 8 of the Iowa Constitution were violated, does not necessarily mean that he is entitled to recover damages for that violation.

*Baldwin v. Estherville, Iowa*, 333 F. Supp. 3d 817, 842 (N.D. Iowa 2018).

In the *Baldwin* case, the only case known to the Defendants that has examined the "all due care" immunity certified by the Iowa Supreme Court in 2018, the court determined that it is a nuanced negligence standard. In finding so, it stated the following:

> Normally we think of due care or objective good faith as more nuanced [than how clear the underlying constitutional law was] and reflecting several considerations. *See, e.g.*, *Hetfield*, 3 Greene at 585. Factual good faith may compensate for a legal error, and factual bad faith may override some lack of clarity in the law. *Baldwin*, 915 N.W.2d at 279.

---

[6] It should be noted that the Iowa Legislature has since codified a qualified immunity standard in Iowa Code §§669.14A and 670.4A, for state and municipal actors, respectively, that is more consistent with the federal standard. It is currently unclear when the legislature intended this immunity to be able to be used. In Iowa, the relevant retroactivity inquiry is (1) what is the specific conduct regulated by the statute, and (2) determining whether the event of legal consequence occurred before or after the statute's effective date) *Hrbek v. State*, 958 N.W.2d 799, 783 (Iowa 2021). The conduct regulated is the ability to sue a municipal employee and the legal consequence is now. As such, if the Court agrees with this interpretation, the Defendants point to their arguments under federal qualified immunity.

*Id*. at 844. The court further stated,

> "bad faith," "malice and lack of probable cause," and lack of "reasonable ground"
> for the conduct in question are factors suggesting that the "all due care" qualified
> immunity defense is inapplicable.

*Id*. at 845. Conversely, good faith, lack of malice, and the existence of a reasonable ground are

factors suggesting that the "all due care immunity" is applicable—as it relates to liability.

The officers acted in good faith, without malice and they had reasonable grounds, for all

the reasons stated above. Bad faith generally conjures allegations of dishonesty or fraud. From

the beginning, these officers wrote and testified consistently about what they saw. What they saw

was consistent with Foote's own accounts of her actions. Further, available video confirms the

officers' testimony. These officers didn't target Foote. There were several people arrested that

night who were similarly situated—they were in the immediate area of a riot, which is, a

violation of the law. There was not bad faith. There was no deceit. There was no fraud. There

was merely a need to stop the rioting, which meant arresting who they could from the immediate

area, and in this case, those were people running from the scene of the riot. For all the reasons

above, the officers are entitled to "all due care" immunity under Iowa law and should be granted

summary judgment as to Count II.

### III. Officers Holton and Hernan are Entitled to Summary Judgment on Counts III, IV and XV for Use of Force

III.A. Officers Holton and Hernan did not Violate a Federal or State Constitutional Right[7]
in Terms of the Force Used, nor did the Officers Commit the Tort of Assault and Battery.

---

[7] The Defendants were unable to locate any Iowa caselaw applying the Iowa Constitution to excessive force claims, except *Wagner v. State of Iowa*, which answered certified questions as to the relationship between the Iowa Constitution and the Iowa Tort Claims Act. 952 N.W.2d 843 (Iowa 2020). It did not apply the Iowa Constitution to factual allegations related to uses of force. As such, the Defendants will argue Counts III and IV as if they are analyzed similarly.

Excessive force is analyzed in the context of a seizure under the Fourth Amendment, applying the reasonableness standard. U.S.C.A. Const.Amend. 4; *Graham v. Connor*, 490 U.S. 386, 396 (1989). The reasonableness of an officer's use of force is evaluated "from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight." *Id*. at 396.  This method of appraisal allows "for the fact that police officers are often forced to make split-second judgments —in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Partlow v. Stadler*, 774 F.3d 497, 502 (8th Cir. 2014) (quoting *Graham v. Connor*, 490 U.S. at 397).

The nature and extent of force that may reasonably be used by officers depends on the specific circumstances of the arrest, including whether he is actively resisting arrest or attempting to evade arrest by flight. *Estate of Brown v. Thomas*, 7 F. Supp. 3d 906 (E.D. Wis. 2014). Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, the possibility that the suspect may be armed, whether the action takes place in the context of effecting an arrest, and the number of persons with whom the police officers must contend at one time. *Ansell v. Ross Township,* No. 10–1402, 419 Fed. App'x 209, 213 (3d Cir. 2011); *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir. 1997). "The Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within a range of conduct which is objectively 'reasonable' under the Fourth Amendment." *Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995).

Likewise, for the tort of assault and battery, "A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer reasonably believes to be necessary to affect the arrest or to defend any person from bodily harm while making the arrest."

Iowa Code § 804.8.  The Iowa Supreme Court has held that under § 808.8, "An assault only occurs if the peace officer does not reasonably believe the particular force was necessary in the circumstances." *Johnson v. Civil Service Commission,* 352 N.W.2d  252, 257 (Iowa 1994). The Iowa Supreme Court has adopted the objective reasonableness standard for the use of force by an arresting officer. *Chelf v. Civil Service Commission*, 515 N.W.2d 353, 355-356 (Iowa 1994).

Throughout this brief, the City Defendants will describe and analyze the different uses of force separately because of the dictate to examine these matters with precision. In her sworn deposition testimony, Foote provided greater detail regarding her claims of several different uses of force. The first was application of pepper spray by Holton. The second was when Holton, and eventually Herman, used their shields to box her in. The third was Herman's use of 3 strikes with a baton, which ultimately resulted in her laying on the ground. Another was the placement of a knee on her back to hold her to the ground.

Officers may take any measures that are "reasonably necessary" to protect their personal safety and maintain the status quo during the course of the stop.  *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011); *United States v. Sanford*, 813 F.3d 708, 713 (8th Cir. 2016).  Further, as here, officers can use handcuffs in order to control the scene and protect their safety.  *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004). The Eighth Circuit "has declined to second-guess whether alternative actions by police officers 'might conceivably have been available.' "*Estate of Morgan v. Cook,* 686 F.3d 494, 497 (8th Cir.2012). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split—second judgments—in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Kaleta v. Johnson*, No. CIV. 12-170 JNE/FLN,

2013 WL 3448148, at *8 (D. Minn. July 9, 2013), citing *Graham v. Connor,* 490 U.S. 386, 396–97 (1989). That was never more the case in the early morning of May 31, 2020.

