**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| **DENVER FOOTE,**<br><br>　　　　**Plaintiff,**<br><br>**vs.**<br><br>**JOHN DOE 1; CLARK ALLEN; ERNESTO ESCOBAR HERNANDEZ; JEFFREY GEORGE; BRANDON HOLTAN; ADAM HERMAN; KIRK BAGBY; DANA WINGERT; CITY OF DES MOINES, IOWA,**<br><br>　　　　**Defendants.** | **Case No. 4:21-cv-00043-SBJ**<br><br><br>**RESISTANCE TO DEFENDANTS'**<br>**MOTION FOR SUMMARY JUDGMENT**<br><br>　**Redacted version** |

**COME NOWS** the Plaintiff, Denver Foote, and for her Resistance to Defendants'

Motion for Summary Judgment, respectfully states the following:

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 2

FACTS ....................................................................................................... 3

SUMMARY JUDGMENT STANDARDS ....................................................... 16

ARGUMENT ............................................................................................... 17

I.　Fact questions preclude summary judgment on Foote's unconstitutional arrest claims (Counts 1 & 2) ................................................................ 17

　A.　Questions of fact exist regarding whether probable cause existed to arrest Foote 18

　B.　Defendants' did not make an objectively reasonable mistake in arresting Foote 30

　C.　Questions of fact exist regarding whether Herman and Holtan exercised all due care 31

II.　Fact questions preclude summary judgment on Foote's false arrest/imprisonment claim (Count 13) ....................................................................... 32

III.　Fact questions preclude summary judgment on Foote's malicious prosecution claim (Count 12) ....................................................................... 33

IV.　Fact questions preclude summary judgment on Foote's libel claim (Count 14) 34

V.      Fact questions preclude summary judgment on Foote's excessive force claims (Counts 3 & 4) ................................................................................................. 35

VI.     Fact questions preclude summary judgment on Foote's assault/battery claim (Count 15).......................................................................................................... 40

VII.    Fact questions preclude summary judgment on Foote's retaliation claims (Counts 5 & 6) ................................................................................................................... 41

    A.      Probable cause does not defeat Foote's claims ............................................ 42

    B.      Viewed in the light most favorable to Foote, she was engaged in protected activity. .............................................................................................................. 44

    C.      Stopping, abusing, and falsely citing would chill a person from exercising their constitutional rights. ............................................................................................. 45

    D.      Viewed in the light most favorable to Foote, retaliation was a substantial factor for Herman and Holtan's actions .......................................................................... 45

I.      Fact questions preclude summary judgment on Foote's IIED claim (Count 11) .. 47

## INTRODUCTION

Defendants claim that they "accept Ms. Foote's deposition testimony of events for purposes of summary judgment" but then proceed to premise their arguments on the officers' version of events—not Foote's. (Def MSJ Brief at 3). For one example of many, Defendants assert, "Whether Foote indicates she heard it or not, Holtan gave her an order to get to the ground." (Def MSJ Brief at 30). Such a statement indicates a fundamental misunderstanding of how summary judgment works. If Foote, the nonmovant, claims the Defendants never gave her an order, for purposes of summary judgment that means *Defendants never gave her an order.* Whether Foote is correct or not is a credibility call for the jury to make.

Taking the facts in the light most favorable to Foote, there was no unlawful assembly nearby when she was attacked by Holtan and Herman. She did not resist them or flee and they had no legitimate reason for assaulting her. Probable cause was also plainly lacking for Foote's arrest and subsequent charges. Defendants are not entitled to

summary judgment on Counts 1 and 2 (illegal seizure), 3 and 4 (excessive force), 5 and 6 (retaliation), 11 (IIED), 12 (malicious prosecution), 13 (false arrest), 14 (libel), or 15 (assault/battery). Foote does not resist the dismissal of her conspiracy claims, Counts 7 and 8, or her deliberate indifference claims, Counts 9 and 10. She does not resist the dismissal of her libel claim, Count 14, against Defendant Escobar Hernandez.

**FACTS**

After receiving word that people were vandalizing property on Court Avenue and breaking into Hy-Vee, police arrived on Court Avenue at 2:37am. (4th Court HyVee Cam West-2020-05-30_21h00min00s000ms at 2:37:10). The crowd of people gathered at Hy-Vee immediately dispersed, running away primarily to the West and South. (4th Court HyVee Cam West-2020-05-30_21h00min00s000ms at 2:37:00–20). Shortly before the police arrived, Foote had been walking West on the South side of Court Avenue. She never reached Hy-Vee. Around 50 seconds before officers arrived, Foote ran North through the alley just West of Court Avenue Brewing & Company. (Def Appx 252).

After police arrived at Hy-Vee, things immediately calmed down on Court Avenue and there were no unruly crowds. (4th Court Looking North-2020-05-30_21h00min00s000ms_6 at 2:37:10–40:00). That area of downtown Des Moines— Court Avenue between 2nd Avenue and 5th Avenue, extending roughly a block to the North and South as well—has a very active nightlife. There are 10+ bars in that area of downtown, and those bars are particularly busy on the weekends. A handful of people remained in the area after the police arrived. (*See generally* 4th Court Looking North-2020-05-30_21h00min00s000ms_6 at 2:37:10–43:15). To the East, at the intersection of Court Avenue and 3rd Street, dozens of people continued on about their business, walking

3

by themselves or with a friend or two. (3rd-Court NE-SW Cam-2020-05-31_02h00min00s000ms at 2:37:10–43:15).

No officers approached people at that end of Court Avenue and told them they had to leave. *Id.* It was reasonable that other people were still downtown. (Def Appx 547 (Herman DT 33:9–25)). People were coming in and out of bars. (Def Appx 548 (Herman DT 34:10–16; 3rd-Court NE-West Cam-2020-05-31_02h00min00s000ms at 2:40:55)). Dozens of officers were in the Court Avenue area and far outnumbered the citizens who continued to mill about in the area. (*See generally* 4th Court Looking North-2020-05-30_21h00min00s000ms_6 at 2:37:10–43:15; 3rd-Court NE-SW Cam-2020-05-31_02h00min00s000ms at 2:37:10–43:15; 3rd-Court NE-N Remote-2020-05-31_02h00min00s000ms at 2:43:00).

Shortly before her arrest, Foote had been standing near the corner of Court Avenue and 3rd Street, by Annie's Irish Pub. She encountered no police near Court Avenue. (3rd-Court NE-SW Cam-2020-05-31_02h00min00s000ms at 2:37:10–43:15). She left her partner and her friend at the corner of Court Avenue and 3rd Street and began walking back North on 3rd Street by herself at 2:43:00 to go to her car to leave. (Def Appx 50 (Foote DT 48:22–24)).



(3rd-Court NE-SW Cam-2020-05-31_02h00min00s000ms at 2:43:00 (immediately before Foote walks out of sight to the North)).

There are surveillance cameras at various points around Court Avenue in Des Moines. Foote's arrest is not captured on video because the location of her arrest fell in a blind spot between two camera views. The X in this picture marks the location of her arrest, which is on 3rd Street just North of Court Avenue:



(Plf Appx 13).

Herman and Herman were notified that people were breaking into Hy-Vee and was sent to the Court Avenue area. (Def Appx 530 (Herman DT 16:6–18)). Herman and Holtan received orders from Commander Schafnitz to arrest people in the area. (Def Appx 530, 622 (Herman DT 16:12–17:8; Holtan DT 27:8–11)). They rode together, along with a large group of Metro STAR officers, and parked near the Civic Center on 3rd Street. (Def Appx 615–16 (Holtan DT 20:15–21:7)). This camera view shows Herman and Holtan (along with 15+ other Metro STAR officers) walking South on 3rd Street towards Court Avenue immediately prior to encountering Foote:



Sunday, May 31, 2020 2:43:00 AM

Remote-2020-05-31_02h00min00s000

7

(3rd-Court NE-N Remote-2020-05-31_02h00min00s000ms at 2:43:00). Foote's arrest took place just beyond this camera's view at approximately 2:43:15. (*See* Def Appx 548 (Herman DT 34:25–35:4)).

When Foote saw the officers coming, she stepped backwards into an alcove at the patio entrance to Annie's Irish Pub. (Def Appx 51 (Foote DT 49:7–9)). As the officers came closer, Foote decided it was not safe to be out of sight in the alcove, so she stepped out on to the sidewalk and stood there. (Def Appx 51, 53 (Foote DT 49:8–11, 51:16–22)). Foote is 4 foot 11 inches tall and weighs 101 lbs. (Def Appx 684). Foote did not run when she saw the officers. (Def Appx 563 (Herman 49:4–15); Plf Appx 13 ¶¶ 3, 5)). Foote was by herself when Herman and Holtan observed her. (Def Appx 544, 633 (Herman DT 30:3–5; Holtan DT 38:24–25); Def Appx 51 (Foote DT 49:16–18)). Foote was not wearing goggles. (Def Appx 27, 54 (Foote DT 25:17–20, 52:18–23); 3rd-Court SW-NE Cam-2020-05-31_02h00min00s000ms at 2:38:52–59)). She was not carrying anything indicative of protesting or rioting, like milk, rocks, or signs. (3rd-Court SW-NE Cam-2020-05-31_02h00min00s000ms at 2:38:52–59).

