# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | | |
|---|---|---|
| DENVER FOOTE, | * | CIVIL NO. 4:21-cv-00043-SBJ |
| | * | |
| Plaintiff, | * | |
| v. | * | |
| | * | |
| JOHN DOE 1; CLARK ALLEN; | * | **MEMORANDUM OPINION** |
| ERNESTO ESCOBAR HERNANDEZ; | * | **AND ORDER ON** |
| JEFFREY GEORGE; BRANDON | * | **DEFENDANTS' MOTION** |
| HOLTAN; ADAM HERMAN; KIRK | * | **FOR SUMMARY JUDGMENT** |
| BAGBY; DANA WINGERT; and | * | |
| CITY OF DES MOINES, IOWA, | * | |
| | * | |
| Defendants. | * | |
| | * | |

## I. INTRODUCTION

This lawsuit arose from protest activities in downtown Des Moines, Iowa in late May 2020 in the aftermath of the death of George Floyd in Minneapolis, Minnesota. There were peaceful activities at certain times and locations but acts of violence and vandalism at certain times and locations. Several arrests were made by law enforcement officers. This case involves one of those arrests.

Denver Foote was present during some of the protest activities. There is no evidence she engaged in violence or vandalism. She was arrested by Des Moines police officers around 2:45 a.m. and eventually charged with rioting, unlawful assembly, and failure to disperse. During the arrest, officers deployed pepper spray into her face, used shields to push her into a metal gate, struck her with a baton, held her down with a knee to her back after she went to the ground, and placed zip-ties on her wrists while she was face down. Foote claims she did not resist while being arrested; the officers claim she was resisting and attempting to flee. After spending a night in jail, Foote was released from custody on pretrial supervision. All charges were later dismissed.

Foote subsequently brought this action against several law enforcement officers and the City of Des Moines. She contends the officers used excessive force and she was arrested and charged without probable cause in violation of protected rights under the United States Constitution and the Iowa Constitution. She also asserts various claims under Iowa common law.

Now before this Court is a Motion for Summary Judgment (Dkt. 35) filed by defendants pursuant to Federal Rule of Civil Procedure 56. Defendants assert, *inter alia*, there was probable cause to arrest and charge Foote and the force used was reasonable. Defendants also assert entitlement to qualified immunity on some claims. Foote resists the motion as to certain claims insisting, *inter alia*, there are questions of fact which preclude summary judgment. Dkt. 41. The Court considers the matter to be fully submitted. For the reasons which follow, the motion is granted in part and denied in part.

## II. STANDARDS FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial responsibility of identifying evidence "which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp.*, 477 U.S. at 324).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At this stage, the court's function is not to determine credibility, weigh the evidence or determine the truth of the matter. *Id.* at 249, 255. Instead, the court views the record in the light most favorable to the nonmoving party and determines whether there is a genuine issue for trial. *Id.*; *see also Torgerson*, 643 F.3d at 1042.

### III. EVIDENTIARY RECORD OF FACTS

The parties submitted a substantial evidentiary record including deposition testimony, personal affidavits, photos, and documents prepared by law enforcement personnel. The parties also submitted video from security cameras in various locations in downtown Des Moines and body cameras on law enforcement officers. Notably, however, there is no video of the specific interaction between Foote and the officers during her arrest.

Following the death of George Floyd in Minneapolis, Minnesota, various protest activities occurred in multiple locations in downtown Des Moines, Iowa in late May and early June 2020. Foote attended a planned protest on May 29, 2020. Allan Tunks, Assistant Chief of Police for the

Des Moines Police Department, was part of the command staff overseeing the events. Dkt. 35-2

p. 500. Tunks set forth certain details in a sworn affidavit, stating as follows:

> The Des Moines Police Department worked with protest organizers to assist with creating space for the protests regarding George Floyd's killing to occur in the immediate vicinity of the Des Moines Police Department. The support the Department provided included blocking traffic at the intersections of E. 2nd Street and Court Avenue and River Drive and Court Avenue to allow safe movements of protesters in the road without threat of car traffic. Several individuals made speeches and the sizable crowd was peaceful. The planned protest was scheduled to last for a set period of time. At the close of the planned protest, organizers advised the attending crowd that the event was completed.

> Many people left at that time but a crowd of more than one hundred remained. Those that remained were becoming increasingly agitated and confrontational. Command staff was monitoring the activity as there was concern about a potential attack on the Police Department building, as had just occurred in Minneapolis the day before. As we were monitoring, we learned that the crowd had targeted Officer Sivid Becivoric, who was alone in his marked vehicle blocking traffic at East 2nd and Court Avenue. Eventually, Officer Becivoric was forced to deploy OC spray, commonly referred to as mace, in order to escape the threat of the people attacking him and his vehicle. This was, of course, in the immediate vicinity of the crowd that remained after the planned protest ended.

> It was the actions of the crowd toward Becivoric that caused command staff to direct that a protective line be put in place to ensure the security of the Police Department building. This protection was absolutely imperative for public safety because, there were employees working inside, and also because there are firearms, seized narcotics, and money inside the building. The protective line was made up of uniformed officers. Those officers began to be assaulted by the crowd, which was by this time growing rather than diminishing. As I later learned, social media and mainstream media were providing live information about the events, which prompted additional people to join in the disturbance. The assaults on law enforcement included being hit with water bottles-some frozen for greater impact, rocks, broken concrete, and landscaping blocks. Once the crowd became this violent, it was clear that we needed to call in our tactical squad, STAR Team.

> Once STAR Team, a multi-agency tactical squad, was in place, the uniformed officers were able to drop back and protect other portions of the Police Department campus. The assault on officers continued and the crowd continued to grow. As such, I made the decision to make dispersal orders. I did so through the Public Address "PA" system in a patrol car parked immediately at the line between the STAR Team and the crowd. I made at least three dispersal orders, with ample time to allow for compliance, to no effect. There were also community leaders out talking to members of the crowd trying to get them to stop the violence and disperse, also to no effect.

Based on the escalating threat and violence, and after consulting with the commander for STAR Team, I made the decision to deploy a riot control agent, CS gas, commonly referred to as teargas. This was done in stages to allow for people to exit the area. Officers had to deploy CS gas several times in order to get any dispersal compliance. When this crowd eventually dispersed from the immediate area of the Police Department, they moved through the East Village causing substantial to [sic] damages, including Hilltop Tire (all windows smashed and items looted), the federal courthouse, and the Embassy Suites. We continued to have a police presence in the area and through time and persistence, we were able to halt the assault on the East Village.

*Id.* pp. 500-01.

Foote admits to several facts stated by Tunks. *See* Dkt. 41-2 ¶¶ 2-27. Other portions Foote admits for purposes of the summary judgment motion but asserts such facts are irrelevant. *Id.* She attended the May 29th planned protest with her partner, Jacob Grobe, and other friends sitting near the police department. Dkt. 35-2 pp. 11-12. After the event concluded, she marched with the crowd for about a block until they came to a line of police officers. *Id.* pp. 12-13. She left the area when police deployed tear gas. *Id.* p. 13. Foote was not in the immediate vicinity as to certain events on May 29th including those related to Officer Becivoric. Dkt. 41-2 ¶¶ 11-12.

The next evening, May 30th, protest activities occurred again in downtown Des Moines. Foote drove to the downtown area with Jacob, parked her car, and could hear people chanting. Dkt. 35-2 p. 14. Foote was wearing black jeans, sneakers, a black rain jacket and a red bandana as a mask. *Id.* pp. 27-28. She is 4 foot 11 inches tall and weighs 101 pounds. *Id.* p. 684. She had a pair of goggles but was not wearing them. *Id.* They joined a crowd marching on Court Avenue and met a friend, Miranda Nicolai. *Id.* p. 14. In general, the Court Avenue area has an active nightlife with several bars. Dkt. 49-2 ¶¶ 6, 7.

As they marched, around 9:45 p.m., Foote heard glass breaking near a county courthouse and saw two officers proceed toward the building. Dkt. 35-2 pp. 17, 76, 81. Foote was concerned about events escalating and thought about leaving but Jacob did not want to leave, and she did not

want to walk back to her car by herself. *Id.* pp. 17-18. Eventually, the group marched to the Iowa State Capitol where Foote stayed for a couple of hours. *Id.* pp. 14, 17, 19. A line of officers were at the top of the stairs to the Capitol. *Id.* p. 23. Foote mainly remained near the bottom of the stairs behind the crowd of protestors and within approximately 25 feet of the police line. *Id.* pp. 23-24. At 11:08 p.m., a dispersal order was given over a loudspeaker, second and third dispersal orders were given by 11:11 p.m., and a final dispersal order was given at 11:12 p.m. Dkt. 41-2 ¶¶ 39-41. Officers started to deploy tear gas into the crowd which caused Foote's eyes to burn for 10 to 15 minutes. Dkt. 35-2 pp. 19-20, 26-27, 29. A stranger gave her water to rinse her eyes. *Id.* p. 27. Foote testified she never heard a dispersal order while at the Capitol. *Id.* p. 29. She left the area because of the tear gas. *Id.* p. 30.

Foote walked with the crowd, which she estimated to be hundreds of people, back towards Court Avenue. *Id.* She wanted to leave but "didn't want to walk away by" herself. *Id.* As they proceeded, Foote witnessed people breaking windows at a parking garage. *Id.* pp. 32, 77. She described this incident as follows:

> I think maybe there was like loose brick, or something, from the sidewalk, and I just remember like hearing the glass, turning around, and seeing like people like being like, "Oh my God. I can't believe you did that," and stuff. And I was like, "I want to leave now."

*Id.* pp. 32-33. At this point, according to Foote, she still had not heard any dispersal orders from officers. *Id.* p. 35. Foote and Jacob went to her car which was then nearby, left the downtown area to go home, and did not plan to return. *Id.* pp. 31, 33, 36. She arrived at home shortly after midnight. *Id.* p. 37.