These officers had been assaulted by mobs of people. They had witnessed hours of criminal activity occurring, and the crowds wasn't dispersing—it was a traveling, mobile riot. The individuals in the immediate area of Court Avenue where the riots were occurring were not protesters, they were "violent opportunists" (VO), as referred by the Defendants' expert Anthony DiCara. DiCara is the one and only expert who opined about both the arrest of and the force used against Denver Foote. He stated,

> The duties of a police officer to make an arrest, even in the best of circumstances, often carry an element of risk and danger. [] The conditions in which the Des Moines officers operated during the 2020 riots were the worst of circumstances. They were under constant threat from the rioters and violent opportunists such as Denver Foote. Foote and her fellow VOs came prepared for violence and their actions guaranteed the police response. The types of force that Foote alleges were used on her fall under the category of "minimally intrusive". OC spray, commonly known as "pepper spray", is a relatively low level of force. It is designed to cause discomfort in the mucus membranes, eyes, nose, and throat. The hope is that this mild discomfort is enough to encourage the offender to comply with police orders. This level of force applied to Foote and the other VOs that night is certainly reasonable and proportionate given the totality of the circumstances. Denver Foote was running from the arriving police presence And the element of flight is important when considering if and what force is appropriate. Flight is a form of resisting arrest. When the police eventually caught up with Foote she did not relent, rather she stood her ground. One officer again used OC spray and she did not get on the ground. Since OC spray was not effective in controlling Foote, two officers used their shields to block her in and one officer used his baton to deliver 2-3 strikes. It should be noted that while the officers reported using their shields, they report that Foote was actively pushing away from them, which is an assault against an officer. Even if one accepts Foote's version of events that she did not go to the ground based on pepper spray and the shields, it was a reasonable decision to use the baton considering the ineffectiveness of the other attempts at force. Furthermore, the areas of the body where the strikes were delivered are consistent with the training and best practices for that baton. The use of the strikes caused Foote to go to the ground, which was the desired outcome. She was then handcuffed using means that are consistent with training.

> Considering the violence to which the officers were exposed during the riot that evening, they acted reasonably by moving quickly to make arrests when the opportunities presented themselves. Denver Foote was able to elude arrest for hours until the officers finally caught up with her and were in a position to make arrests. They were carrying shields which make it difficult to effect arrests, however, they had no choice due to the amount of projectiles being thrown at them all night. Appropriate uses of the riot shield include using it to pin a person to a wall or ground or to use multiple shields to detain a person and prevent escape. [] By all accounts the officers used a measured, reasonable approach to the arrest of Denver Foote… (App. at 812-818).

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). The Court considers the claim from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. As noted by DiCara, making an arrest in a situation in which they were under constant threat of harm from active rioters made for extremely challenging circumstances. Nevertheless, they used minimally intrusive force on Foote. Holton ordered her to get to the ground. (App. 618) When she didn't comply, he used a short burst of pepper spray. She did not get to the ground. He used his shield to try to box her into an area so she couldn't flee. She did not go to the ground. Officer Herman then used three strikes with a PS baton, which was effective in Foote going down to the ground. One officer[8] then used a knee to her back to hold her down until she could be handcuffed. The entire interaction took under three minutes.

Under *Graham v. O'Connor*, the amount of force that can be used depends on a careful analysis of the facts and circumstances of each particular case regarding (1) the seriousness of the offense, (2) physical threat to officers and others, (3) and whether the subject is actively

---

[8] Foote could not identify which officer held her to the ground or placed zip ties on her wrists. (App. at 64). IN supplemental reports, Officer Herman indicated that Holton placed zip ties on Foote. (App. at 824)

resisting or attempting to flee. 490 U.S. 396 (1989).  The offense of rioting, especially on the night in question was extremely serious. There were assaults on officers and significant property damage. The physical threat to officers, does not just relate to Ms. Foote. These officers were surrounded by violent opportunists. They were in very serious danger. Finally, Ms. Foote had been seen in the act of fleeing. All the factors weigh in favor of these uses of force being reasonable. Use of minimal force in order to gain compliance, safety and control of a previously fleeing individual does not present a constitutional violation or an assault and battery. Summary judgment should be granted in favor of Holton and Herman.

<u>III.B. Officers Holton and Herman are Entitled to Qualified Immunity Under Both the Federal and State Constitutions for the Amount of Force Used.</u>

It is well-established in law and common practice for an officer to use force to effectuate arrest and maintain safety in the specific circumstances as described above. Otherwise stated, there is no clearly established law that prohibited Holton and Herman, in the midst of a riot, to use pepper spray, then a shield to box someone in, and then a baton to gain compliance. *City of Escondido, Cal. v. Emmons*, 139 U.S. 500, 503 (2019), *Rice v. Murakami*, 2015 WL 1736427 (D. Idaho Apr. 16, 2015), <u>aff'd,</u> 671 F. App'x 472 (9th Cir. 2016). Whether Foote indicates she heard it or not, Holton gave an order to get to the ground. When an individual has taken action that demonstrates noncompliance, a takedown is reasonable. *Ehlers v. City of Rapid City*, 846 F. 3d 1002 (8th Cir. 2017), *Hosea v. City of St. Paul*, 867 F.3d 949 (8th Cir. 2017). As noted above, "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Saucier v. Katz*, 533 U.S. 194, 209 (2001).

> While we have previously stated that "the use of force against a suspect who was not threatening and not resisting may be unlawful," *Shannon v. Koehler*, 616 F.3d 855, 864 (8th Cir. 2010), that general proposition does not answer whether a particular use of force is *de minimis* (and therefore insufficient to support a claim). In *Crumley v. City of St. Paul*, we held that a police officer did not violate

a suspect's clearly established rights when he "struck or pushed [the suspect] approximately five times and then spun her around and handcuffed her," and where the suspect suffered bleeding wrists as a result of being handcuffed. 324 F.3d 1003, 1006–08 (8th Cir. 2003) ("[W]e conclude no reasonable jury could have found the police officer used excessive force by pushing or shoving Crumley to effect the arrest.").[3] The amount of force used in *Crumley* was comparable to that alleged here, where Robinson was shoved up against a trailer and handcuffed. The injuries Robinson sustained as a result of the force were fairly minor, including some pain and bleeding from the wrists as a result of being handcuffed and pain in her shoulders from being pushed against the trailer.