As Foote stood on the sidewalk in front of the alcove, an unknown Metro STAR officer passed by and sprayed her in the eyes with pepper spray. (Def Appx 54, 55 (Foote DT 52:1–4, 53:14–17)). Metro STAR officers continued to the corner of Court Avenue and Third Street, where they come into camera view, pepper-spraying people willy-nilly:

- At 2:43:16, a Metro STAR officer sprays two people, one in a black shirt and one in a blue shirt, who are standing by the Annie's patio wall with their backs turned to the street and their hands up. The officer does a drive-by spraying and continues to run down the street.

- At 2:43:20, that same officer and another officer run up and spray three people who they chase into Court Avenue. One individual did not run away, but instead stood on the corner and bent over, trying to protect his face. Both officers pepper-spray him in the face, as one of the officers

8

has ahold of his collar. The officers then release the man and proceed to their next target.

- At 2:43:23, another Metro STAR officer enters the frame from the North and pepper-sprays the two people in the black and blue shirts who are still standing in the same place by the Annie's patio wall with their backs to the street and their hands up. That officer also sprays another person standing by the wall with his back turned to the street.

- At 2:43:25, another Metro STAR officer confronts a man walking on the sidewalk by the corner of the Annie's patio. The man gets down on the ground in submission to the officer. The officer kicks him twice in the side. The man crawls forward and then stands up. Another officer hits the man in the back with a baton as the man rises. They allow the man to run away.

- At 2:43:42, those same Metro STAR officers walk West a couple of paces and find someone squatting down by the Annie's patio fence. The person rises, and an officer shoves the person backwards. Another officer shoots the person in the face with pepper-spray. The officers then allow the person to walk away.

- At 2:43:31, on the Northeast corner of the Court Avenue and 3rd Street intersection, a man attempts to walk North on 3rd Street. He is cut off by a Metro STAR officer holding a can of pepper-spray. They have a conversation and the man takes a couple of steps backwards. A group of 10+ Metro STAR officers have gathered on the corner at this point. The officers gesture to the South, indicating that is where the man should go. The man begins to turn to the South and the first officer shoots him in the face with a blast of pepper-spray. The man falls on his face into the intersection. The Metro STAR officers walk away, leaving the man incapacitated in the street. No one attempts to arrest him. At 2:44:10, the man manages to get up and is allowed to walk away.

- At 2:44:21, a Metro STAR officer throws a canister of tear gas at a group of four people who were walking away to the South. The officer walking beside him throws another canister at the people.

(3rd-Court NE-SW Cam-2020-05-31_02h00min00s000ms at respective timestamps).

Meanwhile, after the first blast of pepper-spray from the lead-off Metro STAR officer, Foote remained standing on the sidewalk, blinded. (Def Appx 56, 57 (Foote DT 54:13, 55:2)). Holtan then reached Foote and again sprayed her in the face with pepper spray. (Def Appx 55 (Foote DT 53:1–5)). After he sprayed Foote, Holtan pushed her back

into the Annie's Pub alcove with his shield, into the metal bars of the patio gate. (Def Appx 56, 57 (Foote DT 56:9–14, 55:5–17)).



(Plf Appx 14, 15). Holtan did not say anything before spraying and pushing her. (Def Appx 57 (Foote DT 55:18–23); Plf Appx 13 ¶ 6). Nor had Foote said anything. (Def Appx 57 (Foote DT 55:24–25)).

Herman then joined Holtan and also pushed Foote with his shield, boxing her in and pushing her into the metal gate. (Def Appx 58–59 (Foote DT 56:9–57:2)). Herman struck Foote three times with his baton, first in her right thigh, then her ribs, and then her arm. (Def Appx 59, 61, 62 (Foote DT 57:22–23, 59:5, 60:1–15)). Herman testified he struck Foote twice on the left shoulder with his baton. (Def Appx 533 (Herman DT 19:19–20); Def Appx 538 (Herman DT 24:5–6)). Foote's bruising in consistent with where she

claims she was hit, and inconsistent with Herman's claim that he struck her twice on the shoulder. The attack caused Foote severe bruising and pain. (Plf Appx 18–22).

After Herman struck her the first time, Foote said "Stop. I'm not resisting." (Def Appx 60 (Foote DT 58:21–22)). He nevertheless struck her two more times. Foote then fell to the ground. (Def Appx 62, 63 (Foote DT 60:13–20, 61:10–13)). She continued to tell the officers she was not resisting as she fell to the ground and laid there. (Def Appx 63 (Foote DT 61:6–9)). Either Holtan or Herman had his knee in her back and his shield holding her down, which was painful. (Def Appx 64 (Foote DT 62:16–23)). One of the officers stepped on her glasses and broke them. (Def Appx 66 (Foote DT 64:6–8)).

At no point in her interaction with the officers did Foote resist them in any way. (Plf Appx 13 ¶ 2). Foote did not have the opportunity to comply before Holtan and Herman began assaulting her. (Plf Appx 14 ¶ 7). She did not try to evade the officers or run away. (Plf Appx 14 ¶¶ 8, 9).

Herman did not record any body camera footage on Saturday evening. (Def Appx 622 (Herman DT 8:13–20)). Holtan was wearing his body camera and it still had battery, but he did not record his arrest of Foote. (Def Appx 605 (Holtan DT 10:3–11:7)).

Herman and Holtan took Foote and dropped her off with other officers by the paddy wagon. (Def Appx 607 (Holtan DT 12:13–24)). When he dropped Foote off at the paddy wagon staging area, Herman understood Foote would be charged with rioting or failure to disperse. (Def Appx 540 (Herman DT 26:1–5)). Foote sat by the paddy wagon, blinded and sobbing. (JordanWall_202005310244_WFC1006110_162909917 at 6:09–:46; ThomasGarcia_202005310239_WFC1049311_46927103 at 10:45).

Herman did not know if Foote had received a dispersal order. (Def Appx 541 (Herman DT 27:8–12)). Holtan also had no reason to believe Foote had been present earlier in the evening when dispersal orders were given at other locations. (Def Appx 624, 625 (Holtan DT 29:22–25, 30:11–14)). Holtan did not witness Foote at any place where a dispersal order had been given, nor did he have information from any other officer that Foote had been present for a dispersal order. (Def Appx 625 (Holtan DT 30:11–18)). Holtan had no reason to believe Foote had been in a parking garage where people had been throwing objects at officers. (Def Appx 658 (Holtan DT 63:18–23). The officers did not question Foote as to whether she had been a part of the earlier riots or heard any order to disperse. (Def Appx 553 (Herman DT 39:6–9)). They did not conduct any follow-up investigation to see if Foote heard an order to disperse. (Def Appx 553 (Herman DT 39:10–13)).

Holtan had not been given any training prior to that night about the crimes of unlawful assembly or failure to disperse. (Def Appx 621, 644 (Holtan DT 26:10–14; 49:12–13)). The only evidence Herman had to suggest Foote had been with rioters was that she was in the area, was wearing industrial-grade goggles (disputed), had a handkerchief covering her nose, and was wearing black. (Def Appx 540–542 (Herman DT 26:6–12, 27:16–19, 28:4–9)). Holtan testified that his probable cause for arresting Foote was that she was running from the Hy-Vee area (disputed), which justified charges for failure to disperse and vandalism. (Def Appx 623 (Holtan DT 28:2–25)).

Herman admitted he had suspicion Foote was guilty of failing to disperse, but he had no actual evidence. (Def Appx 543 (Herman DT 29:19–30:2)). Herman never asked Foote any questions about what she had been doing downtown. (Def Appx 554 (Herman

12

DT 39:6–13). Herman was aware of no information that would justify charging Foote with Criminal Mischief. (Def Appx 554 (Herman DT 40:6–9)). Herman thinks it is incorrect that Foote was charged with Criminal Mischief. (Def Appx 575 (Herman DT 61:23–25)).

Foote ended up in Allen and Escobar Hernandez's paddy wagon. Allen and Escobar Hernandez were instructed to charge all of the arrestees in their paddy wagon with the two charges associated with case number 14451. (ClarkAllen_202005310235_WFC1035595_59205971 at 48:45, 1:05:20–50, 1:10:50). Allen and Escobar Hernandez pulled up that case number and realized that the two charges they had been instructed to apply to everyone were Criminal Mischief 2nd degree, a Class D felony, and Rioting, an aggravated misdemeanor. (ClarkAllen_202005310235_WFC1035595_59205971 at 1:12:00). Allen and Escobar Hernandez recognized that there was no basis to charge the arrestees in their paddy wagon with these charges. Allen stated, "We're putting them all under criminal mischiefs? That doesn't make any sense. There's no possible way." *Id.*

Allen therefore went to his supervisor, Bagby, to see if there had been a mistake. (ClarkAllen_202005310235_WFC1035595_59205971 at 1:12:45). Bagby confirmed that everyone was to be charged with Rioting and Criminal Mischief. *Id.* The police did a "blanket charge of criminal mischief on everyone" they arrested that night. (Def Appx 692 (George DT 5:20–21)). Allen and Escobar Hernandez subsequently transported Ms. Foote to jail. ((Def Appx 762 (Clark DT 32:18–20)). Allen and Escobar Hernandez booked Ms. Foote into the Polk County Jail on charges of Criminal Mischief in the 2nd Degree, a Class D felony, and Rioting, an aggravated misdemeanor. (Def Appx 827).