Around 2:00 a.m. on May 31st, she returned to the downtown area with Jacob. *Id.* pp. 37-38. As explained by Foote, her friend Miranda lived in an apartment above her and had not come home. *Id.* p. 38. Foote was concerned because she was unable to contact Miranda and decided to

return to the Court Avenue bar area. *Id.* The bars would be closing at 2:00 a.m. Dkt. 49-2 ¶¶ 6, 7.

Foote did not know if Miranda was still in the area or if protest activities were still occurring. Dkt.

35-2 p. 38. Foote parked in the same location as before and they walked to Court Avenue. *Id.* p.

39. As described by Foote, "there was like people loitering, and there was no police presence." *Id.*

They walked about two blocks and found Miranda. *Id.* pp. 39-40. According to Foote, she "asked

like a million times to leave" but Jacob and Miranda did not want to leave. *Id.* pp. 40, 88.

As they walked along Court Avenue, around 2:30 a.m., Foote observed people placing

trash cans in the street to block traffic and others breaking windows in a restaurant. *Id.* pp. 41-42,

77, 85. Around 2:35 a.m., people started to run from the area. *Id.* pp. 90-91. Foote did not know

why but she and Jacob also started to run north away from Court Avenue through an alley, then

proceeded east back out onto 3rd Street. *Id.* pp. 90-91, 93-94. Around 2:42 a.m., they started

walking south on 3rd Street back to the intersection with Court Avenue. *Id.* pp. 94-95. Near the

same time, officers were proceeding south on 3rd Street behind them. *Id.* pp. 48, 95. Jacob and

Miranda ran away. *Id.* p. 96.

According to Foote, she started to walk back to her car proceeding north on 3rd Street,

around 2:43 a.m. *Id.* pp. 48-50, 89. As described by Foote, she "didn't get very far":

> I probably got like 25, 30 feet before the cops came down the street . . . and out the
> alleyway. . . . I was walking down the street. I remember like there was a nook. I
> remember going in there and being like this isn't safe. I was so scared and anxious,
> and so I stepped outside of the nook, and I was expecting them to just say, "You're
> under arrest. Get down."

*Id.* pp. 50-51. Her expectations were based on watching movies and the vandalism she observed

earlier. *Id.* p. 78. Foote "just stood there" and did not say anything to the officers. *Id.* p. 53.

An unidentified officer then walked by her and "with no warning" sprayed her in the face

with pepper spray which burned her eyes. *Id.* p. 54. As described by Foote, the officer kept

walking: "it was very quick. It was like a pass-by." *Id.* Officer Brandon Holtan then approached

her and sprayed her in the face with pepper spray. *Id.* p. 55. This second spray mostly hit her bandana mask and burned her throat as she breathed. *Id.* pp. 55-56. Holtan then quickly pushed Foote back into the nook against a metal gate with his riot shield, which stunned Foote:

> So I was standing like outside the nook, and he sprayed me with pepper spray, and then he pushed me. I was just--I was stunned because I just expected to be told I was under arrest and to get down. I was just standing there, so I wasn't expecting that kind of force.

*Id.* p. 56. At this point, according to Foote, neither she nor Holtan had said anything. *Id.* p. 57. Officer Adam Herman also pushed Foote back against the gate with his shield, and "[t]hey kind of like boxed [her] in." *Id.* p. 58.

According to Foote, Herman then struck her multiple times with his baton, first in her right thigh, then ribs and then right arm. *Id.* pp. 59, 61. When first struck, Foote said "Stop. I'm not resisting." *Id.* p. 60. According to Foote, "Herman and Holtan beat [her] to the ground with their shields and baton." *Id.* p. 62. She insists she was not resisting and recalls telling the officers she was not resisting:

> I remember saying it when I was standing when they were hitting me, I remember saying it as I fell to the ground, and I remember saying it as I was laying on the ground.

*Id.* pp. 62-63. One of the officers put his knee into her back with his shield on her side to hold her down. *Id.* p. 64-65. This was painful to Foote, "but not as painful as the hits." *Id.* p. 64. Her eyeglasses had fallen off and were broken when stepped on by one of the officers. *Id.* p. 66. She laid on the ground while her wrists were zip-tied. *Id.* pp. 64-65. At approximately 2:46 a.m., Foote was taken to a transport van located in the Court Avenue area. *Id.* pp. 607, 630. She sat by the van crying and can be heard on video stating, "I was peaceful." Dkt. 49-2 ¶ 58.

Officers Holtan and Herman present different versions of their interaction with Foote. Holtan is a police officer for the Des Moines Police Department and was working as a member of

the STAR Team during the protests on May 30th. Dkt. 35-2 p. 599. At some point, Holtan was on a police line with other officers and struck in his helmet with an unknown object knocking him to the ground. *Id.* p. 614. Around 2:30 a.m. on May 31st, after working approximately 19 hours and being released from their shift, the STAR Team was directed to return to the Court Avenue area because individuals were breaking into a Hy-Vee grocery store. Dkt. 41-2 ¶ 79. Holtan drove a van with other officers on the STAR Team to the downtown area. Dkt. 35-2 p. 615. The officers were not given specific instructions but, as understood by Holtan, their "initial intention . . . was to secure the parking garage because people had been throwing bricks and glass bottles at us from above." *Id.* p. 621.

The officers were walking south down Third Street toward the parking garage at the intersection with Court Avenue when Holtan saw Foote "go into that cubby hole." *Id.* p. 616. According to Holtan, "[t]here was several people running in the area" but Foote was by herself. *Id.* pp. 633-34. As described by Holtan: "When I saw her run in the cubby and attempt to hide. That's when I gave the command to get on the ground. . . . Then I delivered a burst of pepper spray." *Id.* p. 618. Holtan recalls Foote wearing a bandana as a mask with goggles over her eyes. *Id.* pp. 618-19. He was wearing a full-face gas mask. *Id.* p. 649. Holtan testified during a deposition as to the following interaction after he sprayed Foote:

A. She was not getting on the ground and remained where she was.

Q. Did you say anything else to her?

A. Not that I remember, no. So I attempted to push her up against the wall, and then she attempted to run away from me and pushed past my shield, and that's when Officer Herman came to assist me.

Q. Can you kind of tell me where you pushed her with your shield? Was this, like, you kind of boxed her into a corner?

A. I attempted to box her up against the wall, yes.

Q. Where did she go when you're saying she pushed past you?

A. There's only one place to go. She just ran straight out to the sidewalk, which is where she was met by Officer Herman and taken into custody.

* * *

Q. So then Officer Herman came up and helped you out. What did he do?

A. As far as I know, he was able to get her on the ground, and I was -- I believe I laid my shield on her back to keep her on the ground, and then at some point I believe I took my shield off. It's very cumbersome. Zip ties. They were flex cuffs.

*Id.* pp. 619-20. Holtan recalls the interaction lasted a "[m]atter of seconds." *Id.* p. 649.

Holtan did not see Herman hit Foote with his baton. *Id.* p. 627. He does not remember stepping on her glasses. *Id.* p. 629. And he does not remember speaking to Foote other than the initial command for her to get on the ground. *Id.* Holtan had a body camera but "it had been shut down" when he thought his shift was over and was not turned back on when he returned to the Court Avenue area and interacted with Foote. *Id.* p. 605.

According to Holtan, when he approached Foote, he was arresting her for "failure to disperse and . . . the vandalism that was occurring at Hy-Vee." *Id.* pp. 622-23. When asked during his deposition whether he had reason to believe Foote had vandalized Hy-Vee, Holtan responded:

A. My probable cause that she was involved in that incident was I believed her to be running from that area.

Q. Is that a yes or no about the vandalism?

* * *

A. Yes.

Q. And so you were arresting her for vandalizing Hy-Vee was your plan?

A. That was one of the events I believed her to be involved with, yes.

*Id.* p. 623. Holtan further testified:

[Foote] was not complying with a lawful order given by a law-enforcement officer. She interfered with official acts once she ran past me and refused to be taken into custody.

10

> But yes, failure to disperse for being downtown after giving multiple dispersal
> orders throughout the night.

*Id.* p. 624. And when asked whether he had reason to believe Foote had heard a dispersal order,

Holtan responded:

> Given the circumstances of that area downtown, no reasonable person would not
> have heard the dispersal orders, and in my opinion, only those that were involved
> in the disorderly behavior that was occurring were staying in the area because they
> wanted to be a part of it. Any reasonable person would have fled hours before this
> took place.

*Id.* He also testified:

> In reviewing my body camera, I believe it's clear that several dispersal orders are
> being given in the hours preceding this. And I believe at this point it was more of a
> taking action sort of presence instead of telling them to disperse at this point.
>                            * * *
> Individuals, you can tell them to disperse and they form back up, and they form
> back up, and they form back up, and they form back up, and this had caused severe
> -- I guess chaos, and this was the decision made to stop the chaos.
>
> I guess it was my impression from Lieutenant Schafnitz that that's what we're going
> to do. You're going to arrest those that were downtown in the immediate area.

*Id.* pp. 621-22. Holtan acknowledged he had no reason to believe Foote had been present when

there had been dispersal orders given and did not know when the last dispersal order had been

given prior to Foote's arrest. *Id.* pp. 624-25. After taking Foote to the transport wagon, Holtan

continued to patrol the area "[l]ooking for problems." *Id.* p. 630.

Herman is a police officer for the Des Moines Police Department and also a member of the

STAR Team. *Id.* p. 518. He was on duty and involved in policing the protests during the first night.

*Id.* p. 521. On the next day, May 30th, Herman began his shift at 11:00 a.m. and again was involved

in policing protest activities including when the window was broken at the county courthouse later

in the evening. *Id.* p. 525. Herman thought his shift was ending in the early morning of May 31st

until the STAR Team was directed to return to the Court Avenue area due to the reports of

vandalism at the grocery store. *Id.* pp. 530, 581. According to Herman, at the order of the STAR

commander, "[w]e were supposed to go there, and then individuals that were in that area would be arrested." *Id.* pp. 530-31. Herman travelled to the area in the van driven by Holtan with 12 to 15 other STAR Team officers. *Id.* p. 531. Upon arrival, the officers walked south down 3rd Street towards the intersection with Court Avenue. *Id.* p. 532. He agrees with Holtan that their initial focus was on the parking garage where previous incidents had occurred, including an officer being hit in the helmet with a brick thrown from the garage. *Id.* p. 578.