*Robinson v. Hawkins*, 937 F.3d 1128, 1136 (8th Cir. 2019).

It is first important to acknowledge that these officers employed force that are widely accepted among models as non-lethal methods to gain compliance. Force models are preferred that allow officers to choose a level of force. *National Consensus Policy and Discussion Paper on Use of Force* (July 2020). It is appropriate to use non-lethal force in the following instances: "(1) to protect the officer or others from immediate physical harm, (2) to restrain or subdue an individual who is actively resisting or evading arrest, or (3) to bring an unlawful situation safely and effectively under control." *Id.*

The core question under this portion of the argument is whether there was sufficient caselaw to demonstrate to any basically competent officer that the actions of Holton and Herman were unconstitutional, and this must be at a highly detailed level. Starting with pepper spray, it was not clearly established that Foote had a right to be free from a short burst of pepper spray when fleeing the scene of a riot. When she failed to comply with Holton's order to get on the ground—within the context of an active riot, it was not clearly established that she had a right to be free from the use of shields to box her in to a wall. When she still failed to comply, it was not clearly established that she had a right to be free from the use of a baton strike three times to soft tissue areas—again in the context of an active riot. Finally, once she got on the ground, it was not clearly established that she had a right to be free of a knee pressed into her back until the

officers were able to handcuff her, in the context of an active riot. The undersigned performed exhaustive searches to find similar fact patterns and responses by law enforcement to no avail.

To the contrary, in 2014, it was clearly established that police officers could use stun guns, kicks, and knee strikes when an arrestee fled one officer and continued to resist arrest. *Smith v. City of Minneapolis*, 754 F.3d 541 (8th Cir. 2014). In 2015, it was clearly established that officers could take to the ground, pepper spray, hit, and kick an individual who was resisting arrest. *Schoettle v. Jefferson Cty.*, 788 F.3d 855, 858 (8th Cir. 2015). It was established that pushing someone away was reasonable, as opposed to making and throwing that person to the ground by more than one officer. *Johnson v. Carroll*, 658 F. 3d 819, 825-827 (8th Cir. 2011).

The circumstances these officers found themselves in was no ordinary arrest. They were surrounded by danger and Denver Foote had been seen fleeing from the scene of an active riot. Given the totality of the circumstances and the caselaw as it stood at the time of Foote's arrest, she did not have a clearly established right to attend a riot, flee from the riot once police presence was obvious, and then avoid pepper spray, shields, and PS batons when she failed to get on the ground pursuant to Holton's directive. Further, the use of a knee to one's back, a use of force that caused no injury whatsoever to Foote, is common practice between gaining compliance and handcuffing to maintain control of a suspect. Officers Holton and Herman are entitled to immunity for their use of force.

**IV. Officers Holton, Herman, Bagby, Allen, Escobar-Hernandez, and George Are Entitled to Qualified Immunity Under Counts V and VI Because Their Actions Were Not Retaliatory Against First Amendment Activity[9]**

Plaintiff argues that Officers Holton, Herman, Bagby, Allen, Escobar-Hernandez, and George violated her rights in arresting her in retaliation for engaging in her First Amendment rights. She fails to note which of those rights were the focus of such retaliation. However, the Petition asserts a state claim solely under the section addressing free speech in Iowa. Thus, the Defendants will assume that Ms. Foote is raising free speech rights.

This claim ignores undisputed facts, basic principles of causation, and the presence of probable cause. It also ignores the fact that Ms. Foote testified that she was not engaging in protest activity when she was on Court Avenue shortly before being arrested. The First Amendment "prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "To prevail on a First Amendment retaliation claim, the plaintiff must show that he engaged in protected activity, that the defendants' actions caused an injury to the plaintiffs that would chill a person of ordinary firmness from continuing to engage in the activity, and that a causal connection exists between the retaliatory animus and the injury." *Bernini v. City of St. Paul*, 665 F.3d 997, 1007 (8th Cir. 2012).

The federal courts have yet to create a uniform approach to addressing First Amendment retaliation allegations. When the question is about an arrest or prosecution, most jurisdictions inquire whether there was probable cause; so long as there was probable cause, any purported impermissible motive is overcome. *Mozzochi v. Borden*, 959 F.2d 1174, 1180 (2d Cir. 1992).

---

[9] Again, there is no case that establishes a direct cause of action under the Iowa Constitution for violations of the cohort free speech section, nor is there any suggestion in caselaw that it would be analyzed differently than federal jurisprudence. As such, the Defendants will argue as if they are analyzed similarly.

That is the approach in the Eighth Circuit. "[A] retaliatory motive on the part of an official urging prosecution combined with an absence of probable cause supporting the prosecutor's decision to go forward are reasonable grounds to suspend the presumption of regularity behind the charging decision." *Small v. McCrystal*, 708 F.3d 997, 1008 (8th Cir. 2013), *citing Hartman*, 547 U.S. at 265. In sum, the Plaintiff must show that the Defendants had an impermissible motive and she must plead and prove the absence of probable cause. *Hartman*, 547 U.S. at 265. Foote failed to adequately do either.

The relevant facts are that Foote was no longer engaged in protest activity when on Court Avenue. She was there with her friends who wanted to observe the riot. When a police presence became known in response to the riot, she and her companions ran. Then, when it appeared the immediate police presence had waned, they returned to the scene of rioting. When Holton first observed Foote she was running away from the area of the riot. He, nor Herman, were arresting her for engaging in First Amendment activity. They had observed hours of peaceful protest activity without engaging in arrest.

Under the *Mozzochi* and *Small* analysis, since there was probable cause to arrest Foote for a violation of the Iowa Code, any purported impermissible motive is overcome. *Mozzochi*, 959 F.2d at 1180 and *Small*, 708 F.3d at 1008. It is important to note, that some courts, including the Eighth Circuit, have ruled that excessive force claims made in the context of the First Amendment must be analyzed under Fourth Amendment framework.