Escobar Hernandez acknowledged that there was no way those charges would hold up, but the charges would serve to "keep them inside." (ClarkAllen_202005310235_WFC1035595_59205971 at 1:14:20). Allen agreed the charges were "an absolute crap shot." (ClarkAllen_202005310235_WFC1035595_59205971 at 1:14:35). Allen testified at his deposition that "it would be conjecture for me to guess one way or the other" as to whether anyone in his paddy wagon had committed criminal mischief. (Def Appx 761 (Allen DT 31:19–23)). He recognized he had no particular probable cause information that night. (Def Appx 762 (Clark DT 32:5–7)).

Later, on May 31, 2020, George filed three criminal complaints against Ms. Foote charging her with Participation in a Riot, in violation of Iowa Code § 723.1; Unlawful Assembly, in violation of Iowa Code § 723.2; and Failure to Disperse, in violation of Iowa Code § 723.3. (Def Appx 799–804). The affidavits George submitted in support of those charges stated:

> Defendant was a member of a group (of WELL over three people) that assembled to protest allegations of racism and police brutality. Initially, the protest was peaceful. The protests evolved to rioting in the late evening of hours of May 30, 2020 into the early morning hours of May 31, 2020 with many of the remaining participants engaging in violent, intimidating and destructive behavior. Police officers clearly, loudly and repeatedly instructed all participants to disperse.

> Despite those instructions, Defendant willfully stayed among the group that remained. This group was engaging in assaultive conduct, the intimidation of people and destruction of property. The participants barricaded public streets. Private businesses and public buildings were damaged with spraypaint.

> Windows were shattered. Fires were started and rocks were thrown at people including police officers. Citizens working in the area were afraid for their safety.

14

> This destruction was open, extensive and obvious, yet the defendant willfully remained among the group of persons responsible for this conduct all of which occurred in the City of Des Moines, Polk County, Iowa.

(Def Appx 799–804). He copied and pasted that language, which was written by someone in the county attorney's office. (Def Appx 702 (George DT 15:4–15)).

George submitted these new charges because the county attorney's office had instructed the police "to drop the criminal mischief and go with rioting, unlawful assembly, and then the failure to disperse." (Def Appx 692–93 (George DT 5:25–6:2)). George had no direct communication with the county attorney's office. (Def Appx 695 (George DT 8:5–7)). The only information he had justifying the charges he filed were the complaints previously filed against Foote and a report from another officer listing Denver Foote's name and saying her charges were criminal mischief 2nd and rioting. (Def Appx 697 (George DT 10:17–19)).

Foote was released from custody on pretrial supervision, with an 8:00 p.m. curfew and a requirement to contact a pretrial supervision officer for an in-person visit once a month. (Plf Appx 3). On July 7, 2020, the State moved to dismiss the Participation in a Riot charge, stating police "have been unable to sufficiently document this defendant's actions for charges to go forward at this time." (Plf Appx 9). The Polk County District Court dismissed the charge the same day. (Plf Appx 6). On December 2, 2020, the State moved to dismiss the charges of Unlawful Assembly and Failure to Disperse stating, "There is insufficient evidence to proceed to a trial." (Plf Appx 10). The Polk County District Court dismissed the charges the same day. (Plf Appx 11).

[redacted]

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. Courts may not draw inferences of fact on summary judgment in favor of the moving party. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). This is particularly true in cases concerning qualified immunity. *See Bell v. Kansas City Police Dep't*, 635 F.3d 346, 347 (8th Cir. 2011); *Gardner v. Buerger*, 82 F.3d 248, 251 (8th Cir. 1996). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2513 (1986).

Defendants bear the burden of proving their entitlement to qualified immunity. To determine whether a defendant is entitled to qualified immunity, the court must access 1) whether the facts, viewed in the light most favorable to Plaintiff, establish a violation of a constitutional or statutory right, and 2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "'In determining whether the legal right at issue is clearly established, this circuit applies a flexible

standard, requiring some, but not precise factual correspondence with precedent, and demanding that officials apply general, well-developed legal principles.'" *Whisman Through Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997).

Defendants incorrectly cite *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 672 (8th Cir. 2007), to assert that "[t]o overcome qualified immunity inquiry, Foote must establish that the defendants were 'intentional or reckless, thereby shocking the conscience.'" (Def MSJ Brief at 14). This is misrepresentation of *Brockinton*. The standard Defendants quote is the specific standard for a Fourteenth Amendment failure-to-investigate claim:

> Brockinton asserts that Gurley violated his right to due process of law under the Fourteenth Amendment by conducting an inadequate investigation. To establish this violation, Brockinton must show that Gurley's failure to investigate was intentional or reckless, thereby shocking the conscience.

*Brockinton*, 503 F.3d at 672. That standard does *not* apply to any of the constitutional claims Foote has raised.

### ARGUMENT

### I. Fact questions preclude summary judgment on Foote's unconstitutional arrest claims (Counts 1 & 2)

"'Arrest on mere suspicion collides violently with the basic human right of liberty.'" *Henry v. United States*, 80 S. Ct. 168, 170–71 (1959). "It is clearly established that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010).

Iowa courts "generally interpret the scope and purpose of the Iowa Constitution's search and seizure provisions to track with federal interpretations of the Fourth Amendment because of their nearly identical language." *State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019) (internal quotation marks omitted). Iowa Supreme Court has held that

violations of article I, section 8 may give rise to a suit for damages. *Godfrey v. State*, 898 N.W.2d 844, 862–63 (Iowa 2017) (collecting cases demonstrating "the thoroughly well settled principle that violation of article I, section 8 gives rise to a cause of action"); *see also Meyer v. Herndon*, 419 F. Supp. 3d 1109, 1126–31 (S.D. Iowa 2019) (finding article I, section 8 to be self-executing).

### A. Questions of fact exist regarding whether probable cause existed to arrest Foote

 "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry*, 80 S. Ct. at 171. "[G]ood faith on the part of the arresting officers is not enough." *Id.* Officers must have specific information suggesting a particular person has committed a crime before making an arrest.

> [W]homever the police arrest they must arrest on 'probable cause.' It is not the function of the police to arrest, as it were, at large and to use an interrogating process at police headquarters in order to determine whom they should charge before a committing magistrate on 'probable cause.'

*Mallory v. United States*, 77 S. Ct. 1356, 1360 (1957). Mere proximity to an area where unlawful activity has occurred does not give rise to probable cause to arrest anyone in the area. *See United States v. Shavers*, 524 F.2d 1094, 1095–96 (8th Cir. 1975) (noting "proximity to scene of crime does not provide probable cause to arrest"); *see also Ybarra v. Illinois*, 100 S. Ct. 338, 342 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.").

Defendants claim that officers had probable cause to arrest and charge Foote with unlawful assembly, rioting, and failure to disperse. (Def. MSJ Brief at 17). Defendants' argument rests on the disputed factual claims that "Foote was seen running from the

18

immediate vicinity of a riot in-progress" and that she was "with two other people who were also running, among a group of many others running from the riot area." (Def MSJ Brief at 18; see also Def MSJ Brief at 20 ("Again, this case is not about mass arrest. It is about one arrest of one individual fleeing the scene of a riot.").

None of that is correct. There was no riot in-progress when Holtan and Herman attacked Foote. Police arrived on Court Avenue at 2:37am. (4th Court HyVee Cam West-2020-05-30_21h00min00s000ms at 2:37:10). Foote was arrested around 6 minutes later, at 2:43am, a block away. *See Shavers*, 524 F.2d at 1095 (finding probable cause lacking in part because "approximately ten minutes had elapsed between the robbery attempt and when [defendant] was arrested only a block from the bank"). The Court Avenue area was calm when Holtan and Herman arrived. When Holtan and Herman encountered her, Foote was not running, she was not with two other people who were running, and she was not in a group of many others running. (Def Appx 563 (Herman 49:4–15); Def Appx 544, 633 (Herman DT 30:3–5; Holtan DT 38:24–25); Plf Appx 13–14). The officers did not see Foote with any person acting in a violent manner. There was no evidence suggesting she had willingly joined in or remained a part of an unlawful assembly. (Def Appx 543 (Herman DT 29:19–30:2)). She was standing by herself on a public sidewalk in Des Moines' busiest bar district, doing nothing illegal or suspicious. (Def Appx 544, 633 (Herman DT 30:3–5; Holtan DT 38:24–25)).