The first time Herman encountered Foote was when he observed Holtan engaging with Foote. *Id.* pp. 524, 528, 532. In his words: "Officer Holtan was struggling with someone in the cubby hole." *Id.* p. 528. He also described Foote as "resisting Officer Holtan":

> I remember that he was over there with an individual. I remember that he had in one hand -- I believe it was pepper spray; in the other hand his shield, and the individual was kind of trying to run away from him, pushing his shield off to the side. Then that's when I went over and assisted him.

*Id.* p. 532. Herman also had a body camera but did not capture the events with Foote because the battery had died. *Id.* p. 522. He testified as follows:

> From there I went in to assist him, used my shield. I began shoving mine. She was kind of coming out towards the street, to where she could have fled.
>
> So we continued to kind of push back and forth on the shield, you know. I might be a bigger guy, but when it's -- one of the things we teach in DT is body versus a limb is the most effective way to kind of gain control, so she's able to use her body against our limbs, and she's kind of gaining the advantage on us.
>
> At that time I decided to deliver two strikes to her shoulder area with a PR-24, and then that's when she made some kind of comment about "Okay. I'm done" or "Okay. I'll quit," and then she stopped resisting, and she got on the ground.
>
> * * *
>
> She just completely stopped resisting and got down on the ground.

*Id.* pp. 533-34. In describing the location of his baton strikes, Herman stated: "Well, it wouldn't have been the clavicle because I assume if I would have hit that, it probably would have broke it, so probably the meaty area, yes, up near the trap." *Id.* p. 535. According to Herman, the interaction

lasted less than a minute and they were giving Foote commands to "stop resisting" and "get on the ground." *Id.* p. 535, 537.

Herman recalls Foote was zip-tied while on the ground, but denies he personally did so, and she was helped up. *Id.* pp. 535, 539. He "grabbed her glasses that were on the ground" and denies he deliberately stepped on the glasses. *Id.* pp. 535, 577. Herman remembers Foote having "industrial-grade goggles . . . hanging down around her face [with a] mask/handkerchief that she was wearing." *Id.* p. 536. He further recalls asking "her if she was okay. She said she was, and then I remember her saying that she had left previously and should not have come back downtown." *Id.* pp. 535-36. Herman described Foote's demeanor at that moment as "very nonchalant." *Id.* p. 539. He did not ask her what she was doing in the area or otherwise interview her. *Id.* p. 553. As described by Herman, his shift from May 30th into May 31st "was definitely chaotic. It was stressful and unlike any other day that [he had] ever worked." *Id.* p. 581.

Foote submitted a sworn affidavit in which she responds to certain assertions by Holtan and Herman:

> I did nothing to threaten or resist any police officer in the early-morning hours of May 31, 2020. I was not running when I encountered the officers coming down 3rd Street. I did not start running when I saw the officers. I did nothing to warrant the first unknown officer pepper-spraying me in the face. I was standing on the sidewalk when the officer pepper-sprayed me. I was still standing on the sidewalk, not running, when Officer Holtan attacked me. Officer Holtan did not say anything to me prior to pushing me back into the nook and pepper-spraying me in the face. I did not have the opportunity to comply with Officer Holtan or Officer Herman before they started physically abusing me. I did not try to run away from Officer Holtan or Officer Herman. I did not try to get around Officer Holtan or Officer Herman and escape.

Dkt. 41-3 pp. 13-14.

After Foote was taken to the transport van, she was driven to jail by Des Moines Police Officers Clark Allen and Ernesto Escobar Hernandez with other individuals who also had been arrested. Dkt. 41-2 ¶ 106. There were ongoing communications with the county attorney's office

and the Des Moines Police Department on what the criminal charges should be for individuals being arrested in the early morning of May 31st. *Id.* ¶ 107. Officers Holtan and Herman were not involved in those communications or making the decision as to charging Foote. Instead, while the arrests were being processed, there was direction to charge everyone with criminal mischief and rioting. *Id.* ¶ 108. That information was given to Officers Allen and Escobar by Lieutenant Kirk Bagby. *Id.* ¶ 109. According to Bagby, he did not make any charging decisions: "I passed on charging decisions from command staff to officers transporting arrested individuals to jail." Dkt. 35-2 p. 828.

Escobar began his shift on May 30th at 8:00 p.m. and was involved in policing the protest activities including being on police lines. *Id.* pp. 781-82. He was not personally involved in making any arrests. *Id.* p. 783. In the early morning of May 31st, he was assigned to take a van to the Court Avenue area to transport individuals who were arrested to jail. *Id.* According to Escobar, it was "chaotic" because he "did not personally witness what each individual person was arrested for" or know who the arresting officer was for those brought to the van. *Id.* pp. 784-85. Escobar testified the only memory he had of interacting with Foote was after reviewing his body camera video "where [he] asked her for her name." *Id.* p. 794.

Allen worked shifts policing the protests beginning at 9:00 p.m. on both May 29th and May 30th. *Id.* p. 748. He had responded with other officers after persons broke into the Hy-Vee grocery store in the early morning of May 31st. *Id.* p. 735. At a later point, he joined Escobar in loading arrestees into the van to transport to jail. *Id.* p. 741. Other than one individual, Allen had no idea who the arresting officers were for each arrestee. *Id.* He would remove the zip-ties, replace them with regular handcuffs, and place the individuals in the van. *Id.* Allen's first encounter with Foote was removing her zip-ties which "was a very long and tedious process" because he did not have the proper tools. *Id.* p. 743.

Allen completed forms titled Jail Booking Information by Arresting or Transporting Officer, referred to as "bookers", for the arrestees in the van including Foote. *Id.* p. 746. The bookers were completed on a computer program in the van and printed off for the jail. *Id.* pp. 745-46. The same case number was used for each booker which listed the charges of rioting and criminal mischief against each arrestee. *Id.* pp. 747, 827. Allen testified he "had nothing to do with the charge," did not know who made the charging decision, and characterized the booker as "administrative paperwork" for the jail. *Id.* pp. 750, 762-63. He further testified he had no reason not to trust the information given to him by his supervisors or believe the individuals "were being charged inaccurately." *Id.* pp. 768-69.

In the afternoon of May 31st, the county attorney's office provided updated charging information to Sergeant Chad Nicolino and directed that all charges be refiled as rioting, unlawful assembly, and failure to disperse. Dkt. 41-2 ¶ 112. An Arrest Report was completed listing the charges of unlawful assembly, failure to disperse, and rioting against Foote. Dkt. 35-2 p. 826. The Arrest Report listed Clark Allen as the arresting officer. *Id.*

Jeff George is a senior police officer with the Des Moines Police Department assigned to the detective bureau. *Id.* p. 691. He was not involved in policing the protest activities on the nights of May 29th and May 30th. *Id.* Around 10:00 a.m. on the morning of May 31st he was called in by Nicolino to assist with filing preliminary complaints against the arrestees. *Id.* p. 692. It was his understanding the county attorney's office had decided to drop the charge of criminal mischief. *Id.* pp. 692-93. He had a list of arrestees from the night before which was split with Nicolino to file the preliminary complaints. *Id.* p. 695. He relied on the arrest reports and the initial criminal charges, and reviewed the criminal code provisions. *Id.* pp. 694, 697.

George filed three separate preliminary Complaints against Foote for failure to disperse, unlawful assembly, and participate in a riot. *Id.* pp. 799-804. Affidavits at the bottom of each

Complaint stated:

> Defendant was a member of a group (of WELL over three people) that assembled
> to protest allegations of racism and police brutality. Initially, the protest was
> peaceful. The protests evolved to rioting in the late evening of hours of May 30,
> 2020 into the early morning hours of May 31, 2020 with many of the remaining
> participants engaging in violent, intimidating and destructive behavior. Police
> officers clearly, loudly and repeatedly instructed all participants to disperse.
>
> Despite those instructions, Defendant willfully stayed among the group that
> remained. This group was engaging in assaultive conduct, the intimidation of
> people and destruction of property. The participants barricaded public streets.
> Private businesses and public buildings were damaged with spray-paint. Windows
> were shattered. Fires were started and rocks were thrown at people including police
> officers. Citizens working in the area were afraid for their safety.
>
> This destruction was open, extensive and obvious, yet the defendant willfully
> remained among the group of persons responsible for this conduct all of which
> occurred in the City of Des Moines, Polk County, Iowa.

*Id.* pp. 799, 801, 803. George signed the statements which were under the heading:

> I, the undersigned, being duly sworn, state that all facts contained in this Complaint
> and Affidavit, known by me or told to me by other reliable persons form the basis
> for my belief that the defendant committed this crime.

*Id.* The language set forth in the affidavit was provided by the county attorney's office then copied

and pasted into each preliminary complaint. *Id.* p. 702. It was George's understanding the arrest

reports he relied on were true and there was probable cause for the charges against Foote. *Id.* pp.

698, 700, 704. George testified it is "not uncommon for us to file charges . . . based on reports,

[and] other officers' statements. . . . I have no reason to doubt that their statements or observations

were not truthful." *Id.* p. 706.

Foote stayed in jail from the early morning hours of May 31st through the night until

released the next day June 1st. *Id.* p. 98. She was released from custody on pretrial supervision,

with an 8:00 p.m. curfew and a requirement to contact a pretrial supervision officer for an in-

person visit once a month. Dkt. 41-3 p. 3. In July 2020, an Assistant Polk County Attorney moved

to dismiss the participation in a riot charge, stating police "have been unable to sufficiently

document this defendant's actions for charges to go forward at this time." *Id.* p. 9. The Polk County District Court granted the motion and dismissed the charge. *Id.* p. 6. In December 2020, an Assistant Polk County Attorney moved to dismiss the charges of unlawful assembly and failure to disperse stating, "[t]here is insufficient evidence to proceed to a trial." *Id.* p. 10. The Polk County District Court granted the motion and dismissed the charges. *Id.* p. 11.