> As the district court properly recognized, the Supreme Court in *Graham v. Connor*, 490 U.S. 386, 394 (1989) established that excessive force claims arising in the context of an arrest are 'most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right to be secure in their persons against unreasonable seizures of the person.' Having reviewed the record in full, we agree that the conduct at issue plainly implicates the protections of the Fourth Amendment and that no cognizable § 1983 First Amendment claim has been asserted.

*Anderson v. Franklin Cty*., Mo., 192 F.3d 1125, 1132 (8th Cir. 1999).

Further,

> Multiple lower federal courts, including this one, have extended *Graham* to preclude First Amendment claims based on alleged excessive force employed during an arrest. *See Anderson v. Franklin Cnty., Mo.*, 192 F.3d 1125, 1132 (8th Cir.1999) (holding that alleged excessive force and arrest "plainly implicates the protections of the Fourth Amendment and that no cognizable § 1983 First Amendment claim has been asserted"); *Jenkins v. Town of Vardaman, Miss.*, 899 F.Supp.2d 526, 534 (N.D. Miss. 2012) ("An allegation that excessive force was used in the course of making an arrest is clearly a Fourth Amendment, not a First Amendment, matter."); *Kirk v. Bostock*, No. 09–CV–15018–DBH, 2011 WL 52733, at *3 (E.D. Mich. Jan. 7, 2011) (granting summary judgment on First Amendment claim based on "the same set of facts" as the Fourth Amendment excessive force claim); *Montoya v. City of Albuquerque*, No. 03–CV–0261–JB, 2004 WL 3426436, at *10 (D.N.M. May 10, 2004) ("The Court believes that allowing Plaintiffs to proceed with their First Amendment retaliation claim would unnecessarily complicate excessive force claims brought under the Fourth Amendment and would be contrary to the Supreme Court's holding in *Graham v. Connor*."); *Lagrone v. Hall*, No. 91–CV–7133–ACW, 1992 WL 350702, at *3 (N.D. Ill. Nov. 23, 1992) (dismissing First Amendment claim based on excessive force, and noting "that the Fourth Amendment is the only appropriate vehicle for relief on a claim of excessive use of force during an arrest").

> In accord with this clear weight of authority, the Court finds that the Fourth Amendment functions as the exclusive remedy for Plaintiff's assertion that excessive force was used in connection with his arrest. His First Amendment retaliation claims must be dismissed.

*Price v. Elder*, 175 F. Supp. 3d 676, 679 (N.D. Miss. 2016). To the extent this Court is in agreement that a Fourth Amendment analysis is necessary with regard to the force portion of this argument, the undersigned references back to the arguments above.

There is no evidence that animus for her speech was the causal connection leading to Foote's arrest and the force applied. It was Foote's fleeing behavior from the scene of the riot that provided the legitimate bases for the arrest and charges. As such, all named officers are entitled to summary judgment on Counts V and VI.

**V. Officers Holton, Herman, Bagby, Allen, Escobar-Hernandez, and George Are Entitled To Qualified Immunity For Counts VII and VIII and Because They Did Not Conspire to Violate Foote's Constitutional Rights**

Foote alleges conspiracy claims under both Federal and Iowa Constitutions, in Counts VII and VIII, against all the named individual officers. If Foote fails to present sufficient evidence generating genuine issues of material fact for the underlying wrongful conduct, then the civil conspiracy claim also fails."*Asplund v. iPCS Wireless, Inc.*, 602 F.Supp.2d 1005, 1011 (N.D. Iowa 2008). A civil conspiracy requires an actionable underlying act. *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002). Likewise:

> civil conspiracy "do[es] not set forth an independent cause of action" but rather is "sustainable only after an underlying tort claim has been established." *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413 n. 7 (D.C.Cir.1984); *accord Mizokami Bros. v. Mobay Chem. Corp.*, 660 F.2d 712, 718 n. 8 (8th Cir.1981); *Rotermund v. United States Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir.1973)."

*K & S P'ship v. Cont'l Bank, N.A.*, 952 F.2d 971, 980 (8th Cir. 1991). In Iowa, a civil conspiracy requires an understanding between two or more parties to harm another; "[i]t involves some mutual mental action coupled with an intent to commit the tortious act which results in injury." *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 233 (Iowa 1977). Since there appear to be no civil conspiracy jurisprudence addressing Article I, 8 of the Iowa Constitution, the jurisprudence developed under 42 U.S.C. §1985(3) will be argued herein. Based on the arguments submitted in the subsections above, there is no underlying wrong, therefore, summary judgment must be granted in favor of the officers on the conspiracy counts, as well.

In this case, the alleged tortious act is the arrest of Foote and the force used in detaining her. To begin on the merits of this argument, the Petition makes a claim of conspiracy to violate Foote's Fourth Amendment rights. Typically, that is a claim brought under 42 U.S.C. §1985. However, there is a body of cases that appears to recognize a separate conspiracy action directly

through §1983. *Earle v. Benoit*, 850 F.2d 836 (1st Cir. 1988), *Klingele v. Eikenberry*, 849 F.2d

409, 413 (9th Cir. 1988); *Helton v. Clements*, 832 F.2d 332, 338 (5th Cir. 1988).

 To make out a conspiracy claim under §1983, Foote must demonstrate: "(1) that the

defendants conspired with others to deprive him of constitutional rights; (2) that at least one of

the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that

the overt act injured him." *Holmes v. Slay*, 895 F.3d 993, 1001 (8th Cir. 2018) (quoting

*Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1109 (8th Cir. 2016)). Federal

district courts have routinely observed that the first element of this claim requires a showing of

specific intent. See, e.g., Wooten v. Roach, 431 F. Supp. 3d 875, 902 (E.D. Tex. 2019) (requiring

that a §1983 conspiracy plaintiff show the defendants acted in concert "with the specific intent to

violate the [plaintiff's] right"); *Dennis v. DeJong*, 867 F. Supp. 2d 588, 650 (E.D. Pa. 2011)

(noting a § 1983 conspiracy claim requires a showing of "actions taken in concert by defendants

with the specific intent to violate the right protected"); *Crist v. Phelps*, 810 F. Supp. 2d 703, 711

(D. Del. 2011) (explaining that in a § 1983 conspiracy case, "there must be evidence of actions

taken in concert by defendants with the specific intent to violate [the plaintiff's] right"); *Tigrett*

*v. Rector & Visitors of Univ. of Virginia*, 137 F. Supp. 2d 670, 680 (W.D. Va. 2001) ("To make a

conspiracy claim under section 1983, a plaintiff must show . . . actions taken in concert by the

defendants with the specific intent to violate the [plaintiff's] right."). Thus, Foote's §1983

conspiracy claim cannot survive summary judgment unless there is "a possibility the jury could

infer from the circumstances a 'meeting of the minds' or understanding among the conspirators

to achieve the conspiracy's aims"—namely, a violation of Foote's rights. *Bonenberger*, 810 F.3d

at 1109 (alterations omitted) (quoting White v. McKinley, 519 F.3d 806, 816 (8th Cir. 2008)).