These facts distinguish this case from *Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012), where the Court found probable cause for a mass arrest of protesters. In *Bernini*, during protests in St. Paul, Minnesota, there were reports of property damage around the city. *Id.* at 1001. Consequently, the police commander

ordered that no one be allowed to enter the downtown area. *Id.* Officers blocked a large group that attempted to move towards downtown, and the group threw objects at the officers. *Id.* The crowd grew in size and started chanting in unison and yelling profanities. *Id.* The officers were "clearly outnumbered." *Id.* at 1005. "The group had demonstrated an intent to charge the downtown area, and members of the group were beginning to obstruct a major roadway that was designated for emergency vehicles and the First Lady's motorcade." *Id.* at 1004. Officers then decided to encircle the crowd in a nearby park to make arrests. *Id.* at 1002. The officers attempted to determine who had been in the protesting crowd and who were innocent bystanders in the park. The officers eventually released approximately 200 people and arrested around 160 others, but some innocent bystanders were still arrested. *Id.*

*Bernini* held "the Fourth Amendment 'is satisfied if the officers have grounds to believe all arrested persons were a part of the *unit* observed violating the law.'" *Id.* at 1003 (emphasis in original); *see also Dinler v. City of New York*, No. 04 CIV. 7921 RJS JCF, 2012 WL 4513352, at *5 (S.D.N.Y. Sept. 30, 2012) ("*Bernini* stand[s] for the unremarkable proposition that, where a group of individuals is acting in concert such that a reasonable police officer could conclude that every member of the group violated the law, that officer would be justified in arresting every member of the group."). The Court ultimately held the officers in that case had probable cause to conduct the mass arrest because "a reasonable officer could have concluded that the individuals at the intersection were acting together and that they intended to break through the police line in an attempt to access downtown St. Paul." *Bernini*, 665 F.3d at 1004. The Eighth Circuit found the officers could have reasonably concluded that the group was acting as a unit because the

individuals donned gas masks and other facial coverings, flags waved from within the crowd, several people shouted profanities and taunted the officers, members shielded themselves behind two large signs, and members chanted in unison. *Id.* at 1003-04. The Eighth Circuit also noted that the officers did not arrest everyone but attempted to discern who had been a part of the initial altercation where the unlawful activity had occurred and who had not, releasing approximately 200 people. *Id.* at 1005. *Bernini* demonstrates that to conduct a mass arrest there must be probable cause that the group is committing a crime and acting as a unit.

Foote's presence on a public sidewalk by herself after the unlawful assembly had completely dispersed sets this case apart from *Bernini*. Herman and Holtan had no basis to believe Foote was part of a "unit observed violating the law." *See Baude v. City of St. Louis*, 476 F. Supp. 3d 900, 910 (E.D. Mo. 2020) ("Unlike the crowd in *Bernini*, which was marching and chanting in unison, the people near the intersection of Washington and Tucker were just milling about."). In that busy bar district, no reasonable officer would believe that every person in the vicinity had been a part of something illegal. *See Davis v. City of St. Louis*, No. 4:18CV1574 HEA, 2021 WL 4148331, at *7 (E.D. Mo. Sept. 13, 2021) ("It is not reasonable to assume the group of individuals arrested in mass are the same group that engaged in the earlier vandalism when the area includes many businesses, including shops and restaurants, as well as residential buildings[.]"). Indeed, the officers did not arrest or harass many other citizens who were in the area. (*See* 3rd-Court NE-N Remote-2020-05-31_02h00min00s000ms at 2:43:00–45:00). Further, in this case, the officers asked Foote no questions and did no investigation to determine if she was an innocent bystander or violent rioter. "Defendants' failure to determine which

members of the crowd were part of the unit acting unlawfully undermines their argument that arguable probable cause existed." *Baude*, 476 F. Supp. 3d at 910; *see also Alston v. City of Saint Louis, Missouri*, No. 4:18-CV-01569-AGF, 2021 WL 4476690, at *6 (E.D. Mo. Sept. 30, 2021) (noting "key factor" in the *Bernini* analysis was the officers attempt to separate innocent civilians from those who acted unlawfully and faulting the St. Louis defendants for making "no such attempt").

Herman and Holtan suspected Foote has been part of an unlawful assembly but had no particular information to substantiate that suspicion. They had only her proximity to an area where unlawful activity had taken place. Given that this area was a busy bar district where many people live and socialize, her mere proximity was insufficient. *See Shavers*, 524 F.2d at 1095 (finding probable cause lacking when man was arrested "[a]t 9 o'clock on any weekday morning, [when] many individuals answering to the broadcast description could be found in a business district such as the one where Shavers was arrested").

Likewise, Allen, Escobar Hernandez, George, and Bagby had no particular information to justify charging Foote with Criminal Mischief in the 2nd Degree, Rioting/Participation in a Riot, Unlawful Assembly, or Failure to Disperse, but they did so anyway. Bagby was merely "passed on charging decisions from command staff to officers transporting arrested individuals to jail." (Def Appx 828). By ordering his subordinates to issue blanket charges to everyone arrested regardless of individualized probable cause, Bagby directly participated in violating Foote's constitutional rights. *See Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806–07 (8th Cir. 1994) (recognizing supervisor may be held liable if "he directly participated in the constitutional violation"). Allen and Escobar

Hernandez explicitly recognized the lack of information justifying the Rioting and Criminal Mischief charges, but they booked Foote into jail on those charges anyway. George filed criminal complaints and affidavits against Foote despite having no particularized information that anything he was saying was true. They all bear responsibility for Foote's continued, illegal arrest. It is no excuse that they were just following orders. *See J.H.H. v. O'Hara*, 878 F.2d 240, 245 (8th Cir. 1989) ("An official's actions are not immunized because they were taken according to orders or regulations if the defendant still knew or should have known he was violating plaintiff's constitutional rights."); *Villanueva v. George*, 659 F.2d 851, 855 (8th Cir. 1981) (noting officers may not "'hide behind the cloak of institutional loyalty'"); *Magnan v. Doe*, No. CIV. 11-753 JNE/SER, 2012 WL 5247325, at *7 (D. Minn. July 6, 2012) ("The fact that Moore was junior to other officers on the scene does not grant him leave to disregard his training on proper detention.").

Defendants spend a significant portion of their brief discussing what Foote did on the prior day and earlier in the evening on May 30th, but the fact that Foote participated in protests earlier in the night or the previous night is immaterial. "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 125 S. Ct. 588, 593 (2004). "It depends on the facts known, at the time of the arrest, to the person by whom the arrest is made, from which it follows that an arrest cannot be justified by what a subsequent search discloses." *Children v. Burton*, 331 N.W.2d 673, 680 (Iowa 1983). When they arrested Foote, Herman and Holtan had no information suggesting Foote had been at any particular location or joined with anyone doing anything illegal. Defendants' after-the-fact assessment of Foote's culpability cannot justify their illegal arrest. *Cf. Tatum v.*

*Robinson*, 858 F.3d 544, 549 (8th Cir. 2017) (noting pepper-spraying was not justified by later discovery of shank in plaintiff's pocket); *Welch v. Dempsey*, No. 420CV00235SMRHCA, 2021 WL 5206138, at *6 n. 10 (S.D. Iowa Nov. 4, 2021) (officer claimed plaintiff's earlier statements at protest justified arrest but "provide[d] no explanation for how [officer] would be aware of her alleged statements since they occurred prior to his arrival on the scene").

Defendants offer no analysis of the elements of the crimes they claim Foote committed. Considering these factual disputes, probable cause is lacking on several elements of each alleged crime. There is no arguable probable cause for her arrest and charges.

### 1. Unlawful Assembly

Iowa Code § 723.2 (2020) provides:

An unlawful assembly is three or more persons assembled together, with them or any of them acting in a violent manner, and with intent that they or any of them will commit a public offense. A person who willingly joins in or remains a part of an unlawful assembly, knowing or having reasonable grounds to believe that it is such, commits a simple misdemeanor.

The Iowa Charging Manual sets forth the elements as follows:

a. Willingly join in or remain a part of;

b. An unlawful assembly of

(1) three or more persons,

(2) assembled together,

(3) any or all of them acting:

(a) in a violent manner and

(b) with intent to commit a public offense;

(4) Knowing that the gathering is an unlawful assembly or having reasonable grounds to believe it is an unlawful assembly.

24

"Assembly" has been defined as "the concourse or meeting together of a considerable number of persons at the same place." *State v. Bush*, 518 N.W.2d 778, 780 (Iowa 1994) (cleaned up).

In *Small v. McCrystal*, 708 F.3d 997 (8th Cir. 2013), the Eighth Circuit considered whether there was probable cause to arrest the plaintiff for unlawful assembly. In that case, officers went to a golf course at 1:30am to respond to a large disturbance. *Id.* at 1002. There were 30 to 50 people inside the clubhouse when the officers arrived, none of them acting violently. *Id.* The officers went outside. *Id.* A few minutes later, the plaintiff also exited and walked towards his camper in the parking lot. *Id.* Without warning, one of the officers tackled the plaintiff from behind and arrested him. *Id.*

The Eighth Circuit found there was not probable cause to arrest the plaintiff for unlawful assembly because "[n]either he nor any other person gathered at the time of his arrest was "acting in a violent manner." *Id.* at 1003. Rather, those gathered were dispersing. *Id.* Further, the plaintiff did not "'join in or remain' a part of any group; he was walking away when arrested." *Id.*

The facts here, taken in the light most favorable to Foote, are the same. There was no unlawful assembly at the time Herman and Holtan arrived. Those who had been gathered had dispersed. The officers never observed Foote with any other person. There was no probable cause to arrest her for unlawful assembly. Allen, Escobar Hernandez, George, and Bagby similarly had no information justifying Foote's arrest on this basis.

### 2. Failure to Disperse

Iowa Code § 723.3 provides:

A peace officer may order the participants in a riot or unlawful assembly or persons in the immediate vicinity of a riot or unlawful assembly to disperse.

Any person within hearing distance of such command, who refuses to obey, commits a simple misdemeanor.