Foote claims the interaction with Holtan and Herman caused severe bruising on her body. A Jail Incident Report was completed by an officer around 7:00 a.m. on May 31st which states:

> I noticed a big bruise on Inmate Foote, Denver Rose (IH07) right arm. Medical Dale was called to look at her arm. Pictures were taken and she is okay to stay in general population.

*Id.* p. 22. Foote submitted photographs which depict a fairly large bruise on her right shoulder and on her right leg. *Id.* pp. 18-21. Herman disputes he caused the bruising with his baton strikes: "I don't think it's possible that I would have caused them. . . . [I]f I delivered a strike, that would have been . . . on her left shoulder. . . . She would have had injuries from me on her upper left shoulder." Dkt. 35-2 pp. 538, 576. He reported he scraped his own knuckles during the incident. *Id.* p. 539. When Holtan was asked whether Foote would have bruising from their interaction, he testified as follows:

> A. I understand that she has bruising. But knowing just in general, I have three kids. And they fall down and hurt their knee, whatever. They bruise. My wife will get a bruise on herself, and she'll ask me "How did this happen?" No idea. So I understand that each person's body reacts differently to – we'll call it impacts or whatever. So yes, I'm a 200-pound man. The equipment that I wear is heavy. So me attempting to control someone and them resisting, I would believe that would result in bruising, yes.
>
> Q. So you think the bruising that she suffered was likely due to you pushing her with the shield?
>
> A. I don't know.
>
> Q. But you wouldn't rule out that you caused her bruising?

A. I don't know. I did push her up against that wall, and her pushing past or whatever, resisting could also cause that bruising, her struggling in general, resistance.

*Id.* p. 646.

## IV. FOOTE'S COMPLAINT

Foote filed an initial Petition at Law in Iowa state court which was removed by defendants to this United States District Court for the Southern District of Iowa. Dkt. 1. She subsequently filed an Amended Petition at Law asserting various claims against law enforcement officers Clark Allen, Ernesto Escobar Hernandez, Jeffrey George, Kirk Bagby, Brandon Holtan, Adam Herman, Dana Wingert, an unidentified John Doe, and the City of Des Moines. Dkt. 18. Counts 1 and 2 assert claims of illegal seizure in violation of the Fourth Amendment to the United States Constitution and Article I, section 8 of the Iowa Constitution. Counts 3 and 4 assert claims of excessive force in violation of the Fourth Amendment to the United States Constitution and Article I, section 8 of the Iowa Constitution. Counts 5 and 6 assert claims of retaliation in violation of the First Amendment to the United States Constitution and Article I, section 7 of the Iowa Constitution. Counts 7 and 8 assert claims of conspiracy in violation of the United States Constitution and the Iowa Constitution. Counts 9 and 10 assert claims of deliberately indifferent policies, practices, customs, training and supervision in violation of the United States Constitution and the Iowa Constitution. Count 11 asserts state law claims of intentional infliction of emotional distress. Count 12 asserts state law claims of malicious prosecution. Count 13 asserts state law claims of false arrest/imprisonment. Count 14 asserts state law claims of libel. Count 15 asserts state law claims of assault and battery.

Foote claims she "suffered severe pain, bruising, and burning as a result of being pepper-sprayed, slammed to the ground, beat, and zip-tied." *Id.* ¶ 75. She further claims she "suffered severe or extreme emotional distress as a result of Defendants' actions." *Id.* ¶ 195. She seeks, *inter*

*alia*, compensatory damages, "[c]ompensation for violation of her constitutional rights, mental anguish, and humiliation," and punitive damages. *Id.* pp. 228-29. She demands a trial by jury. *Id.* p. 229.

## V. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

All defendants except for the unidentified John Doe move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the multiple claims asserted by Foote. Dkt. 35. As argued in their supporting brief in introduction:

> There are no disputed factual issues in this case. Much of the events are captured on video, and the Defendants accept Ms. Foote's deposition testimony of events for purposes of summary judgment. Based on this undisputed record, the officers had probable cause to arrest Ms. Foote. The presence of probable cause thwarts nearly all of Foote's arguments, including the First Amendment retaliation claims, the conspiracy allegations, and the common law torts. . . . It is also uncontroverted that the force used was within acceptable police practices, especially in the context of a riot. Finally, the record is devoid of any evidence that the City of Des Moines or Chief Wingert were deliberately indifferent, or in any way, failed in hiring, training, and supervising these officers.

Dkt. 39 p. 3. Defendants follow with several specific challenges to Foote's claims, including the assertion of qualified immunity as to claims under the United States Constitution.

In response, Foote does not resist the motion as to the conspiracy claims asserted under Counts 7 and 8, the deliberate indifference claims asserted under Counts 9 and 10, and the libel claim asserted against Escobar under Count 14. Dkt. 41 p. 3. Foote contends defendants are not entitled to summary judgment as to the remaining claims. She argues in introduction to her brief:

> Defendants claim that they "accept Ms. Foote's deposition testimony of events for purposes of summary judgment" but then proceed to premise their arguments on the officers' version of events—not Foote's. For one example of many, Defendants assert, "Whether Foote indicates she heard it or not, Holtan gave her an order to get to the ground." Such a statement indicates a fundamental misunderstanding of how summary judgment works. If Foote, the nonmovant, claims the Defendants never gave her an order, for purposes of summary judgment that means *Defendants never gave her an order*. Whether Foote is correct or not is a credibility call for the jury to make.

> Taking the facts in the light most favorable to Foote, there was no unlawful assembly nearby when she was attacked by Holtan and Herman. She did not resist them or flee and they had no legitimate reason for assaulting her. Probable cause was also plainly lacking for Foote's arrest and subsequent charges.

*Id.* p. 2 (internal citations to docket omitted).

In the Court's view, upon review of the submitted evidentiary record, the contention there are no disputed factual issues in this case is clearly incorrect. Most notable, the parties present distinctly divergent versions of the specific interaction between Foote and Officers Holtan and Herman, which as noted was not captured on video. And the parties' statement of facts and responses thereto contain many disputes over various aspects of the events in downtown Des Moines in late May 2020. In that regard, there is a substantial amount of video but the parties again present divergent versions of multiple events depicted at various locations and times. Those factual disputes are material to most of the legal claims and defenses raised by the parties.

Under the well-established standards for summary judgment motions under Rule 56, this Court cannot endeavor to assess credibility, weigh the evidence or determine the truth of matters genuinely disputed by the parties under their present submissions. Those are matters to be considered and determined after a full presentation of evidence at trial. As a result, much of defendants' Rule 56 motion must be denied. There are some claims, however, which fail as a matter of law even under the disputed evidentiary record before this Court.

## VI. COURT'S ANALYSIS

This Court has original jurisdiction over the alleged violations of the United States Constitution and supplemental jurisdiction over the Iowa state claims. 28 U.S.C. § 1367(a); *see also Starkey v. Amber Enterprises, Inc.*, 987 F.3d 758, 765 (8th Cir. 2021). The Court will first address the alleged violations of the United States Constitution. And then address the alleged violations of the Iowa Constitution followed by the Iowa common law claims.

## A. Alleged Violations of the United States Constitution

The federal claims against the law enforcement officers are brought by Foote pursuant to 42 U.S.C. § 1983 which provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "'Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed. Section 1983 does not sanction tort by association.'" *Grider v. Bowling*, 785 F.3d 1248, 1252 (8th Cir. 2015) (quoting *Smith v. City of Minneapolis,* 754 F.3d 541, 547 (8th Cir. 2014) (internal quotation marks omitted)). Accordingly, "'a plaintiff must show each individual defendant's personal involvement in the alleged violation.'" *Molina v. City of St. Louis, Missouri*, 59 F.4th 334, 344 (8th Cir. 2023) (quoting *White v. Jackson*, 865 F.3d 1064, 1080-81 (8th Cir. 2017)); *see also Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 837 (8th Cir. 2021) ("defendants must be individually involved in the unconstitutional act to be liable under § 1983").

Law enforcement officers are entitled to qualified immunity from civil liability under § 1983 when their "'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rivas-Villegas v. Cortesluna*, 142 S.Ct. 4, 7 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017)); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise

power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. It is "an immunity from suit rather than a mere defense to liability," *id.*, and "protects all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. at 79; *see also Ross v. City of Jackson, Missouri*, 897 F.3d 916, 920 (8th Cir. 2018) (quoting *White v. Pauly*, 580 U.S. at 78-79).

To determine whether qualified immunity applies, the Court considers two questions. First, when viewed in the light most favorable to plaintiff, do the facts demonstrate the officer violated a constitutional right? Second, was the constitutional right clearly established at the time of the officer's alleged violation? *See, e.g.*, *Laney v. City of St. Louis, Missouri*, 56 F.4th 1153, 1156 (8th Cir. 2023); *Just v. City of St. Louis, Missouri*, 7 F.4th 761, 766 (8th Cir. 2021); *Quraishi*, 986 F.3d at 835; *Ross*, 897 F.3d at 920; *Hosea v. City of St. Paul*, 867 F.3d 949, 955 (8th Cir. 2017); *Jackson*, 865 F.3d at 1074. If the answer to either question is "no," the officer is entitled to qualified immunity. *Laney*, 56 F.4th at 1156; *Jackson*, 865 F.3d at 1074.

"In order to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008 (8th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also, e.g.*, *Bell v. Neukirch*, 979 F.3d 594, 606-07 (8th Cir. 2020) (defining "clearly established" rights); *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (same). "'[E]xisting precedent must have placed the statutory or constitutional question beyond debate.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). "Reciting an abstract right at a high level of generality will not suffice." *Ehlers*, 846 F.3d at 1008. "The dispositive question is "whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 577 U.S. at 11 (quoting *al–Kidd*, 563 U.S. at 741). The "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-*

*Villegas*, 142 S.Ct. at 8 (quoted citation omitted).