There is nothing in the record to even determine that the officers communicated at all about her arrest. Holton and Herman did not have any conversation about it. There is likewise no evidence in the record to show Holton and Herman had any conversation with Officers Clark Allen and Ernesto Hernandez-Escobar about Foote's arrest. Nor did any of those parties discuss Foote with Kirk Bagby and/or Jeffrey George. There is simply no evidence in the record to suggest there was any meeting of the minds to deprive Foote of her rights.

If Defendants assume this is a civil rights conspiracy claim under § 1985(3), that requires the Plaintiff must prove: (1) that the defendants did "conspire," (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or equal privileges and immunities under the laws," (3) that one or more of the conspirators did, or caused to be done, "any act in furtherance of the object of the conspiracy," and (4) that another person was "injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States." 42 U.S.C. § 1985(3).

Foote must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement. She can satisfy this burden by "point[ing] to at least some facts which would suggest that appellees 'reached an understanding' to violate [her] rights." *Larson by Larson v. Miller, 76 F.3d 1446, 1454 (8th Cir. 1996).* Additionally, §1985(3) "requires a plaintiff to allege that he or she is a member of a protected class and that the conspirators acted with racial, or otherwise class-based 'invidiously discriminatory motivation.'" *Ali v. Connick*, 136 F.Supp.3d 270, 277 (E.D.N.Y. 2015) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). Foote's complaint does not do so, nor does the record contain any such

facts that would suggest that the officers acted with invidiously discriminatory or racial motive. That's because there isn't any. Summary judgment for the claims of conspiracy in Counts VII and VIII must be granted in favor of all the named individual defendants.

**VI.** **The City is Not Liable For Deliberately Indifferent Policies, Practices, Customs, Training and Supervision**

VI.A.  Federal Constitution

Foote's Count IX asserts a claim against the City of Des Moines for Civil Rights violation by way of 42 U.S.C § 1983 under the 1st, 4th, 5th & 14th Amendments. This is commonly known as a *Monell* claim. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Every *Monell* claim requires 'an underlying constitutional violation.'" *Kitchen v. Dallas Cnty., Tex.*, 759 F.3d 468, 483 (5th Cir. 2014). Further, a municipality cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not been clearly established. *Hollingsworth v. City of St. Ann*, 800 F3d 985, 992 (8th Cir. 2015). For the reasons stated above, there is no constitutional wrong, or a wrong that was clearly established, so *Monell* liability does not attach. For sake of argument though, the Defendants offer argument a step further.

A municipality may be liable under § 1983 where "action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell, 436 U.S.* at 691. "A municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Id. at 691. Rather [a] municipality may only be liable for a constitutional violation resulting from (1) an official municipal policy; (2) an unofficial custom, or (3) failure to train or supervise." *Robbins*, 984 F.3d 673, 681 (8th Cir. 2021).

Individual government officials are also immune from *respondeat superior* liability under § 1983 and may be held personally liable only for their own misconduct. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010). To establish a claim against an official for failing to train or supervise subordinates, a plaintiff must show the supervisor "1) Received notice of a pattern of unconstitutional acts committed by subordinates; 2) Demonstrated deliberate indifference to or tacit authorization of the offensive acts; 3) Failed to take sufficient remedial action; and 4) That such failure proximately caused injury to [the plaintiff]." Parrish, 594 F.3d at 1002. "Allegations of generalized notice are insufficient." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).

The City of Des Moines does not have an official municipal policy encouraging officers to violate the 1st, 4th, 5th & 14th Amendments. To the contrary, the City of Des Moines has policies that specifically direct officers to observe the constitutional rights of individuals they encounter. [App ]. All officers, including the named officers, have been trained to observe the constitutional rights of individuals. [App. ]. All named officers have been trained on arrest protocols, use of force and various statutes. Nevertheless, Foote alleges that the City of Des Moines embraces an unofficial custom of unconstitutional arrests and unreasonable use of force amongst its officers. To prevail on this theory, she must demonstrate:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Corwin v. City of Independence*, 829 F.3d 695, 700 (8th Cir. 2016) (quoting *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014)). Foote cannot demonstrate any of the

three above elements —and certainly not in the context of a riot scenario—largely because there haven't been riots in the City of Des Moines in decades.

The City of Des Moines does not have an unofficial custom of violating the constitutional rights of citizens nor has it failed to train or supervise its officers on these matters. The City of Des Moines has policies that specifically direct officers to observe the constitutional rights of individuals they encounter, including during protest activity. (App. at 833-834, 838-882, 898-1023, 1024-1036) All officers, including the named officers, have been trained to observe the constitutional rights of individuals. (App. at 833-834, 838-882, 898-1023, 1024-1036, 1037-1148) All named officers have been trained on arrest protocols, use of force and various statutes. (App. at 883-897, 898-1023, 1024-1036, 1037-1148) In 2020 alone, prior to the riots, Adam Herman received more than 20 hours of training. (App. at 1139-1142) Holton, in that same time period received 26 hours. (App. at 1135-1138) Clark Allen received 21 hours in early 2020. (App. at 1148) Escobar-Hernandez received 19 hours of training in 2020, prior to the riots. (App. at 1147) Jeff George had 13 hours in that same time period. (App. at 1143-1146)

There is simply no evidence in the record to demonstrate these allegations of a widespread pattern of lack of training. Further, there is no evidence of the City or Chief Wingert being on notice of unconstitutional activity and that they then displayed deliberate indifference. In fact, there is no evidence in the record, whatsoever, that among three days of chaos and violence, that Chief Wingert personally knew of every interaction between thousands of citizens and his police force, because that would be impossible. There is no evidence in the record that he was personally aware of the arrest of Denver Foote. The Defendants, City of Des Moines and Chief Wingert should be granted summary judgment on Count IX.