The Iowa Charging Manual sets forth the elements as follows:

a. Person is

    (1) A participant in

        (a) A riot or

        (b) An unlawful assembly or

    (2) In the immediate vicinity of

        (a) A riot or

        (b) An unlawful assembly

b. Within hearing distance of a peace officer's order to disperse

c. And refuses to obey police officer's order to disperse.

A "riot" is defined as "three or more persons assembled together in a violent and disturbing manner, and with any use of unlawful force or violence by them or any of them against another person, or causing property damage." Iowa Code § 723.1.

To begin, when Herman and Holtan encountered Foote, there was no riot or unlawful assembly occurring anywhere in Foote's "immediate vicinity." The crowd of people had dispersed from Court Avenue when officers arrived at Hy-Vee at 2:37am. There was no basis except rank speculation for the officers to conclude Foote had been a participant in any riot or unlawful assembly on Court Avenue. She certainly was not a participant or in the immediate vicinity of a riot/unlawful assembly at the time they crossed her path. Thus there was not arguable probable cause to arrest Foote for failure to disperse because element (a) was not satisfied.

Nor was element (b) satisfied. There was no probable cause for this charge because neither Holtan nor Herman had any reason to believe Foote had been given an

order to disperse. (Def Appx 541 (Herman DT 27:8–12); Def Appx 624, 625 (Holtan DT 29:22–25, 30:11–14); Def Appx 625 (Holtan 30:11–18)). Foote did not encounter officers in the Court Avenue area until Herman and Holtan attacked her, so she certainly never received an order to disperse. No order to disperse was given on Court Avenue when officers arrived at 2:37am. Many people continued to mill about the downtown area and were allowed to do so by officers in the area. Neither Holtan nor Herman themselves gave Foote an order to disperse or the opportunity to comply with such an order. *See Baude*, 476 F. Supp. 3d at 911 (finding probable cause lacking when there were "significant factual disputes regarding the nature, quantity, and timing of dispersal orders given to the crowd"). A dispersal order is the one thing that is required prior to criminalizing someone being in a public area, and it did not happen. *Id.* ("Given the First Amendment protections enjoyed by protesters, the police could not simply disperse or arrest them without fair warning.").

Element (c) is also lacking. There was no basis for the officers to believe Foote had refused an order to disperse. Foote was by herself and there was no riot or unlawful assembly nearby when the officers encountered her. Even assuming Foote had earlier been in the immediate vicinity of a riot or unlawful assembly, she had dispersed from that area and separated herself from everyone else.

*McCrystal* is again instructive. The Eighth Circuit considered whether probable cause existed to arrest the plaintiff for failure to disperse and concluded it did not. Viewing the facts in the light most favorable to the plaintiff, there was no unlawful assembly or riot occurring when the officer tackled the plaintiff. "Because there was no unlawful assembly or riot, there was no failure to disperse." *McCrystal*, 708 F.3d at 1008. There also had

been no orders to disperse. *Id.* at 1003–04. The officers therefore were not entitled to qualified immunity.

This case is also akin to the situation in *Quraishi v. St. Charles Cty., Missouri*, 986 F.3d 831, 836 (8th Cir. 2021), where the defendant officer claimed he was justified in arresting several reporters because "they violated dispersal orders," projectiles were flying from the reporters' area," and the protesters "were ignoring requests to turn off their lights." 986 F.3d at 837. The Eighth Circuit reviewed the video, which did not show dispersal orders, flying projectiles, or orders to turn off the lights. *Id.* Instead, the video showed a "peaceful scene." *Id.* Interpreting the facts most favorably to the protesters, the Eighth Circuit recognized "it is disputed whether the reporters' location was an unlawful assembly." *Id.* at 838.

*Molina v. City of St. Louis*, No. 4:17-CV-2498-AGF, 2021 WL 1222432, at *6 (E.D. Mo. Mar. 31, 2021) is another example of this. In that case, after protesters were ordered to disperse, officers found a few individuals 2.5 blocks away and "deployed chemical munitions there because of conditions existing 12 minutes earlier and/or at a distance of nearly two football fields." The court denied qualified immunity to the officers because footage "depict[ed] confrontation earlier in the day but a marked dissipation, relative calm, and a significant police presence at the time in question." *Id.* at *6. The video footage "totally contradict[ed] Defendants' characterization of ongoing unlawful assembly or high conflict." *Id.*

Like *Quraishi* and *Molina*, the surveillance video shows a peaceful scene near 3rd Street and Court Avenue in the minutes leading up to Foote's arrest and when Holtan and Herman crossed her path. Genuine disputes exist in this case regarding whether probable

cause existed to arrest Foote for Failure to Disperse. Allen, Escobar Hernandez, George, and Bagby similarly had no information justifying Foote's arrest on this basis.

### 3. Participation in a Riot

Iowa Code § 723.1 defines the crime of rioting as:

> A riot is three or more persons assembled together in a violent and disturbing manner, and with any use of unlawful force or violence by them or any of them against another person, or causing property damage. A person who willingly joins in or remains a part of a riot, knowing or having reasonable grounds to believe that it is such, commits a class "D" felony.

Iowa Code § 723.1. A defendant may be found guilty if he

(a) willingly,

(b) joins in the riot or remains a part of the riot,

(c) knowing or having reasonable grounds to believe it is a riot.

*Williams v. Osmundson*, 281 N.W.2d 622, 624 (Iowa 1979). "As to requirement (b) of the second sentence, a defendant does not Join in a riot or Remain a part of a riot, unless he conducts himself in a violent manner under element 1(b) of the first sentence." *Id.* "[M]ere presence at the scene of a riot is not punishable." *Id.*

Herman and Holtan had no information suggesting Foote had conducted herself in a violent manner; thus there was not probable cause for element (b). *See Welch*, No. 2021 WL 5206138, at *6 (denying summary judgment when there was "no evidence that Welch participated in any of the property destruction"). And again, she was by herself when they found her and there was no riot occurring anywhere nearby. Judge Rose recently denied summary judgment under similar circumstances, commenting:

> [V]iewing the evidence in the light most favorable to Welch, any potentially "riotous" activities had subsided by the time Officer Dempsey arrived at the Criminal Courthouse. Much of the crowd had already migrated west on Cherry Street.

29

*Id.* at *6. Herman and Holtan's assumption that Foote had been with others who were rioting earlier was mere speculation. There was no probable cause for this charge. Allen, Escobar Hernandez, George, and Bagby similarly had no information justifying Foote's arrest on this basis.

### 4. Interference with Official Acts

Though not raised in Defendants' briefing, Herman claimed in his deposition that probable cause existed to charge Foote with Interference with Official Acts because she resisted arrest. (Def Appx 540–41 (Herman DT 26:24–27:4)). Foote disputes that she resisted arrested in any fashion. (Plf Appx 13). Viewing the facts in her favor, then, there was not probable cause to arrest her for Interference. *See McCrystal*, 708 F.3d at 1004 (denying qualified immunity when, viewing the facts in plaintiff's favor, plaintiff did not resist officers).

### B. Defendants' did not make an objectively reasonable mistake in arresting Foote

Though Defendants insist they "were not mistaken" in arresting Foote (Def MSJ Brief at 23), it is worth addressing the fact that the mistakes they in fact made were not reasonable. "[O]fficers are entitled to qualified immunity 'if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable.'" *Baribeau*, 596 F.3d at 478. While qualified immunity protects against *reasonable* mistakes of law or fact, *e.g. Pearson*, 555 U.S. at 231, it is not reasonable to violate clearly established law. *Id.* at 243-44. In analyzing mistake of law cases, the Eighth Circuit has explained:

> [S]ubjective good faith is not sufficient to justify the stop, for officers have an obligation to understand the laws that they are entrusted with enforcing, at least to a level that is objectively reasonable. Any mistake of law that

results in a search or seizure, therefore, must be objectively reasonable to avoid running afoul of the Fourth Amendment.

*United States v. Rodriguez-Lopez*, 444 F.3d 1020, 1022 (8th Cir. 2006) (cleaned up). "Where there is a basis in state law for an officer's action and some ambiguity or state custom that caused the officer to make the mistake, it may be objectively reasonable." *United States v. Washington*, 455 F.3d 824, 828 (8th Cir. 2006). Otherwise, "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." *Heien v. North Carolina*, 135 S. Ct. 530, 539–40 (2014).

As discussed above, probable cause was plainly lacking for all of the crimes alleged. Similarly, the Eighth Circuit rejected a "reasonable defense" mistake in *Quraishi* because it was "disputed whether the SWAT Team gave dispersal orders, whether there were projectiles, and whether they ordered the reporters to turn off their lights before deploying the tear-gas." *Quraishi*, 986 F.3d at 837. Taking the facts in the light most favorable to Foote, Herman and Holtan's arrest of Foote represents an unreasonable mistake of law. *Molina*, 2021 WL 1222432, at *6 (finding the "facts belie an objectively reasonable belief of unlawful assembly, mistaken or otherwise" in protest arrest case with similar facts). Given the dearth of information Allen, Escobar Hernandez, George, or Bagby had justifying Foote's arrest, any "mistake" they made was also unreasonable. The seizure of Foote consequently ran afoul of the Fourth Amendment to the U.S. Constitution and Article I, Section 8 of the Iowa Constitution.