With these well-established principles in mind, the Court will address each of Foote's federal constitutional claims as asserted against the individually named defendants.

### 1. Alleged Illegal Seizure Under Count 1

Under Count 1, Foote asserts claims of illegal seizure in violation of the Fourth Amendment to the United States Constitution against officers Holtan, Herman, Bagby, Allen, Escobar and George. Dkt. 18 ¶¶ 115-19. Foote contends "Defendants violated Plaintiff's clearly established federal constitutional rights by seizing Plaintiff without reasonable suspicion or probable cause to do so and by charging Plaintiff with crimes without probable cause." *Id.* ¶ 116. Defendants contend they are entitled to qualified immunity because there was probable cause for the arrest of Foote and, therefore, no constitutional violation. Dkt. 39 pp. 19-21. In response, Foote asserts questions of fact exist regarding whether probable cause existed for all of the crimes alleged by defendants. Dkt. 41 pp. 18-31. She contends "[m]ere proximity to an area where unlawful activity has occurred does not give rise to probable cause to arrest anyone in the area." *Id.* p. 18.

Pursuant to the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The Fourth Amendment, as applied to the States through the Fourteenth Amendment, requires that an officer have probable cause before making a warrantless arrest." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (citing *Stufflebeam v. Harris,* 521 F.3d 884, 886 (8th Cir. 2008)). "'It is well established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth and Fourteenth Amendments.'" *Ross*, 897 F.3d at 920 (quoting *Joseph v. Allen*, 712 F.3d 1222, 1226 (8th Cir. 2013) (quoted

citations omitted)). In turn, "[a] warrantless arrest does not violate 'the Fourth Amendment if it is supported by probable cause.'" *Jackson*, 865 F.3d at 1074; *see also Ehlers*, 846 F.3d at 1008; *Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012).

"An officer has probable cause to make a warrantless arrest when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Jackson*, 865 F.3d at 1074 (internal quotation marks and citations omitted); *see also*, *e.g.*, *Ehlers*, 846 F.3d at 1009. "'Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" *Just*, 7 F.4th at 767 (quoting *Ross*, 897 F.3d at 920 (citation omitted)). "The standard is a 'practical, nontechnical conception' that calls for 'facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" *Bell*, 979 F.3d at 603 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111-112 (1975)). While "not a high bar . . . it is a bar: An arrest must be supported by more than a reasonable, articulable suspicion that a person committed a crime." *Id.*

An officer "'is entitled to qualified immunity for a warrantless arrest if the arrest was supported at the time by at least 'arguable probable cause.'" *Ross*, 897 F.3d at 921 (quoting *Joseph*, 712 F.3d at 1226 (quoted citations omitted)); *see also*, *e.g.*, *Just*, 7 F.4th at 767; *Quraishi*, 986 F.3d at 836; *Hosea*, 867 F.3d at 955; *Jackson*, 865 F.3d at 1074; *Ehlers*, 846 F.3d at 1008-09. "'Arguable probable cause exists even where an officer mistakenly arrests a suspect believing [the arrest] is based on probable cause if the mistake is 'objectively reasonable.'" *Ross*, 897 F.3d at 921 (quoted citations omitted); *see also*, *e.g.*, *Quraishi*, 986 F.3d at 836; *Bell*, 979 F.3d at 607; *Hosea*, 867 F.3d at 955; *Jackson*, 865 F.3d at 1074; *Ehlers*, 846 F.3d at 1009.

As explained by the Eighth Circuit, "the terms 'probable cause' and 'arguable probable cause' are not interchangeable, and each term serves a different purpose within the qualified

immunity analysis." *Brown v. City of St. Louis, Missouri*, 40 F.4th 895, 901 (8th Cir. 2022). The Eighth Circuit has "assigned consideration of *actual* probable cause to [the] constitutional violation prong analysis while reserving any consideration of *arguable* probable cause for [the] clearly established prong analysis." *Id.* Accordingly, "even if an officer arrests an individual without *actual* probable cause—in violation of the Constitution—he has not violated that individual's 'clearly established' rights for qualified immunity purposes if he nevertheless had *arguable* probable cause to make the arrest." *Id.* (internal quotation marks and citation omitted).

"[Q]ualified immunity may apply if there was probable cause or arguable probable cause to arrest [an individual] for *any* crime at the time of the arrest." *Webster v. Westlake*, 41 F.4th 1004, 1012 (8th Cir. 2022) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). "[A]rguable probable cause is determined at the time of arrest and after-acquired knowledge is irrelevant to the analysis." *Hosea*, 867 F.3d at 956. "The fact that the person arrested is later found innocent is [also] not material." *Joseph*, 712 F.3d at 1226. "Whether a law enforcement officer had probable cause at the time of arrest is a question of law." *Id.* at 1226-27; *see also, e.g., Just*, 7 F.4th at 767; *Hosea*, 867 F.3d at 955.

In this case, defendants contend there was probable cause to arrest and charge Foote with participating in a riot, unlawful assembly, and failure to disperse. Dkt. 39 p. 17. At the time of Foote's arrest, participation in a riot was defined under Iowa statutory law as follows:

> A riot is three or more persons assembled together in a violent manner to the disturbance of others, and with any use of unlawful force or violence by them or any of them against another person, or causing property damage. A person who willingly joins or remains a part of a riot, knowing or having reasonable grounds to believe that it is such, commits an aggravated misdemeanor.

Iowa Code § 723.1 (2020). An unlawful assembly was defined as follows:

> An unlawful assembly is three or more persons assembled together, with them or

> any of them acting in a violent manner, and with intent that they or any of them will commit a public offense. A person who willingly joins in or remains a part of an unlawful assembly, knowing or having reasonable grounds to believe that it is such, commits a simple misdemeanor.

Iowa Code § 723.2 (2020). A failure to disperse was defined as follows:

> A peace officer may order the participants in a riot or unlawful assembly or persons in the immediate vicinity of a riot or unlawful assembly to disperse. Any person within hearing distance of such command, who refuses to obey, commits a simple misdemeanor.

Iowa Code § 723.3 (2020).

Upon review of the evidentiary record submitted to this Court in the present case, defendants have not shown an absence of disputes as to material facts demonstrating there was probable cause or arguable probable cause to seize and arrest Foote under the circumstances at the time. To the contrary, the record contains several genuine disputes over facts material to the determination of probable cause and arguable probable cause. And while there is video of many events at issue, the video does not conclusively establish defendants' versions or conclusively disprove Foote's versions.

For example, defendants insist "Foote was seen running from the immediate vicinity of a riot in-progress." Dkt. 39 p. 18. In their words: "A riot was happening and Denver Foote, along with her friends, were in the middle of it by choice." *Id.* p. 20. But Foote disputes there was a "riot in-progress" or that she was running from a "riot in-progress" at the time and location of her arrest. Dkt. 41 pp. 18-19. In her words: "None of that is correct." *Id.* p. 19. She contends that before her arrest "there were no unruly crowds" as she was "standing near the corner of Court Avenue" and "began walking back North on 3rd Street by herself." *Id.* pp. 3-4. She further contends:

> No officers approached people at that end of Court Avenue and told them they had to leave. It was reasonable that other people were still downtown. People were coming in and out of bars. Dozens of officers were in the Court Avenue area and far outnumbered the citizens who continued to mill about in the area.

26

*Id.* p. 4. Foote insists "[s]he was standing by herself on a public sidewalk in Des Moines' busiest bar district, doing nothing illegal or suspicious." *Id.* p. 19. She emphasizes officers Holtan and Herman asked her "no questions and did no investigation to determine if she was an innocent bystander or violent rioter." *Id.* p. 21. From her perspective, "no reasonable officer would believe that every person in the vicinity had been a part of something illegal." *Id.*

As presented to this Court, the parties have diametrically opposed versions as to the events in the early morning of May 31st. When the evidence is viewed in the light most favorable to Foote, which must be done when considering a summary judgment motion, a reasonable finder of fact may conclude there was an absence of probable cause and arguable probable cause to arrest Foote. Given the existence of disputed material facts, officers Holtan and Herman have not established entitlement to qualified immunity for their actions in seizing and arresting Foote. Their motion for judgment as a matter of law as to the claims brought pursuant to the Fourth Amendment to the United States Constitution under Count 1 must be denied.

As to the other named defendants, however, Foote has not shown sufficient facts exist to support claims of illegal seizure as to their individual involvement with the arrest and charging of Foote. It bears repeating: "'Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed. Section 1983 does not sanction tort by association.'" *Grider*, 785 F.3d at 1252 (quoted citation omitted). It is also a "settled principle that law enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable." *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005). Accordingly, "an assisting officer is entitled to rely on the probable cause determination of the arresting officer and may receive qualified immunity as long as the reliance is reasonable." *Ehlers*, 846 F.3d at 1010; *see also Baude v. Leyshock*, 23 F.4th 1065, 1074-75 (8th Cir. 2022) (quoting *Ehlers*, 846 F.3d at 1010).

It is undisputed that officers Bagby, Allen, Escobar and George all acted in reliance on and in compliance with information and orders given to them by other officers, including their supervisors, as to their specific actions relating to Foote's seizure and arrest. Under the evidentiary record before this Court, their compliance with supervisory directions was reasonable under the particular circumstances occurring on May 30th and 31st in downtown Des Moines. Foote has not presented sufficient facts showing any personal, particularized action of Bagby, Allen, Escobar or George was violative of clearly established Fourth Amendment rights. Defendants Bagby, Allen, Escobar and George are therefore entitled to qualified immunity and judgment as a matter of law as to the claims brought pursuant to the Fourth Amendment to the United States Constitution under Count 1.

### 2. Alleged Excessive Force Under Count 3

Under Count 3, Foote asserts a claim of excessive force in violation of the Fourth Amendment to the United States Constitution against Holtan and Herman. Dkt. 18 ¶¶ 126-31. Foote contends the force used by Holtan and Herman "was excessive and applied maliciously and sadistically for the purpose of causing harm and not in a good faith effort to achieve a legitimate purpose." *Id.* ¶ 127. Officers Holtan and Herman contend "they used minimally intrusive force on Foote" and are entitled to qualified immunity. Dkt. 39 pp. 25-32. Foote contends questions of fact preclude summary judgment on her excessive force claims. Dkt. 41 pp. 35-40.