VI.B.  State Constitution

It should be noted that the Iowa Supreme Court has not adopted or embraced a *Monell*-

like claim directly under the Iowa Constitution. The Court confirmed this when it stated:

> At most, *Cunha* rejects a direct cause of action under the due process clause of the
> Iowa Constitution for monetary damages against a local governmental entity for
> reasons expressed in *Monell* [*v. Department of Social Services*, 436 U.S. 658, 98
> S.Ct. 2018 [56 L.Ed.2d 611] (1978), a United States Supreme Court case
> extending § 1983 liability to local governments]. It does not address whether there
> is an Iowa analogue to *Bivens* under the common law when, as here, Iowa
> government officials are alleged to have violated the Iowa Constitution and the
> Iowa General Assembly has not specifically provided a statutory remedy for such
> violations.

*Godfrey v. State*, 898 N.W.2d 844, 856 (Iowa 2017), citing *Cunha v. City of Algona*, 334 N.W.2d

591 (Iowa 1983). In *Godfrey*, the Iowa Supreme Court announced that a *Bivens*-like claim (a

direct cause of action under the United States Constitution) exists in Iowa under its Constitution,

when there is not a sufficient statutory remedy. *Id*. at 879. The Court certainly could have

announced that it was embracing a *Monell*-like claim, as well—or even cast aspersions about the

pronouncement in *Cuhna*, that Iowa would not recognize a *Monell*-like claim. The Court was

silent and has remained so on this issue. There is, therefore, no recognized claim in Iowa as set

forth in Count X. Even if there was, the City and Chief Wingert point to the arguments set forth

in subsection VI.B. related to the federally-recognized *Monell* claim. There was no failure of the

City of Des Moines or Chief Wingert in policy, practice, training and supervision of officers.

Summary judgment must be granted to the City of Des Moines and Chief Wingert with regard to

Count X.

### VII.  Because the Force Used Against Her was not Outrageous nor is Her Distress Severe, Ms. Foote's Intentional Infliction of Emotional Distress Claim Fails

The Court should grant summary judgment in favor of Defendants on the intentional

infliction of emotional distress claims contained in Count XI of Ms. Foote's petition. The facts in

this case fall far short of sustaining such a claim, and even the undisputed facts could not support such a claim before a jury. Intentional infliction of emotional distress ("IIED") is a demanding cause of action. To succeed, a plaintiff must show:

> (1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.

*Smith v. Iowa State univ of Sci. & Tech*, 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Barreca v. Nickolas*, 683 N.W.2d 111, 123-24 (Iowa 2004)). "To qualify as outrageous, the conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Ette ex rel. Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 70-71 (Iowa 2002) (internal quotation omitted). Not all wrongful conduct is outrageous. It requires more than "mere insults, bad manners, or hurt feelings." *Mastin v. Navistar, Inc.*, 4:20-cv-00362, 2021 WL 1726893, at *10 (S.D. Iowa Mar. 29, 2021). For example, outrageous conduct has not been found when an employer terminated an employee on an incorrect allegation of falsifying timecards. *Mastin*, at *10 (citing *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108 (Iowa 1984)). Ms. Foote's claim fails to meet any of the elements of intentional infliction of emotional distress that was severe or extreme. As an initial matter, the second prong is quite simple. There isn't evidence in the record that the officers' goal was to cause Foote emotional distress. They were trying to complete an arrest with minimal force, in the context of a riot. One might assume that being arrested and experiencing force will cause an emotional response in the arrestee in nearly all cases. This tort requires the specific intent to cause the emotional distress, of which there is no evidence in the record.

VII.A. Defendants' Use of Force was not Outrageous.

The officers used reasonable force to effect Ms. Foote's arrest in the chaotic and unlawful environment where she had chosen to remain. Ms. Foote's petition points to the uses of force against her, pepper spray, baton strikes, being slammed to the ground, and the smashing of her eyeglasses as conduct that is outrageous. However, the facts she testified to in her deposition are much less extreme than the petition described. While there were uses of pepper spray and baton strikes, she fell to the ground rather than being slammed. Ms. Foote also could not say that an officer stepping on her glasses was intentional, and the arresting officers denied such an intention. These facts fall far short of outrageous conduct.

As discussed with regards to the excessive force claim, the use of force in this context was reasonable. Officers used force to arrest an individual in an area where rioting was taking place. Even to Ms. Foote, the arrest was not a surprise. She expected to be arrested. That she had brought goggles to protect her eyes shows that pepper spray or teargas was not unexpected, which makes sense given her presence at a riot a day earlier when she left only when teargas was deployed. The conduct of Officers Holtan and Herman was consistent with the circumstances and was reasonably expected by Ms. Foote.

The lack of excessive force demonstrates a lack of outrageous conduct. Several courts have indicated that when an arrest complies with the Fourth Amendment, it is unlikely, perhaps impossible, for it to constitute outrageous conduct. *Pegg v. Herrnberger*, 845 F.3d 112, 122 (4th Cir. 2017); *Tillotson v. City of San Francisco*, 739 F. App'x 997, 889 (9th Cir. 2018). In contrast it has been found that "A serious case of excessive force can constitute outrageous behavior that satisfies a claim of intentional infliction of emotional distress." *Harris v. Dep't of Veterans Affairs*, 776 F.3d 907, 917 (D.C. Cir. 2015) (internal citation and quotation omitted). However,

the modifier "serious" suggests that the use of excessive force does not necessarily constitute outrageous conduct. Defendants have not found authority to suggest that every use of excessive force is outrageous, however, examination of when outrageous excessive force was found to be present is instructive. In one case, excessive force was found to possibly be outrageous when officers beat a non-violent arrestee and caused broken bones after the arrestee was already restrained. *Williams v. Dist. of Columbia*, 268 F. Supp. 3d 178, 195 (D. Col. 2017).

The force used against Ms. Foote does not approach near to that example. Even if it did, for sake of argument, and violated the Fourth Amendment, it still was not outrageous. In a riot situation, the officers used an amount of force necessary to obtain compliance from a suspect. Once Ms. Foote complied and was restrained, the use of force ceased. This is reasonable conduct, consistent with Ms. Foote's expectation that she would be arrested, and does not approach the conduct found to be outrageous in past cases.