## C. Questions of fact exist regarding whether Herman and Holtan exercised all due care

The immunity of individual officers to Iowa constitutional torts is created by common law, not statute:

> [T]he all-due-care immunity set forth in *Baldwin* is a constitutional immunity. It bars suit and damages only for constitutional claims and only when the government official proves "that he or she exercised all due care to conform with the requirements of the law."

*Venckus v. City of Iowa City*, 930 N.W.2d 792, 802 (Iowa 2019) (referring to individual immunity as "all due care immunity" or "*Baldwin* immunity"). "All due care" equates with negligence. *Baldwin v. Estherville, Iowa*, 333 F. Supp. 3d 817, 842–43 (N.D. Iowa 2018); *see also Williams v. City of Burlington*, 2021 WL 1026958, at *10 (S.D. Iowa 2021) (applying *Baldwin II*). The "due care" standard is *more difficult* for defendants to meet than the "qualified immunity" standard under federal law:

> Given the Iowa Supreme Court's recent adoption of the "all due care" qualified immunity standard, this Court has also noted that there is little guidance on its application, and there may be other considerations in addition to negligence. . . . The Court can determine, at a minimum, that an officer who acted negligently is not entitled to qualified immunity against claims under the Iowa Constitution.
>
> Under federal law, on the other hand, a state actor who is merely negligent, rather than being plainly incompetent or knowingly violating the law, is entitled to qualified immunity. Thus, the Court finds that the Iowa standard for qualified immunity is more stringent than the federal standard.

*Ohlson-Townsend v. Wolf*, 2019 WL 6609695, at *8-9 (N.D. Iowa 2019) (citations omitted).

In light of the discussion above, the lack of probable cause, and the blanket charging decisions implemented by Defendants, there is certainly a jury question regarding whether Defendants exercised "all due care."

## II. Fact questions preclude summary judgment on Foote's false arrest/imprisonment claim (Count 13)

The tort of false imprisonment is the "closest analogy to an arrest without probable cause." *Torres v. Madrid*, 141 S. Ct. 989, 1000 (2021) (internal quotation marks omitted). "In Iowa, false arrest is indistinguishable from false imprisonment, and is defined as 'an

unlawful restraint on freedom of movement or personal liberty.'" *Barrera v. Con Agra, Inc.*, 244 F.3d 663, 666 (8th Cir. 2001) (internal citation omitted). The elements are: "(1) detention or restraint against a person's will, and (2) unlawfulness of the detention or restraint." *Id.* An officer may avoid liability by showing "not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable." *Burton*, 331 N.W.2d at 681. "If the pertinent facts on the issue of probable cause were in dispute, the issue was for the jury to decide." *Id.*

As discussed above, fact questions exist regarding the existence of probable cause. These fact questions also pertain to the reasonableness of the officers' belief that probable cause existed. Summary judgment therefore must be denied as to Count 13.

## III. Fact questions preclude summary judgment on Foote's malicious prosecution claim (Count 12)

Defendants assert that Foote's malicious prosecution claim must be dismissed because her charges were supported by probable cause. (Def MSJ Brief at 47).

In the context of a civil action for malicious prosecution the existence of probable cause is determined under the following standard:

> One who initiates or continues criminal proceedings against another has probable cause for doing so if [the accuser] correctly or reasonably believes
>
> > (a) that the person [accused] has acted or failed to act in a particular manner, and
> >
> > (b) that those acts or omissions constitute the offense that [the accuser] charges against the accused, and
> >
> > (c) that [the accuser] is sufficiently informed as to the law and the facts to justify [the accuser] in initiating or continuing the prosecution.

*Sisler v. City of Centerville*, 372 N.W.2d 248, 251 (Iowa 1985).

As discussed above, there are fact questions regarding the existence of probable cause. None of the Defendants was "sufficiently informed as to the law and the facts" to justify them initiating and then continuing the prosecution against Foote.

A jury question also exists on the question of malice. To satisfy this element, Foote must show that the prosecution against her was "inspired by ill-will, hatred or other wrongful motives." *Vander Linden v. Crews*, 231 N.W.2d 904, 906 (Iowa 1975). As to Herman and Holtan, a jury could find they pepper-sprayed and beat her unnecessarily due to their perception that she had associated with protesters. This would plainly be action motivated by ill-will or wrongful motives, namely their dislike of Foote's perceived First Amendment activities. A reasonable jury could then also find that the subsequent prosecution initiated by the officers when they delivered her to the paddy wagon was motivated by ill-will or wrongful motives.

As to Allen and Escobar Hernandez, a reasonable jury could find that the officers acted with wrongful motives when they arrested Foote and booked her into jail despite explicitly voicing misgivings about the basis for the charges. As to Bagby, a reasonable jury could find that he acted with wrongful motives when he directed his subordinates to issues blanket charges to everyone, regardless of probable cause. As to George, a reasonable jury could find that he acted with wrongful motives when he filed copy-and-paste baseless charges against Foote despite having no specific information about her actions and doing no follow-up. The Court should deny summary judgment on Foote's malicious prosecution claim.

## IV. Fact questions preclude summary judgment on Foote's libel claim (Count 14)

Foote has asserted a libel claim against Holtan, Herman, Allen, Escobar Hernandez, and George. As stated in the introduction, she does not resist the dismissal of her libel claim as to Escobar Hernandez. Fact questions preclude summary judgment as to Holtan, Herman, Allen, and George.

As to Holtan and Herman, they both drafted police reports 10 days after Foote's arrest containing false claims about Foote. Holtan drafted a report stating that he saw Foote running and she refused to comply. (Def Appx 823). He further wrote that she pushed past him and attempted to escape. *Id.* Herman wrote that he saw Foote running and then trying to push past Holtan's shield to run away. (Def Appx 824). He claimed that Foote refused to stop resisting. *Id.* These were false statements, which were shared with the DMPD and prosecutors and used to justify her wrongful prosecution. A reasonable jury could find that Holtan and Herman made these false statements in bad faith in order to justify their excessive uses of force. Accordingly, a jury question exists as to whether Holtan and Herman are entitled to qualified privilege for the statements.

As to Allen, he represented that Foote committed the crimes of Rioting and Criminal Mischief 2nd. (Def Appx 827). A reasonable jury could find his statements were not made in good faith when he knew the charges were "an absolute crap shot." Foote had not committed either of these crimes; Allen's statements were false.

As to George, he copy-and-pasted charging language, claiming that it was true even though he had no basis for anything he wrote and it was in fact false. A reasonable jury could find that this was done in bad faith and improper.

## V. Fact questions preclude summary judgment on Foote's excessive force claims (Counts 3 & 4)

"[T]he right to be free from excessive force in the context of an arrest [is] clearly established under the Fourth Amendment." *Smith v. Kansas City, Missouri Police Dep't*, 586 F.3d 576, 582 (8th Cir. 2009); s*ee also, e.g., Neal v. Ficcadenti*, 895 F.3d 576, 582 (8th Cir. 2018) ("In June 2012, the state of the law would have given a reasonable officer fair warning that using physical force against a suspect who was not resisting or threatening anyone was unlawful."); *Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018) (holding "every reasonable official would have understood that he could not throw Rokusek—a nonviolent, nonthreatening misdemeanant who was not actively resisting— face-first to the ground," despite Rokusek's failure to comply with orders).

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Coker v. Ark. State Police*, 734 F.3d 838, 842 (8th Cir. 2013). Iowa also requires objective reasonableness under its constitution as the standard for excessive force under article I, section 8. *See McElree v. City of Cedar Rapids, Iowa*, 372 F. Supp. 3d 770, 792 n. 24 (N.D. Iowa 2019); *Church v. Anderson*, 249 F. Supp. 3d 963, 979 (N.D. Iowa 2017).

In assessing reasonableness of uses of force, including pepper-spraying, courts consider the *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 109 S. Ct. 1865, 1872 (1989). "Force may be objectively unreasonable when a plaintiff does not resist, lacks an opportunity to comply with requests before force is exercised, or does not pose an immediate safety threat." *Wilson v. Lamp*, 901 F.3d 981, 989 (8th Cir. 2018).

Evaluating each of the *Graham* factors in turn, the first factor—severity of the crime alleged—counsels against any use of force. *See Tatum*, 858 F.3d at 548 (denying summary judgment to officer who pepper-sprayed nonviolent, suspected misdemeanant). Unlawful Assembly, Failure to Disperse, and Participation in a Riot are all misdemeanor offenses. Despite the filing of a felony-level Criminal Mischief charge against Foote, no officer claims that there was actual probable cause for that charge. (*See* Def Appx 554, 575 (Herman DT 40:6–9, 61:23–25)).

Second, Foote did not pose an immediate threat to officers or any person. Foot is 4'11" and 101 lbs. She carried no weapons and was standing by herself. She was already incapacitated, blinded by the burst of pepper-spray another officer had shot in her face. Foote posed absolutely no threat to these much larger male officers who were clad in gas masks and carried shields, batons, and pepper spray.