"'The Fourth Amendment protects citizens from being seized through excessive force by law enforcement officers.'" *Wilson v. Lamp*, 901 F.3d 981, 989 (8th Cir. 2018) (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1202 (8th Cir. 1999)); *Thompson v. Monticello, Arkansas*, 894 F.3d 993, 998 (8th Cir. 2018) (same). Claims that law enforcement officers used excessive force while making an arrest or other "seizure" of persons are analyzed under an "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Force is constitutionally excessive if it

is objectively unreasonable." *Hosea*, 867 F.3d at 957. As instructed by the Supreme Court:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham*, 490 U.S. at 396-97 (internal citations omitted); *see also Lombardo v. City of St. Louis, Missouri*, 141 S.Ct. 2239, 2241 (2021) (Facts and circumstances to consider in a particular case include "'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). The principles set forth in *Graham* have been repeatedly cited and relied upon by the

Eighth Circuit including within the context of arrests made during protest activities. *See*, *e.g.*, *Laney*, 56 F.4th at 1156; *McDaniel v. Neal*, 44 F.4th 1085, 1090 (8th Cir. 2022); *Mitchell v. Kirchmeier*, 28 F.4th 888, 898 (8th Cir. 2022); *Burbridge v. City of St. Louis, Missouri*, 2 F.4th 774, 780 (8th Cir. 2021); *Fischer v. Hoven*, 925 F.3d 986, 988 (8th Cir. 2019); *Wilson*, 901 F.3d at 989; *Hosea*, 867 F.3d at 957; *Jackson*, 865 F.3d at 1074, 1079-80; *Bernini*, 665 F.3d at 1006.

Here, under the evidentiary record before this Court in this case, there are several genuine disputes as to facts material to whether the force used to arrest Foote was objectively reasonable under the particular circumstances, especially as to the specific interaction between Foote and officers Holtan and Herman. In support of their motion, defendants again rely on their assertion Foote was seen fleeing from the scene of an active riot which, again, is disputed by Foote. Dkt. 39 pp. 31-32. Defendants also assert Foote failed to comply with an order to get on the ground which also is disputed by Foote. *Id.* She contends she "did not have the opportunity to comply before Holtan and Herman began assaulting her." Dkt. 41 p. 11. And defendants assert Foote was resisting arrest which also is disputed by Foote. Dkt. 39 pp. 31-32. According to Foote, "[a]t no point in her interaction with the officers did [she] resist them in any way" and "[s]he did not try to evade the officers or run away." Dkt. 41 p. 11. From her perspective, at 4'11" and 101 pounds with no weapons, she "posed absolutely no threat to these much larger male officers who were clad in gas masks and carried shields, batons, and pepper spray." *Id.* p. 37.

When the evidence is viewed in the light most favorable to Foote, there are genuine issues of fact material as to whether Holtan and Herman used unconstitutionally excessive force. As repeatedly stated by the Eighth Circuit: "Force may be objectively unreasonable when a plaintiff does not resist, lacks an opportunity to comply with requests before force is exercised, or does not pose an immediate safety threat." *Wilson*, 901 F.3d at 989-90 (citing cases); *see also*, *e.g.*, *Westwater v. Church*, 60 F.4th 1124, 1131 (8th Cir. 2023) ("Our cases clearly established that it

30

was objectively unreasonable to use more than *de minimis* force to seize a non-threatening misdemeanant who was not fleeing, resisting arrest, or ignoring officer commands."); *Mitchell*, 28 F.4th at 898 ("Applying [the *Graham*] factors, we have held time and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimis* force against him."); *Thompson*, 894 F.3d at 1000 (""[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of officers or the public.'" (quoted citation omitted)); *Hosea*, 867 F.3d at 957 (same). Accordingly, if Foote's version of her arrest is accepted as true, the force utilized by Holtan and Herman was objectively unreasonable. On that point, while officer Herman insists Foote was resisting arrest, he acknowledges it would be inappropriate to pepper spray or hit her if she was not resisting arrest. Dkt. 35-2 pp. 553, 574.

"Where the record does not conclusively establish the lawfulness of an officer's use of force, summary judgment on the basis of qualified immunity is inappropriate." *Banks v. Hawkins*, 999 F.3d 521, 525 (8th Cir. 2021). Such is the case here. Given the disputed material facts in the evidentiary record, this Court cannot conclude as a matter of law that the force used in seizing and arresting Foote, when the facts are viewed in a light most favorable to her, was objectively reasonable. Consequently, officers Holtan and Herman have not established entitlement to qualified immunity. Their motion for judgment as a matter of law as to the claims brought pursuant to the Fourth Amendment to the United States Constitution under Count 3 must be denied.

### 3. Alleged First Amendment Retaliation Under Count 5

Under Count 5, Foote asserts claims of retaliation in violation of the First Amendment to the United States Constitution against Holtan, Herman, Bagby, Allen, Escobar and George. Dkt. 18 ¶¶ 138-46. Foote contends "Defendants violated [her] clearly established federal constitutional

rights by pepper-spraying her, slamming her to the ground, beating her, arresting her, and charging her with crimes in retaliation for her exercise of her First Amendment rights." *Id.* ¶ 140. Defendants contend their actions were not retaliatory against any alleged expression of constitutional rights by Foote. Dkt. 39 pp. 33-35. Foote contends there are questions of fact which preclude summary judgment on her retaliation claim. Dkt. 41 pp. 41-47.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "It protects 'symbolic or expressive conduct as well as . . . actual speech.'" *Molina*, 59 F.4th at 338 (quoted citation omitted). "'[N]onverbal conduct constitutes speech if it is intended to convey a particularized message and the likelihood is great that the message will be understood by those who view it.'" *Id.* at 341 (quoted citation omitted).

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S.Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)); *Laney*, 56 F.4th at 1157 (same). As explained by the Supreme Court:

> If an official takes adverse action against someone based on that forbidden motive, and "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim.
>
> To prevail on such a claim, a plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury." It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

*Nieves*, 139 S.Ct. at 1722 (internal citations omitted).

According to the Eighth Circuit, "it is clearly established that using an arrest (that lacks arguable probable cause) to interfere with First Amendment activity is a constitutional violation." *Quraishi*, 986 F.3d at 839. On the other hand, "a First Amendment retaliatory arrest claim is

defeated by a showing of probable cause (or arguable probable cause)." *Just*, 7 F.4th at 768 (citing *Nieves*, 139 S. Ct. at 1724); *see also Galarnyk v. Fraser*, 687 F.3d 1070, 1076 (8th Cir. 2012) (existence of probable cause is fatal to First Amendment retaliatory arrest claim). Because the evidentiary record before this Court contains several genuine disputes over facts material to the determination of probable cause and arguable probable cause, defendants are not able to defeat Foote's First Amendment claim on that basis as a matter of law.

Defendants further argue, however, Foote fails to present sufficient facts to support the requisite elements of such a claim. Dkt. 39 pp. 33-35. Foremost, defendants maintain Foote fails to show she was engaging in activity protected by the First Amendment at the time of her arrest. *Id.* On this point, the Court agrees.

To prevail on the retaliation claim, Foote must show she "'engaged in protected [First Amendment] activity.'" *Molina*, 59 F.4th at 338 (quoting *Quraishi*, 986 F.3d at 837); *see also Dreith v. City of St. Louis, Missouri*, 55 F.4th 1145, 1148 (8th Cir. 2022) (setting forth requisites to establish First Amendment retaliatory use of force claim); *Bernini*, 665 F.3d at 1007 (same). During her deposition, Foote testified she was not engaged in protesting activities when she returned to the Court Avenue area in the early morning hours of May 31st. Dkt. 35-2 p. 155. Instead, as explained by Foote, she decided to return to the Court Avenue bar area because her friend Miranda had not come home. *Id.* p. 38. She further testified that just prior to her arrest she "just stood there" and did not say anything to the officers. *Id.* p. 53. In her brief, Foote argues that, when the evidence is viewed in the light most favorable to her, "she was engaged in protected activity." Dkt. 41 p. 44. But she proffers no explanation for, or addresses in any manner, her own contradictory testimony. Based on the evidentiary record before this Court, there is a lack of evidence showing Foote was engaged in either verbal or nonverbal protected First Amendment activity at the time of the alleged violative actions of each defendant.

In addition, there is also a lack of evidence of the requisite causal connection between any protected First Amendment activity and the actions of officers Bagby, Allen, Escobar and George. *See Nieves*, 139 S.Ct. at 1722, *Molina*, 59 F.4th at 338; *Dreith*, 55 F.4th at 1148; *Bernini*, 665 F.3d at 1007. Foote has not presented evidence of those officers being motivated by any protected First Amendment activity engaged in by Foote. As explained by the Eighth Circuit:

> to prevail on a First Amendment retaliation claim, the plaintiff must show that the defendant would not have taken the adverse action but for harboring "retaliatory animus" against the plaintiff because of his exercise of his First Amendment rights. *Nieves v. Bartlett*, 587 U.S. ——, 139 S. Ct. 1715, 1722, 204 L.Ed.2d 1 (2019). It is not enough for the plaintiff to show that the defendant arrested or used force against the plaintiff in response to conduct that in fact was protected. *See Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010). If the response was driven not by "animus" but by the defendant's understanding— however mistaken—of his official duties, then it was not "retaliatory." *See id.* (affirming summary judgment for the defendants on a First Amendment retaliatory-arrest claim because the defendants arrested the plaintiffs based on a genuine albeit "unreasonable" belief that the plaintiffs' protest conduct violated the law).
>
> * * *
>
> Officers merely carrying out their duty as they understand it are not liable for retaliatory arrest or retaliatory use of force even if their understanding of their duty is mistaken—indeed, even if it is so mistaken as to be "unreasonable." *Baribeau*, 596 F.3d at 481. To be sure, they may be liable for unlawful arrest or use of excessive force. *See id.*; *infra* Section II.B. But constitutional torts of retaliation require acting on retaliatory animus.