<u>VII.B. Ms. Foote's emotional distress is not severe or extreme.</u>

Showing extreme emotional distress is also challenging. A plaintiff must show "more than the fact that they felt bad for a period of time." *Ette*, 656 N.W.2d at 71 (internal quotation and citation omitted).

> The Iowa Supreme Court upheld a finding of emotional harm when a plaintiff claimed she endured abdominal cramps, visited the emergency room on multiple occasions, lost forty pounds, received medication for her nerves, and experienced multiple break downs. *Northrup v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850, 855, 860 (Iowa 1973). In contrast, evidence that a plaintiff "was very, very down," and "was feeling super badly" for a "month or two" was insufficient to demonstrate extreme emotional distress. *Poulsen v. Russell*, 300 N.W.2d 289, 297 (Iowa 1981). Additionally, a plaintiff's emotional distress was not extreme when it consisted "of headaches, insomnia, and loss of appetite," but the plaintiff had not taken medications, been treated by a doctor, or suffered any weight loss. *Millington v. Kuba*, 532 N.W.2d 787, 794 (Iowa 1995).

*Mastin*, at *11. These cases indicate that to sustain an intentional infliction of emotional distress claim, the emotional distress must be more than general unhappiness.



Ms. Foote's emotional distress is not sufficiently severe or extreme to support this claim. The Court should grant summary judgment for the officers on the intentional infliction of emotional distress claim. The officers' use of force in arresting Ms. Foote simply is not outrageous for purposes of this claim, and her emotional distress is not severe or extreme.

VIII.   **Ms. Foote cannot prevail on her malicious prosecution claim when there was probable cause for her arrest and her prosecution was not motivated by malice.**

The Court should grant summary judgment in favor of Defendants on the malicious prosecution claims contained in Count 12 of Ms. Foote's petition. The undisputed facts do not meet the elements of this claim. In Count 12, Ms. Foote alleges that Officer Doe, Officer Holtan, Officer Herman, Lt. Bagby, Officer Allen, Officer Escobar Hernandez, and Officer George maliciously prosecuted Ms. Foote. Recovery on this claim requires:

> (1) a previous prosecution, (2) instigation or procurement thereof by defendant, (3) termination thereof by an acquittal or discharge of plaintiff, (4) want of probable cause, (5) malice in bringing the prosecution on the part of the defendant and (6) damage to the plaintiff.

*Mills County State Bank v. Roure*, 291 N.W.2d 1, 3 (Iowa 1980).[10] Ms. Foote's claim fails on both elements 4 and 5.

Ms. Foote's arrest and charges against her were supported by probable cause. As discussed in several sections above, there was probable cause for the arrest of Ms. Foote. She was in an area of criminal activity and rioting and was herself in violation of orders to disperse. Officers Holtan and Herman had orders to assist in clearing the area of rioters, and Ms. Foote was in the area wearing clothing consistent with other rioters. Probable cause exists where the officer knew enough about the facts and circumstances and had reasonable trustworthy information, including what someone else told the defendant so that a reasonable person would believe that the plaintiff was guilty of the crime charged. *Iowa Model Civil Jury Instructions* 2800.1; *Sisler v. City of Centerville*, 372 N.W.2d 248, 251 (Iowa 1985). On the facts of this case, officers had probable cause to arrest and charge Ms. Foote.

Subsequent officers were entitled to rely on the information provided to them. As officers passed Ms. Foote on for transport and processing, other officers could reasonably rely on the actions of Officers Holtan and Herman. Lt. Bagby, Officer Allen, Officer Escobar Hernandez, and Officer George relied upon the information of their fellow officers for probable cause. Because all of the defendants either had probable cause for arrest and charges relied on that information from other officers, the Court should grant summary judgment on all of Ms. Foote's Count 12 claims.

---

[10] It does not appear that Ms. Foote is asserting a malicious prosecution claim under the Federal Constitution. In the event she is, judgment on that claim should be granted because no claim of malicious prosecution exists under the Federal Constitution. *See Roskens v. Graham*, 435 F. Supp. 3d 955, 980 (N.D. Iowa 2020), citing *Kurtz v. City of Shrewsbury*, 245 F.3d 753, 758 (8th Cir. 2001). *See also*, *Joseph v. Allen*, 712 F.3d 1222, 1228 (8th Cir. 2013), *Johnson v. Moody*, 2017 WL 2903351 *4 (S.D. Iowa June 15, 2017).

Ms. Foote also cannot prove malice. "Malice means any wrongful act which has been willfully and purposely done to the injury of another. The act must be done with an improper purpose or motive." *Craig v. City of Cedar Rapids, Iowa*, 826 N.W.2d 516 (Table), at *7 (Iowa Ct. App. 2012) (cleaned up). There is no evidence that any defendant acted from an improper purpose or motive. Without such evidence, a malicious prosecution claim cannot succeed. This is another reason summary judgment is warranted.

### IX. Ms. Foote's libel claims fail as a matter of law.

Ms. Foote cannot prevail on her libel claims because the statements made about her were truthful. Defendants were also privileged to make statements in the course of their duties. Libel is a form of defamation involving a written statement. In Iowa, this requires a plaintiff to demonstrate all of the following: (1) defendant made a written statement concerning the plaintiff; (2) the statement was false; (3) the statement was made with malice; (4) the statement was communicated to a third party; (5) the statement tended to injure the plaintiffs' reputation; (6) the statement caused damages; and the (7) amount of such damages. *See Delaney v. International Union UAW Local No. 94 of John Deere Mfg. Co*., 675 N.W.2d 832, 839 (Iowa 2004).

In order to meet element two, a statement must have been false. A truthful statement cannot be a defamatory one. *See Wilson v. I.B.P., Inc*., 558 N.W.2d 132, 140 (Iowa 1996), *Hovey v. Iowa State Daily Publication Board, Inc.,* 372 N.W.2d 253, 256 (Iowa 1985)( if an allegedly defamatory statement is substantially true, it provides an absolute defense to an action for defamation). It is not "necessary for a libel defendant to establish the literal truth of the publication in every detail as long as the 'sting' or 'gist' of the defamatory charge is substantially true." *Behr v. Meredith Corp.,* 414 N.W.2d 339, 342 (Iowa 1987) (citing *Hovey v. Iowa State Daily Pub. Bd., Inc.*, 372 N.W.2d 253, 255 (Iowa 1985)).