Turning to the third factor, there is a fact dispute regarding whether Foote resisted arrest or was otherwise noncompliant. Though Defendants claim Foote was running from an "active riot" when Holtan and Herman encountered her, this is contradicted by Foote's testimony and the video evidence. (Plf Appx 13–14). Viewing the facts in Foote's favor, she was standing on a public sidewalk and the unlawful assembly had completely dispersed. She denies resisting in any way. *See McCrystal*, 708 F.3d at 1005 (denying summary judgment on excessive force claim because plaintiff "was not in flight or resisting arrest" when he was tackled without warning).

Further, "prior to using force officers must allow a reasonable opportunity to comply with their commands," but these officers gave her no warning before attacking her. *McReynolds v. Schmidli*, 4 F.4th 648, 653 (8th Cir. 2021). She did not have an opportunity

to comply before Holtan shoved her against a wall with his shield and sprayed her in the face with pepper-spray. *See Smith*, 586 F.3d at 581 (finding officer used excessive force where plaintiff was forcibly removed from his home before having the opportunity to comply with commands); *see also McReynolds*, 4 F.4th at 653 ("Whether a reasonable officer could have viewed [plaintiff's] alleged delay . . . as noncompliant is, at most, a jury question.").

A useful comparison is *Tatum.* 858 F.3d at 549 In that case, witness affidavits described the plaintiff as "fighting and resisting" the officer, but those statements were "inconsistent with the security footage." *See id.* Based on the video and viewing the facts in the light most favorable to the plaintiff, the Eighth Circuit concluded "a reasonable officer would not think he was 'actively' resisting arrest" and denied qualified immunity. *Id.* Like *Tatum*, accepting Foote's version of events as true, there is a jury question regarding whether Holtan and Herman used excessive force. *Tolan*, 572 U.S. at 657 ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant."); *see also Rokusek*, 899 F.3d at 548 (finding force used against plaintiff was excessive even though plaintiff did not comply with three requests). Whether the jury believes the Foote or believes Holtan and Herman is a question for trial. *See, e.g., Brown v. City of Golden Valley*, 574 F.3d 491, 500 (8th Cir. 2009) ("It is the province of the jury to assess the credibility of the evidence, and if the jury accepts Sandra's account, it could fairly conclude that to apply a Taser in the situation here presented would constitute the use of excessive force."); *Shannon v. Koehler*, 616 F.3d 855, 863 (8th Cir. 2010) ("Assuming, then, that Shannon's story is true—i.e., assuming he was not threatening

anyone, not resisting arrest, and so on—it was not reasonable for Officer Koehler to use more than de minimis force against him.").

Defendants rely on their expert Anthony DiCara in support of their excessive force argument. Contemporaneously with this summary judgment resistance, Foote files a Motion to Strike Defendants' Experts, which challenges both DiCara and Daniel Billington's "expert" opinions. For the reasons explained in that motion, the Court should not consider DiCara's opinion because it invades the province of the Court and the jury and because it is irrelevant under Rule 401 and 402. Notably, DiCara relies on Defendants' view of the facts to develop his opinion: he accepts the claim that Foote was "running from the arriving police presence" and actively resisted arrest. (Def Appx 818). Because disputed facts form the foundation for DiCara's opinion, it carries no weight in the summary judgment analysis.

Defendants also claim that the force used by Herman and Holtan is "widely accepted among models as non-lethal methods to gain compliance" when an individual is "actively resisting or evading arrest." (Def MSJ Brief 31). Again, Foote disputes resisting or evading arrest. Moreover, "following standard procedure does not necessarily make an officer's acts reasonable." *Smith*, 586 F.3d at 581 (denying qualified immunity when jury could find officer's use of force was not objectively reasonable).

Applying the *Graham* factors, fact questions exist as to whether any of the uses of force against Foote were objectively reasonable. This includes Holtan's use of pepper-spray, the officers' use of shields to push Foote into the wall, Herman's three baton strikes, and pinning Foote to the ground with a knee on her back. These officers attacked a tiny, blinded, defenseless woman standing by herself on a public sidewalk, who

repeatedly told them she was not resisting. A reasonable jury could find their uses of force unconstitutional.

## VI. Fact questions preclude summary judgment on Foote's assault/battery claim (Count 15)

"Assault is but the initial stage of an act which is aggravated by a battery. Stated otherwise a battery necessarily includes an assault, the latter inhering in the former." *State v. Redmon*, 244 N.W.2d 792, 797 (Iowa 1976). The elements of an assault claim are:

1. The defendant [describe the act].

2. The act was done with the intent to put [in fear of physical pain or injury] [in fear of physical contact which would be insulting or offensive].

3. _____ reasonably believed that the act would be carried out immediately.

4. The defendant's act was a cause of plaintiff's damage.

5. The amount of damage.

Iowa Civil Jury Instruction 1900.1 (June 2020). The elements of battery are:

1. The defendant [describe the act].

2. The act was done with the intent to cause physical pain or injury [insulting or offensive bodily contact].

3. The defendant's act resulted in [physical pain or injury] [insulting or offensive bodily contact].

4. The defendant's act was a cause of plaintiff's damage.

5. The amount of damage.

*Id.* 1900.3. An officer commits an assault if "the peace officer does not reasonably believe the particular force was necessary in the circumstances." *Johnson v. Civ. Serv. Comm'n of City of Clinton*, 352 N.W.2d 252, 257 (Iowa 1984). The Iowa Court of Appeals has relied on the *Graham* factors in evaluating whether an officer's use of force was

"reasonable" under Iowa Code § 804.8. *Chelf v. Civ. Serv. Comm'n of City of Davenport*, 515 N.W.2d 353, 355 (Iowa Ct. App. 1994).

Jury questions exist on Foote's assault and battery claim. Herman and Holtan may claim their intent was not to cause pain and injury but merely to arrest Foote, but a jury could disbelieve that based on the circumstances discussed above. "Generally, the issue of whether a particular intent existed is a question of fact for the jury." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002).

A genuine issue of material fact also exists regarding the reasonableness of Holtan and Herman's uses of force. *See* ."); *Fakorzi v. Dillard's, Inc.*, 252 F. Supp. 2d 819, 834–35 (S.D. Iowa 2003) (denying officers' motion for summary judgment on assault and battery claims, stating "[t]he officers' actions were purposeful, and . . . it is for the jury to determine whether the officers acted with the requisite intent"); *Burbridge v. City of St. Louis, Missouri*, 2 F.4th 774, 781 (8th Cir. 2021) (denying summary judgment on assault and battery claims when fact dispute existed on intent). A jury could easily conclude the force Holtan and Herman used was not "necessary in the circumstances." Herman agreed that it would be inappropriate to pepper-spray or hit Foote if she was not resisting arrest. (Def Appx 574 (Herman DT 60:7–9). Taking the facts in the light most favorable to Foote, she was not resisting arrest. Holtan and Herman are not entitled to summary judgment on Count 15. *See Welch*, 2021 WL 5206138, at *8 (denying summary judgment on assault/battery claim when DMPD officer pepper-sprayed protester earlier in the evening on May 30th).

## VII.   Fact questions preclude summary judgment on Foote's retaliation claims (Counts 5 & 6)

"A citizen's right to exercise First Amendment freedoms 'without facing retaliation from government officials is clearly established.'" *Baribeau*, 596 F.3d at 481. Thus, the "only question" is whether a reasonable jury could find a defendant violated the plaintiff's First Amendment rights. *Id.*

To survive summary judgment on a First Amendment retaliation claim, a plaintiff must generate fact questions on the following elements:

> (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.

*Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014). In retaliatory arrest cases, the Court must also determine whether there was probable cause for the arrest. *Baribeau*, 596 F.3d at 474. Foote's protections under the Iowa Constitution are the same as those under the U.S. Constitution. *In re Adoption of S.J.D.*, 641 N.W.2d 794, 802 (Iowa 2002); *State v. Milner*, 571 N.W.2d 7, 12 (Iowa 1997). Foote satisfies each of the elements of this claim.

A. **Probable cause does not defeat Foote's claims**

As discussed above, there are fact questions regarding whether arguable probable cause existed to arrest Foote. This case is similar to *Garcia*, where a man gave an officer the middle finger while driving. 984 F.3d at 670. The Eighth Circuit recognized there was a genuine dispute of material fact regarding whether the officer had probable cause to stop the driver for a license plate violation. *Id.* Accordingly, a reasonable jury could find the officer lacked probable cause for the stop. *Id.* The Eighth Circuit thus denied the officer qualified immunity. Just as in *Garcia*, probable cause is disputed here and does not require dismissal of his retaliatory stop claim. *See also Collins v. Jordan*, 110 F.3d 1363,

1372 (9th Cir. 1996) ("The law is clear that First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence.").

Summary judgment must also be denied as to the retaliatory use-of-force aspects of Foote's claims. The probable cause analysis only pertains to Foote's claims so far as they relate to a claimed retaliatory *arrest*. Claims regarding the use of retaliatory force are not defeated by a finding of probable cause to arrest. *Kopp*, 754 F.4d at 602–603. This is illustrated in *Kopp*, where the plaintiff challenged as retaliatory both his arrest and the officer's decision to pepper-spray him. 754 F.4d at 602. The Court found the officer had qualified immunity for the retaliatory *arrest* because there was probable cause. *Id*. The Court then separately considered the officer's pepper-spraying the plaintiff in retaliation for the plaintiff criticizing the officer and asking for his badge number. *Id.* Because there were fact questions as to whether the officer pepper-sprayed the plaintiff with retaliatory intent, the Eighth Circuit denied the officer qualified immunity on the plaintiff's First Amendment claim. *Id.*

Just as in *Kopp*, probable cause does not excuse Holtan and Herman's retaliatory acts of pepper-spraying Foote, pushing her down, hitting her with their shields, hitting her with the baton, and kneeling on her back. Foote had a right to be free of retaliatory use of force, regardless of whether Holtan and Herman could have legally arrested her for a protest-related crime. She is entitled to First Amendment protection.