*Mitchell*, 28 F.4th at 896, 897-98. There is an absence of evidence before this Court that Bagby, Allen, Escobar or George acted out of retaliatory animus against Foote. The record is devoid of any evidence they were even personally aware of Foote's activities on May 29th, May 30th, or the early morning of May 31st, whether protected by the First Amendment or not.

In sum, Foote has not established there is a genuine issue for trial as to any defendant for the claims brought pursuant to the First Amendment to the United States Constitution. Based on the evidentiary record before this Court, and especially given Foote's own testimony, the First Amendment retaliatory claims asserted by Foote fail as a matter of law. Defendants are therefore

entitled to summary judgment as to Count 5.

**B. Alleged Violations of the Iowa Constitution**

Under Count 2, Foote asserts claims of illegal seizure in violation of Article I, section 8 of the Iowa Constitution. Dkt. 18 ¶¶ 120-25. Under Count 4, she asserts claims of excessive force in violation of Article I, section 8 of the Iowa Constitution. *Id.* ¶¶ 132-37. And under Count 6, she asserts claims of retaliation in violation of Article I, section 7 of the Iowa Constitution. *Id.* ¶¶ 147-56. The Iowa Supreme Court recently held there is no "standalone cause of action for money damages under the Iowa Constitution unless authorized by the common law, an Iowa statute, or the express terms of a provision of the Iowa Constitution." *Burnett v. Smith*, 990 N.W.2d 289, 307 (Iowa 2023) (overruling *Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017); affirming summary judgment for defendants on claim for damages brought under Article I, section 8 of the Iowa Constitution). This Court is unaware of any of the noted exceptions authorizing the Iowa constitutional claims asserted by Foote in this case. Therefore, defendants are entitled to judgment as a matter of law as to Counts 2, 4 and 6 seeking damages for alleged violations of the Iowa Constitution.

**C. Alleged Violations of Iowa Common Law**

**1. Intentional Infliction of Emotional Distress**

Under Count 11, Foote asserts state law claims of intentional infliction of emotional distress against Holtan and Herman. Dkt. 18 ¶¶ 190-96. She alleges Holtan and Herman "repeatedly pepper-sprayed [her], struck her with batons, slammed her to the ground, and smashed her eyeglasses" with "no legitimate justification." *Id.* ¶¶ 191-92. She further alleges their conduct "was outrageous" and they "intentionally caused or recklessly disregarded the probability of causing emotional distress" which she suffered because of their actions. *Id.* ¶¶ 193-95. Defendants contend they are entitled to summary judgment because "[t]he facts in this case fall far short of

sustaining such a claim, and even the undisputed facts could not support such a claim before a jury." Dkt. 39 pp. 42-46. Foote maintains questions of fact preclude summary judgment. Dkt. 41 pp. 47-49.

To successfully bring a claim of intentional infliction of emotional distress under Iowa law, a plaintiff must demonstrate four elements:

> "'(1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.'"

*Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Barreca v. Nickolas,* 683 N.W.2d 111, 123-24 (Iowa 2004) (quoting *Fuller v. Local Union No. 106,* 567 N.W.2d 419, 423 (Iowa 1997))). For conduct to be considered outrageous, it "must be extremely egregious; mere insults, bad manners, or hurt feelings are insufficient." *Hedlund v. State*, 930 N.W.2d 707, 724 (Iowa 2019) (internal quotation marks and citation omitted). As set forth by the Iowa Supreme Court:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 198 (Iowa 1985) (internal quotation marks and citation omitted).

Defendants Holtan and Herman argue "Foote's claim fails to meet any of the elements of intentional infliction of emotional distress." Dkt. 39 p. 43. Defendants reassert "[t]hey were trying to complete an arrest with minimal force, in the context of a riot" and insist there is no evidence of an intent to cause emotional distress. *Id.* They contend "the facts fall far short of outrageous conduct" and maintain they "used reasonable force to effect Ms. Foote's arrest in the chaotic and

unlawful environment where she had chosen to remain." *Id.* p. 44. Defendants further contend Foote's alleged emotional distress is not severe or extreme. *Id.* pp. 45-46.

As determined in addressing the constitutional claims of illegal seizure and excessive force, there are several genuine disputes related to the pertinent events in the early morning of May 31st. Those same disputed facts are also material to Foote's claim of intentional infliction of emotional distress under Iowa law. When the evidence is viewed in the light most favorable to Foote, there is a genuine issue for trial whether Foote can establish the requisite elements of her claim, including whether she suffered severe or extreme emotional distress. Officers Holtan and Herman have not established entitlement to judgment on the claim as a matter of law. Their motion for summary judgment as to the claims brought under Count 11 must be denied.

### 2. Malicious Prosecution

Under Count 12, Foote asserts state law claims of malicious prosecution against Holtan, Herman, Bagby, Allen, Escobar and George. Dkt. 18 ¶¶ 197-202. She alleges defendants "instigated a criminal prosecution against" her, the criminal prosecution was dismissed, "[t]here was no probable cause for the charge against" her, and "[d]efendants acted with malice in initiating the prosecution against" her. *Id.* ¶¶ 198-201. Defendants contend they are entitled to summary judgment because "[t]he undisputed facts do not meet the elements" for a malicious prosecution claim. Dkt. 39 pp. 42-46.

As recently explained by the Iowa Supreme Court, "'[a] malicious prosecution is one that is begun in malice, without probable cause to believe it can succeed, and which finally ends in failure.'" *Venckus v. City of Iowa City*, 2023 WL 3555505, at *6 (Iowa May 19, 2023) (quoted citation omitted). The elements of a malicious prosecution claim under Iowa law are as follows:

> (1) a previous criminal prosecution, (2) instigation of the prosecution by the defendant, (3) termination of the prosecution favorably to plaintiff, (4) want of probable cause, (5) malice of defendant in bringing the prosecution, and (6) damage

to the plaintiff.

*Sisler v. City of Centerville*, 372 N.W.2d 248, 251 (Iowa 1985) (citing *Mills County State Bank v. Roure,* 291 N.W.2d 1, 3 (Iowa 1980)); *see also*, *e.g.*, *Klein v. Steinkamp*, 44 F.4th 1111, 1115 (8th Cir. 2022) (quoting *Sarvold v. Dodson*, 237 N.W.2d 447, 448 (Iowa 1976)); *Linn v. Montgomery*, 903 N.W.2d 337, 345 (Iowa 2017) (quoting *Wilson v. Hayes*, 464 N.W.2d 250, 259 (Iowa 1990) (quoting *Royce v. Hoening*, 423 N.W.2d 198, 200 (Iowa 1988))). "The existence of probable cause to arrest vitiates a claim for malicious prosecution against the arresting officer." *Klein*, 44 F.4th at 1115.

Here, defendants again reassert "Foote's arrest and charges against her were supported by probable cause" and, therefore, Foote cannot meet the fourth requisite element, "want of probable cause." Dkt. 39 p. 47. Defendants further contend "[t]here is no evidence that any defendant acted from an improper purpose or motive" as required as the fifth element. *Id.* p. 48. It is emphasized the actions of officers Bagby, Allen, Escobar and George in relation to Foote were based upon information provided to them. *Id.* p. 47. In response, Foote asserts there are fact questions regarding the existence of probable cause and malice. Dkt. 41 p. 34. From the perspective of Foote, a reasonable jury could find Holtan, Herman, Bagby, Allen, Escobar and George each acted with malice. *Id.*

As previously determined, the evidentiary record before this Court in this case contains several genuine disputes over facts material to the determination of probable cause and arguable probable cause. Foote has also sufficiently shown disputed facts exist material to whether officers Holtan and Herman acted with malice or improper motive. The Court agrees with Foote, therefore, that officers Holtan and Herman are not entitled to judgment as a matter of law on the state law claims of malicious prosecution.

As to the other named defendants, however, Foote has not shown sufficient facts exist to

support claims of malicious prosecution as to their individual involvement with the arrest and charging of Foote. Again, it is undisputed officers Bagby, Allen, Escobar and George all acted in reliance on and in compliance with information and orders given to them by other officers including their supervisors. Foote has not presented evidence setting forth specific facts showing there is a genuine issue for trial on the question of malice or improper motive as to those officers. Bagby, Allen, Escobar and George are therefore entitled to judgment as a matter of law as to the claims of malicious prosecution brought under Count 12.

### 3. False Arrest/Imprisonment

Under Count 13, Foote asserts state law claims of false arrest/imprisonment against Holtan, Herman, Bagby, Allen, Escobar and George. Dkt. 18 ¶¶ 203-06. Foote alleges "Defendants detained Plaintiff against her will. The detention of Plaintiff was unlawful." *Id.* ¶¶ 204-05. In seeking summary judgment on this claim, defendants reassert there was probable cause for the arrest of Foote and, therefore, no "tort violation for false imprisonment." Dkt. 39 pp. 22-23. Foote contends summary judgment must be denied because there are genuine questions of fact regarding the existence of probable cause. Dkt. 41 pp. 32-33.

"A false arrest is one way of committing the tort of false imprisonment—restraining freedom of movement." *Children v. Burton*, 331 N.W.2d 673, 678 (Iowa 1983). The essential elements for false arrest under Iowa law "are (1) detention or restraint against one's will and (2) unlawfulness of the detention or restraint." *Id.* at 678-79. "Once a plaintiff shows a warrantless arrest, the burden of proof shifts to the defendant to show justification for the arrest." *Id.* at 679. "When an officer acts with probable cause, he is protected even though the person arrested turns out to be innocent." *Id.* "If pertinent facts relating to the existence of probable cause are in dispute, the existence of probable cause is a jury question." *Kraft v. City of Bettendorf*, 359 N.W.2d 466, 470 (Iowa 1984) (citing *Children*, 331 N.W.2d at 681).