Defendants can also be protected from libel liability by qualified privilege for statements made pursuant to an obligation or duty.

> A qualified privilege exists with respect to statements that are otherwise defamatory if the following elements exist: (1) the statement was made in good faith; (2) the defendant had an interest to uphold; (3) the scope of the statement was limited to the identified interest; and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only.

*Barreca v. Nickolas*, 683 N.W.2d 111, 118 (Iowa 2004) (internal quotation omitted). Multiple courts have recognized that qualified privilege applies to statements made by police officers in investigatory reports. *See Doe HM v. City of Creve Coeur, Mo.*, 666 F. Supp. 2d 988, 1002 (E.D. Mo. 2009); *Bradford v. Mahan*, 548 P.2d 1223, 1229 (Kan. 1976); *Black v. Cleveland Police Dept.*, 644 N.E.2d 682, 685 (Ohio Ct. App. 1994).

None of the named defendants are liable to Ms. Foote for libelous statements.

Ernesto Escobar-Hernandez

Summary judgment on the libel claim should be granted for Officer Escobar-Hernandez because he did not make a written statement. Ms. Foote makes a claim for libel which requires a written statement. Officer Escobar-Hernandez participated in transporting Ms. Foote to the Polk County Jail but did not file any paperwork regarding her. Without a written statement, the libel claim against Officer Escobar-Hernandez cannot succeed.

Clark Allen

Officer Allen's statements about Ms. Foote were substantially true, were made without malice, and were made in the course of his duties. Officer Allen completed two reports: an Arrest Report and a Jail Booking Information form. Generally speaking, both forms contain the same type of information: Ms. Foote was arrested by Des Moines police officers downtown near Court Avenue near rioting and after failing to disperse. This information is substantially true as Ms. Foote was arrested near rioting after failing to leave an area where criminal activity was taking

place. The gist of the documents is accurate, even if some particular facts could be deemed inaccurate, which they were not. As such, Ms. Foote cannot prove the falsity of Officer Allen's statements about her.

Ms. Foote also cannot prove malice. Officer Allen was acting based on information he received and relied on from other officers about Ms. Foote's arrest. With regards to specific charges, he relied on information provided to him by commanding officers. There is no evidence Officer Allen acted with an intent to harm Ms. Foote as necessary to show malice. Again, Ms. Foote cannot prove a libel claim against Officer Allen.

Even if Ms. Foote could make a prima facie case for libel, Officer Allen would be protected by qualified privilege. The statements in the Arrest Report and a Jail Booking Information form were made in good faith, in the course of his duties as a law enforcement officer, were limited in scope to his duties as a law enforcement officer, and they were not published at any improper time. As such, qualified privilege protects Officer Allen's written statements. For all of these reasons, the Court should grant summary judgment to Officer Allen on Ms. Foote's libel claim against him.

<u>Jeffrey George</u>

Ms. Foote's libel claim against Lt. George fails for the same reasons as against Officer Allen. Lt. George relied on the arrest report and prior criminal charges to complete replacement preliminary complaint documents for charges of failure to disperse, unlawful assembly, and participating in a riot. Generally, the documents alleged that Ms. Foote was arrested near Court Avenue in Des Moines near a riot after failing to disperse. This is substantially true. The statements were made without malice. The statements were reasonably made in the course of Lt.

George's duties as a law enforcement officer. Just as with Officer Allen, the Court should grant summary judgment in favor of Lt. George on Ms. Foote's libel claim.

Brandon Holton

Officer Holton's statement about Ms. Foote's arrest is also substantially true. On June 10, 2020, Officer Holtan prepared a supplemental report about the arrest of Ms. Foote on May 31, 2020. In the report he describes approaching Ms. Foote, seeing her run and attempt to hide, commanding her to get down, deploying pepper spray, and pushing her against a wall with his shield. Officer Holtan describes not being able to restrain Ms. Foote until Officer Herman arrived to assist. This is generally consistent with Ms. Foote's description of events. There is no evidence Officer Holton had any intent to cause Ms. Foote harm. As such, Ms. Foote cannot prove falsity or malice to prevail on her libel claim. Additionally, Officer Holtan's statements are entitled to qualified privilege protection because they were made in the course of his law enforcement duties, were published at an appropriate time, and did not exceed the scope of his duties. For these reasons, the Court should grant summary judgment to Officer Holton on Ms. Foote's libel claim.

Adam Herman

Officer Herman's statements about Ms. Foote also do not justify liability for libel. Officer Herman also completed a supplemental report about Ms. Foote's arrest on June 10, 2020. He describes seeing her running and Officer Holton's struggle with her. He describes helping restrain Ms. Foote with his shield and then striking her with his baton. After this, she surrendered and went to the ground on her stomach after which she was handcuffed. Again, all of this is consistent with Ms. Foote's description of events. Disagreements on the details are not sufficient to warrant the libel claim proceeding to a jury where the statement is substantially true. For

evidence of malice by Officer Herman, there is none. Ms. Foote cannot prevail on a libel claim.

Officer Herman is also similarly entitled to qualified privilege for his statements. As with other

officers, the Court should grant summary judgment to Officer Herman on Ms. Foote's libel

claim.

<u>CONCLUSION</u>

For all the reasons stated herein, the named officers did not engage in constitutional or

tortious wrongs, wo they are entitled to summary judgment. Further, the officers are entitled to

qualified immunity on the constitutional claims. Finally, applying *Monell*, the City and Chief

Wingert's action were not deliberately indifferent in terms of training and supervision. In sum,

summary judgment should be granted to all filing defendants on all counts.


Respectfully Submitted,

*/s/ Michelle Mackel-Wiederanders*
Michelle Mackel-Wiederanders
Assistant City Attorney
400 Robert D. Ray Drive
Des Moines, IA 50309-1891
Email: mrmackel@dmgov.org
Telephone: (515) 283-4537

/s/ *Luke DeSmet*
Luke DeSmet
Assistant City Attorney
400 Robert D. Ray Dr.
Des Moines, Iowa 50309-1891
Telephone: (515) 283-4110
Email: lmdesmet@dmgov.org


ATTORNEYS FOR DEFENDANTS