Defendants further suggest that Foote's claims must be analyzed exclusively as Fourth Amendment excessive force claims, not First Amendment claims. (Def MSJ Brief 34). Defendants cite *Price v. Elder*, 175 F. Supp. 3d 676, 679 (N.D. Miss. 2016) for the proposition "excessive force claims made in the context of the First Amendment must be

analyzed under Fourth Amendment framework." This is not the law in the Eighth Circuit. *See Kopp*, 754 F.4d at 600–603 (considering excessive force and retaliation claim separately); *see also Ybarra v. Davis*, 489 F. Supp. 3d 624, 631 (W.D. Tex. 2020) (explaining why *Price* is wrong).

**B.    Viewed in the light most favorable to Foote, she was engaged in protected activity.**

The right to free association includes the "freedom to associate with others for the common advancement of political beliefs and ideas." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976); *Agnew v. St. Louis Cty.*, 504 F. Supp. 3d 989, 1002 (E.D. Mo. 2020) (noting "Plaintiffs' association with the certain organizations and groups perceived to be critical of Defendants" is an exercise of free association rights which should not be retaliated against). The right to associate with like-minded citizens would be "meaningless" unless an individual's right to participate in activities is also protected. *Roberts v. Van Buren Pub. Sch.*, 773 F.2d 949, 957 (8th Cir. 1985). The right of free assembly is another separate and constitutionally-protected activity. Iowa Const. art. I, § 20; *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577 (1980). "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston, Tex. v. Hill*, 107 S. Ct. 2502, 2510 (1987). "[C]riticism of public officials lies at the very core of speech protected by the First Amendment." *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002); *Hill*, 107 S. Ct. at 2509 ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.").

In *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020), the Eighth Circuit held that the "right to watch police-citizen interactions at a distance and without

interfering" is clearly established. "Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inquiry, to be public forum property." *United States v. Grace*, 103 S. Ct. 1702, 1708 (1983).

Foote was exercising her right to free association and her right to free assembly. She was exercising her First Amendment rights when she stood on a public sidewalk observing the police response to the protestors. Her actions were constitutionally protected. *See Chestnut*, 947 F.3d at 1092 ("And though we agree with the dissent that "qualified immunity is important to society as a whole," so is the people's ability to monitor police activities to ensure that their duties are carried out responsibly.").

**C.   Stopping, abusing, and falsely citing would chill a person from exercising their constitutional rights.**

Foote also easily satisfies the second element of her claims. Physically hurting someone by pepper-spraying, pushing her down, hitting her with their shields, hitting her with the baton, and kneeling on her back would chill an ordinary person from continuing the subject speech. *See Kopp*, 754 F.3d at 602. ("[P]epper spraying someone in the face 'would chill a person of ordinary firmness.'"). "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003).

**D.   Viewed in the light most favorable to Foote, retaliation was a substantial factor for Herman and Holtan's actions**

The third element of a First Amendment retaliation claim requires "a causal connection between the retaliatory animus and injury." *Quraishi*, 986 F.3d at 837. A

plaintiff need not, however, provide "specific proof" of a defendant's improper motive. *Id.* at 838. "Retaliation need not have been the sole motive, but it must have been a 'substantial factor'" for the defendant's actions. *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007). "The causal connection is generally a jury question unless the question is so free from doubt as to justify taking it from the jury." *Kopp*, 754 F.3d at 602–03 (cleaned up).

Herman and Holtan claim to have arrested Foote because they assumed she had associated with an unlawful assembly or riot earlier. (*See* Def MSJ Brief at 34). Given that there was no probable cause for those charges, what remains is the officers' assumption that Foote had been with protestors. Lacking any legitimate law enforcement purpose for Holtan to pepper-spray her in the face or for Herman to beat her with his baton, a jury could naturally conclude their motive was retaliatory. *Hartman v. Moore*, 126 S. Ct. 1695, 1701 (2006) ("[W]hen nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution"); *cf. Molina*, 2021 WL 1222432, at *7 ("Defendants assert that Plaintiffs have failed to establish that Defendants recognized them as protestors and acted with retaliatory motive. By this argument, Defendants seem to imply that, on the contrary, they shot canisters at individuals whom they believed had nothing to do with the protests."); *Fakorzi*, 252 F. Supp. 2d at 834 (finding jury question on issue of officers' intent when "the officers could have conducted the investigation in far less threatening ways").

The facts, taken in the light most favorable to Foote, support the inference that Holtan and Herman physically harmed her because they perceived her to be associated

with the anti-police protesters. Their "motive is not 'so free from doubt as to justify taking it from the jury.'" *Quraishi*, 986 F.3d at 838. Defendant's motion for summary judgment on Counts 5 and 6 must be denied.

## I. Fact questions preclude summary judgment on Foote's IIED claim (Count 11)

Defendants again seek summary judgment based on *their* version of the facts: "They were trying to complete an arrest with minimal force, in the context of a riot." (Def MSJ Brief 43); *see Greenhaw v. City of Cedar Rapids*, Iowa, No. 07-CV-109-LRR, 2009 WL 10727429, at *11 (N.D. Iowa Jan. 9, 2009) ("Like its argument seeking dismissal of the false imprisonment claim, Defendant's arguments urging dismissal of the intentional infliction of emotional distress claim are based on facts materially disputed by Plaintiff, which prevents the court from dismissing this claim.").

Fact questions exist on each element of Foote's IIED claim:

1. outrageous conduct by the defendant;

2. the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress;

3. plaintiff suffered severe or extreme emotional distress; and

4. the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.

*Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 26 (Iowa 2014)

Taking the facts in the light most favorable to Foote, Holtan and Herman attacked her: pepper-spraying her, shoving her up against a metal fence, hitting her with a baton multiple times, and forcing her to fall to the ground. Then they arrested her without probable cause. They did not bother to rinse the pepper spray out of her eyes, which continued to burn her for the next several hours. Later, Herman and Holtan wrote up false

reports to cover their tracks. A reasonable jury could find this conduct outrageous and "beyond all possible bounds of decency." *Smith*, 851 N.W.2d at 26 (internal quotation marks omitted); *see Greenhaw*, 2009 WL 10727429, at *11 (denying summary judgment when plaintiff's version of the facts showed officers forced her to kneel for an extended period despite her known knee problems, handcuffed her roughly, and refused to loosen her handcuffs). A reasonable jury could find that Holtan and Herman intentionally caused Foote's emotional distress.

There are also sufficient facts for a jury to conclude that Foote's emotional distress was severe and extreme and that Holtan and Herman's actions cause her distress. She immediately had a severe emotional reaction to her treatment. (JordanWall_202005310244_WFC1006110_162909917 at 6:09–:46; ThomasGarcia_202005310239_WFC1049311_46927103 at 10:45). ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ This creates a question for the jury as to the third and fourth elements of Foote's claim. *Smith*, 851 N.W.2d at 30–31 (finding "extreme stress and anxiety" diagnosis, accompanied by poor sleep, weight loss, and light-headedness sufficient to generate jury question); *Northrup v. Miles Homes, Inc. of Iowa,* 204 N.W.2d 850, 855, 860 (Iowa 1973) (recognizing cramps, weight loss, and crying are sufficient to generate a jury question; as was diagnosis of extreme stress and anxiety); *Atzen v. Atzen*, 913 N.W.2d 628 (Iowa Ct. App. 2018) (finding evidence sufficient to support IIED verdict when plaintiff "suffer[ed] from fear, panic attacks, sadness, anxiety, intense worry, crying spells,

loss of weight, lack of appetite, and inability to sleep"); *Greenhaw*, 2009 WL 10727429, at *12 (denying summary judgment on IIED claim when plaintiff sought treatment for nightmares and received prescription drugs).

**WHEREFORE**, Denver Foote respectfully requests the Court deny Defendants' motion for summary judgment as to:

- Counts 1 and 2 (illegal seizure),

- Counts 3 and 4 (excessive force),

- Counts 5 and 6 (retaliation), 1

- Count 1 (IIED),

- Count 12 (malicious prosecution),

- Count 13 (false arrest),

- Count14 (libel) – except as to Escobar Hernandez,

- and Count 15 (assault/battery).

**PARRISH KRUIDENIER DUNN GENTRY
BROWN BERGMANN & MESSAMER, L.L.P.**

By: ___/s/ Gina Messamer_____
      Gina Messamer        AT0011823
      2910 Grand Avenue
      Des Moines, Iowa 50312
      Telephone: (515) 284-5737
      Facsimile: (515) 284-1704
      Email: gmessamer@parrishlaw.com
      **ATTORNEY FOR PLAINTIFF**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on January 17, 2022, I electronically filed the foregoing with the Clerk of Court using the ECF system and a true copy of the foregoing was served electronically on the attorneys of record.

By: ___/s/ Gina Messamer_____