Again, as previously determined, the evidentiary record before this Court in this case contains several genuine disputes over facts material to the determination of probable cause and arguable probable cause. The Court agrees with Foote, therefore, that officers Holtan and Herman are not entitled to judgment as a matter of law on the state law claims of false arrest/imprisonment. But Foote has not presented sufficient facts showing any personal, particularized actions of officers Bagby, Allen, Escobar or George as related to her arrest and detention were unlawful. Again, it is undisputed those officers all acted in reliance on and in compliance with information and orders given to them by other officers including their supervisors. Bagby, Allen, Escobar and George are therefore entitled to judgment as a matter of law as to the claims brought under Count 13.

### 4. Libel

Under Count 14, Foote asserts state law claims of libel against Holtan, Herman, Allen, Escobar and George. Dkt. 18 ¶¶ 207-13. She claims "Allen, Escobar Hernandez, and George published a statement falsely stating that [she] committed crimes." *Id.* ¶ 208. And she claims "Herman and Holtan wrote police reports falsely stating that [she] had committed crimes." *Id.* ¶ 209. Foote alleges she "committed no crime and there was no probable cause for the charges against" her and "[d]efendants' statements were libelous per se." *Id.* ¶¶ 210-11. Defendants contend Foote's libel claims fail as a matter of law. Dkt. 39 pp. 48-52.

"The centuries-old tort of defamation of character protects a person's common law 'interest in reputation and good name.'" *Bertrand v. Mullin*, 846 N.W.2d 884, 891 (Iowa 2014) (quoting *Johnson v. Nickerson,* 542 N.W.2d 506, 510 (Iowa 1996)). It applies to both written and oral statements. *Id.* "Libel is generally a written publication of defamatory matter, and slander is generally an oral publication of such matter." *Schlegel v. Ottumwa Courier,* 585 N.W.2d 217, 221 (Iowa 1998)). As explained by the Iowa Supreme Court: "Our defamation law 'embodies the public policy that individuals should be free to enjoy their reputation unimpaired by false and

defamatory attacks. An action for defamation ... is based upon a violation of this right.'" *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 46 (Iowa 2018) (quoting *Schlegel*, 585 N.W.2d at 221 (quoting 50 Am. Jur. 2d *Libel and Slander* § 2, at 338–39 (1995))).

Iowa law recognizes "two types of defamation: per quod and per se." *Id.* (citing *Johnson*, 542 N.W.2d at 510).

> Defamation per quod "refer[s] to facts or circumstances beyond the words actually used to establish the defamation." *Id.* To succeed in proving defamation per quod, a party must prove six elements: (1) publication, (2) a defamatory statement, (3) falsity, (4) maliciousness, (5) the statement was of or concerning the party, and (6) a resulting injury. *Bierman v. Weier*, 826 N.W.2d 436, 443 (Iowa 2013).

> Defamation per se, alternatively, exists when a statement has a "natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse." *Johnson*, 542 N.W.2d at 510 (quoting *Prewitt v. Wilson,* 128 Iowa 198, 202, 103 N.W. 365, 367 (1905)). If a statement is defamatory per se, the elements of falsity, malice, and injury are legally presumed and the statement is actionable without proof of the same. *Schlegel*, 585 N.W.2d at 222.

*Bandstra*, 913 N.W.2d at 46-47; s*ee also Ackerman v. Iowa*, 19 F.4th 1045, 1056 (8th Cir. 2021) (quoting same principles from *Bandstra*, 913 N.W.2d at 46).

Defendant Escobar asserts he is entitled to summary judgment on the libel claim because he did not make any written statement related to Foote. Dkt. 39 p. 49. Defendants Holtan, Herman, Allen, and George contend Foote cannot prevail on the libel claims against them because the written statements were substantially true and made without malice. *Id.* pp. 49-52. In addition, defendants contend they are entitled to qualified privilege because their statements were made in good faith within the course of their duties as law enforcement officers. *Id.* Defendants cite to Iowa law providing "[a] communication is qualifiedly privileged if '(1) the statement was made in good faith; (2) the defendant had an interest to uphold; (3) the scope of the statement was limited to the identified interest; and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only.'" *Bandstra*, 913 N.W.2d at 47-48 (quoting *Barreca v. Nickolas*, 683

N.W.2d 111, 118 (Iowa 2004)). Defendants maintain "[m]ultiple courts have recognized that qualified privilege applies to statements made by police officers in investigatory reports." Dkt. 39 p. 49 (citing *Doe HM v. City of Creve Coeur, Mo.*, 666 F.Supp.2d 988, 1002 (E.D. Mo. 2009); *Bradford v. Mahan*, 548 P.2d 1223, 1229 (Kan. 1976); *Black v. Cleveland Police Dep't.*, 644 N.E.2d 682, 685 (Ohio Ct. App. 1994)).

In response, Foote represents "she does not resist the dismissal of her libel claim as to Escobar." Dkt. 41 p. 35. She contends, however, "[f]act questions preclude summary judgment as to Holtan, Herman, Allen, and George." *Id.* As to Holtan and Herman, Foote asserts Supplemental Reports they drafted June 10, 2020, 10 days after her arrest, contain "false statements, which were shared with the [Des Moines Police Department] and prosecutors and used to justify her wrongful prosecution." *Id.* Specifically, Foote notes:

> Holtan drafted a report stating that he saw Foote running and she refused to comply. ([Dkt. 35-2 p.] 823). He further wrote that she pushed past him and attempted to escape. *Id.* Herman wrote that he saw Foote running and then trying to push past Holtan's shield to run away. ([Dkt. 35-2 p.] 824). He claimed that Foote refused to stop resisting. *Id.*

*Id.* Foote maintains "[a] reasonable jury could find that Holtan and Herman made these false statements in bad faith in order to justify their excessive uses of force." *Id.* Therefore, in her view, "a jury question exists as to whether Holtan and Herman are entitled to qualified privilege for the statements." *Id.* Foote makes similar arguments as to Allen and George:

> As to Allen, he represented that Foote committed the crimes of Rioting and Criminal Mischief 2nd. ([Dkt. 35-2 p.] 827). A reasonable jury could find his statements were not made in good faith when he knew the charges were "an absolute crap shot." Foote had not committed either of these crimes; Allen's statements were false.
>
> As to George, he copy-and-pasted charging language, claiming that it was true even though he had no basis for anything he wrote and it was in fact false. A reasonable jury could find that this was done in bad faith and improper.

*Id.* p. 35.

Based on the record before this Court, Foote has failed to present facts or law to support the claims of libel against officers Allen, Escobar and George. It is undisputed Escobar made no statement relating to Foote. And it is undisputed the police documents completed by Allen and George were based on information provided to them and done so at the direction of supervisors. At a minimum, the documents completed by officers Allen, Escobar and George are entitled to qualified privilege. Moreover, notably, Foote cited no law in her response addressing the libel claims. She has not presented the Court with any authority supporting claims of libel against officers completing law enforcement forms within the scope of their duties and at the direction of supervisors, as is undisputed in this case.

In regard to Holtan and Herman, however, Foote has sufficiently shown disputed facts exist material to her libel claims against officers Holtan and Herman in regard to the Supplemental Reports they drafted June 10, 2020. There are also questions of fact material to whether those reports are entitled to a qualified privilege under Iowa law. Officers Holtan and Herman have not established they are entitled to judgment as a matter of law on the state law claims of libel under Count 14.

### 5. Assault and Battery

Under Count 15, Foote asserts state law claims of assault and battery against Holtan and Herman. Dkt. 18 ¶¶ 214-19. Foote alleges Holtan and Herman subjected her "to contact of an insulting and provoking nature" and such actions were undertaken without her consent. *Id.* ¶¶ 215-16. In seeking summary judgment on this claim, defendants cite to Iowa Code section 804.8 which provides as follows:

> A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest.

Iowa Code § 804.8. Defendants further maintain "'an assault only occurs if the peace officer does

not reasonably believe the particular force was necessary in the circumstances.'" Dkt. 39 p. 27 (quoting *Johnson v. Civil Service Commission*, 352 N.W.2d 252, 257 (Iowa 1994)). Defendants then proceed to argue, as with the constitutional excessive force claim, the force used to arrest Foote was objectively reasonable. *Id.* pp. 27-30. Foote, as before, asserts there are genuine issues of material fact regarding the reasonableness of Holtan and Herman's uses of force. Dkt. 41 pp. 40-41. The Court agrees.

As previously determined, under the evidentiary record before this Court in this case, there are several genuine disputes as to facts material to whether the amount of force used to arrest Foote was reasonable under the particular circumstances involving the interaction between Foote and officers Holtan and Herman. When the evidence is viewed in the light most favorable to Foote, there is a genuine issue for trial whether Holtan and Herman committed assault and battery. Again, ultimately it is for the jury to determine the truth of the matter. Given the disputed material facts in the summary judgment record, officers Holtan and Herman are not entitled to judgment as a matter of law on the claims of assault and battery under Count 15.

## VII. CONCLUSION AND ORDER

As set forth above, Defendants' Motion for Summary Judgment (Dkt. 35) is granted in part and denied in part. The Clerk of Court is directed to enter judgment in favor of defendants and against plaintiff Denver Foote on the claims asserted under Counts 2, 4, 5, 6, 7, 8, 9 and 10. The Clerk of Court is also directed to enter judgment in favor of defendants Kirk Bagby, Clark Allen, Ernesto Escobar Hernandez, and Jeffrey George and against plaintiff Denver Foote on the claims asserted under Count 1, 12 and 13. The Clerk of Court is also directed to enter judgment in favor of defendants Clark Allen, Ernesto Escobar Hernandez, and Jeffrey George and against plaintiff Denver Foote on the claims asserted under Count 14. The claims against defendants Brandon Holtan and Adam Herman under Counts 1, 3, 11, 12, 13, 14 and 15 shall proceed to trial by jury.

IT IS SO ORDERED.

Dated June 26, 2023.

STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE